## BEFORE THE UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| GOVERNMENT OF ISRAEL, MINISTRY OF ECONOMY AND INDUSTRY, : | |
| : | |
| Plaintiff, : | |
| : | |
| v. : | Court No. 24-00197 |
| : | |
| UNITED STATES, : | **Non-Confidential Version** |
| : | Business Proprietary Information |
| Defendant. : | removed from pages 6-12, 14, 16, |
| : | 18, 19, 22 and 23. |

### COMPLAINT

Plaintiff Government of Israel, Ministry of Economy and Industry ("Plaintiff" or "Government of Israel"), by and through its attorneys, alleges and states as follows:

1.    Plaintiff seeks judicial review of the final affirmative injury determinations of the U.S. International Trade Commission ("Commission") in the investigations of brass rod from Israel. *See Brass Rod from Israel*, Inv. Nos. 701-TA-687 and 731-TA-1614 (Final), USITC Pub. 5545 (Sept. 2024). The Commission published its final determinations in the *Federal Register* on September 25, 2024. *Brass Rod from Israel*, 89 Fed. Reg. 78,330 (Sept. 25, 2024). Following the Commission's final determinations, the U.S. Department of Commerce ("Commerce") published notice of the antidumping and countervailing duty orders on brass rod from Israel on September 27, 2024. *Brass Rod From Israel: Antidumping and Countervailing Duty Orders*, 89 Fed. Reg. 79,243 (Sept. 27, 2024) ("*Orders*").

1

**NON-CONFIDENTIAL VERSION**

## JURISDICTION

2.      Plaintiff brings this action pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i) to review final affirmative determinations made by the Commission under 19 U.S.C. §§ 1673d(b) and 1671d(b).  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).

## STANDING

3.      As a foreign government of a country in which subject merchandise is manufactured and from which subject merchandise is exported, Plaintiff meets the definition of an "interested party" within 19 U.S.C. § 1677(9)(B).

4.      Plaintiff participated in the underlying investigation giving rise to this action and, therefore, constitutes "a party to the proceeding in connection with which the matter arose" under 19 U.S.C. § 1516a(a)(2)(A).

5.      As an interested party who participated as a party in the underlying proceeding, Plaintiff has standing to commence this action pursuant to 19 U.S.C. § 1516a(d) and 28 U.S.C. § 2631(c).

## TIMELINESS OF THE ACTION

6.      The Commission published notice of its final determination in the *Federal Register* on September 25, 2024.  Commerce subsequently published notice of the antidumping and countervailing duty orders on Brass Rod from Israel on September 27, 2024.

7.      Plaintiff filed its Summons for this action on October 25, 2024.  Plaintiff therefore commenced this action within the time period specified in 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and 28 U.S.C. § 2636(c).

**NON-CONFIDENTIAL VERSION**

8.      Plaintiff timely filed this Complaint within 30 days of the filing of the Summons in this action, as required by the time limits set forth in 19 U.S.C. § 1516a(a)(2)(A) and Court Rule 3(a)(2).

## PROCEDURAL HISTORY

9.      On April 27, 2023, The American Brass Rod Fair Trade Coalition and its members, Mueller Brass Co. ("Mueller") and Wieland Chase LLC ("Wieland"), filed petitions with the Commission and Commerce alleging that imports of brass rod from Brazil, India, Israel, Mexico, South Africa, and South Korea were sold in the United States at less than fair value, imports of brass rod from India, Israel, and South Korea were subsidized, and those imports materially injure or threaten material injury to the domestic brass rod industry.

10.      On April 27, 2023, the Commission instituted antidumping and countervailing duty investigations to determine whether there was a reasonable indication that an industry in the United States is materially injured or threatened with material injury, or that the establishment of an industry in the United States is materially retarded, by reason of imports of brass rod from Brazil, India, Israel, Mexico, South Africa, and South Korea that are alleged to be sold in the United States at less than fair value and to be subsidized by the Governments of India, Israel, and South Korea. *Brass Rod from Brazil, India, Israel, Mexico, South Africa, and South Korea; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 88 Fed. Reg. 27,921 (May 3, 2023).

11.      On June 16, 2023, the Commission published preliminary determinations, which found that there was a reasonable indication that an industry in the United States is materially injured by reason of imports of brass rod from Brazil, India, Israel, Mexico, South Africa, and South Korea that were alleged to be sold in the United States at less than fair value and to be

NON-CONFIDENTIAL VERSION

subsidized by the Governments of India, Israel, and South Korea. *Brass Rod from Brazil, India, Israel, Mexico, South Africa, and South Korea*, 88 Fed. Reg. 39,477 (June 16, 2023).

12.     The final phase investigation schedules became staggered when Commerce did not align its countervailing duty investigation with its final antidumping duty investigation of India and reached an earlier final affirmative countervailing duty determination with respect to India. *Brass Rod from Israel*, USITC Pub. 5545 at 2.  The investigation schedules became further staggered when Commerce aligned its countervailing duty investigation with its antidumping duty investigation of Israel and tolled all deadlines for those investigations by 90 days, due to the October 7, 2023 attack on Israel by the terrorist organization, Hamas, and the ongoing war. *Id.* Despite the delay, the Commission issued its findings with respect to subject imports from Israel as part of its final determination in the countervailing duty investigation of India.  As explained by the Commission:

> Pursuant to the statutory provision on staggered investigations, the record for the trailing investigations will be the same as the record in the countervailing duty investigation of brass rod from India except that, prior to the Commission's final antidumping duty determinations on brass rod from Brazil, India, Israel, Mexico, South Africa, and South Korea, and its final countervailing duty determinations on brass rod from Israel and South Korea, the Commission shall include in the record Commerce's final dumping and countervailing duty determinations and the parties' final comments concerning those determinations.

*Brass Rod from India*, Inv. No. 701-TA-686 (Final), USITC Pub. 5485 at 3-4 (Feb. 2024).

13.     Additionally, the statute provides an exception to cumulation with respect to subject imports from Israel.  The Commission shall not cumulatively assess the volume and effects of imports "from any country that is a party to an agreement with the United States establishing a free trade area, which entered into force and effect before January 1, 1987 {i.e., Israel}, unless the Commission determines that a domestic industry is materially injured or threatened with material injury by reason of imports from that country."  19 U.S.C. § 1677(7)(G)(ii)(IV); *Brass Rod from*

*India*, USITC Pub. 5485 at 14.  If subject imports from Israel are found to not materially injure or threaten material injury to the domestic industry, the Commission makes a negative determination with respect to Israel.  If the Commission makes an affirmative determination with respect to Israel, subject imports from Israel are cumulated with imports from all subject countries.  The Commission therefore conducted its analysis and made its determination with respect to Israel as part of the final phase investigation of brass rod from India because the Commission's determination of whether to cumulate subject imports from Israel affected the outcome of all other investigations, including the countervailing duty investigation of imports from India.

14.    Along with other interested parties, the Government of Israel submitted a prehearing brief on December 6, 2023, gave testimony at the Commission's December 12, 2023 hearing, and filed a posthearing brief on December 19, 2023.

15.    After providing the opportunity for interested parties to submit final comments on Commerce's final affirmative antidumping and countervailing determinations on brass rod from Israel, the Commission formally incorporated by reference its findings from the earlier countervailing duty investigation of brass rod from India and made affirmative determinations of material injury in the trailing investigations of subject imports from Israel.  *Brass Rod from Israel*, Inv. No. 701-TA-687 and 731-TA-1614 (Final), USITC Pub. 5545 at 1-6 (Sept. 2024).  This Complaint concerns only the Commission's findings with respect to subject imports from Israel, articulated in the confidential version of the Majority Opinion, EDIS Document No. 813414, ("*Confidential Majority Opinion*") and the confidential version of the Dissenting Views of Chairman David S. Johanson, EDIS Document No. 813415 ("*Confidential Dissenting Views*").

16.    Three Commissioners found that the volume of subject imports from Israel was significant, and such imports caused significant price effects and had a significant impact on the

domestic industry. *Confidential Majority Opinion* at 45-82. Chairman David S. Johanson made a negative determination, finding that imports of brass rod from Israel neither materially injured the domestic industry nor threatened the domestic industry with material injury. *Confidential Dissenting Views* at 3.

<u>**SUMMARY OF MAJORITY OPINION**</u>

17. When determining whether the domestic brass rod industry was materially injured by reason of subject imports from Israel, the majority considered the volume effects, price effects, and impact of subject imports. With respect to volume effects, the market share of such imports increased from **[     ]** percent in 2020 to **[     ]** percent in 2021 before declining to **[     ]** percent in 2022 and finishing the period of investigation ("POI") in interim 2023 at **[     ]** percent. *Confidential Majority Opinion* at 46; Confidential Version of the Final Staff Report, EDIS Document No. 811118 ("*Confidential Staff Report*") at C-3 (Table C-1). The volume of subject imports from Israel increased by **[          ]** pounds from 2020 to 2022 and by **[          ]** pounds from January-September 2022 ("2022 interim period") to January-September 2023 ("2023 interim period"), which the Commission considered significant in both absolute terms and relative to U.S. consumption. *Id.* at 45-46; *Confidential Staff Report* at C-4 (Table C-1). During the POI, apparent U.S. consumption increased from **[          ]** in 2020 to **[          ]** pounds in 2022, before declining from **[          ]** pounds in interim 2022 to **[          ]** pounds in interim 2023. *Confidential Staff Report* at C-3 (Table C-1). The domestic industry maintained market share in excess of **[     ]** percent throughout the POI. *Id.*

18. With regard to price effects, the majority found significant underselling by subject imports from Israel. *Confidential Majority Opinion* at 47-66. The Commission collected data for nine pricing products that represented sales for three products broken out by channel of distribution

(sales to end users through scrap buyback programs, sales to end users not through scrap buyback programs, and sales to distributors). *Id.* at 47. No pricing data for subject imports from Israel was reported for pricing products 1, 4, and 7 (pricing products sold to end users through scrap buyback programs), which were the [          ] volume pricing products for domestic producers. *Id.* at 48 n.193; *Confidential Staff Report* at V-21 to V-43 (Table V-13).

19.    During the POI, nearly [                              ] of the domestic industry's U.S. shipments were to end users through a scrap buyback program. *Confidential Staff Report* at II-4 (Table II-1). Petitioners "Mueller and Wieland both sell brass rod to participating end user customers under a scrap buyback program whereby the customer can sell back to the respective petitioner the scrap the customer generates in producing its product from the brass rod. Mueller and Wieland typically charge a higher price for the brass rod sold through scrap buyback programs than not through scrap buyback." *Confidential Majority Opinion* at 40-41. Mueller and Wieland "provide a premium over prevailing scrap market prices" and "benefit from getting scrap back from their customers." *Id.* at 41. "{E}ach producer can be sure that the scrap has the same quality as its own brass rod, can minimize freight costs by using its freight carrier that delivered the brass rod to return the scrap, and can ensure that its product continues to be over 90 percent recycled content." *Id.*

20.    In order to account for the different pricing mechanisms, the majority considered whether to adjust the pricing data for end users participating in a buyback program "to take into account the higher price that petitioners receive for brass rod from end user customers participating in their scrap buyback programs." *Confidential Majority Opinion* at 54-55. The majority selected the second of three alternatives: (1) no adjustment (Table F-1); (2) applying the price for sales to non-buyback end users and distributors (also with no buyback) to the quantity sold to end users

with scrap buyback (pricing products 1, 4, and 7) (Table F-2); or (3) a cost-based approach that uniformly adjusted down all U.S. producers' reported pricing data by the average POI differential between the amounts domestic producers paid for scrap from buyback programs and the amount paid on the open market (or net scrap buyback cost premium) (Table F-3). *Id.* at 56-57; *Confidential Staff Report* at F-3.

21.    The majority acknowledged that the selected approach "has certain limitations, including limitations in the available data." *Id.* at 57 n.226. The majority also dismissed concerns that this approach did not account for domestic producers' volume discounts to large customers that would further reduce the price paid for the volume sold for pricing products 1, 4, and 7. *Id.*; *see also Confidential Dissenting Views* at 21-22 (noting that the price-based approach "risks spurious comparisons that ignore the real benefit added for some purchasers by a buyback program," specifically large volume purchasers that opt for scrap buyback). Based on the selected "price-based" adjustment, subject imports from Israel undersold the domestic product in 36 of 42 quarterly comparisons, representing **[          ]** pounds of subject imports from Israel, which the majority found to be "pervasive" and significant underselling. *Confidential Majority Opinion* at 58. For context, apparent U.S. consumption ranged from **[          ]** to **[          ]** pounds per year over the POI, of which domestic producers shipped **[          ]** to **[          ]** pounds per year. *Confidential Staff Report* at C-3 (Table C-1).

22.    Other data indicate predominant overselling. The Commission's staff adjusted the domestic industry's pricing product data by the reported scrap cost premium, or a "cost-based" approach, which shows a greater volume of Israeli product overselling (**[          ]** pounds) than underselling (**[          ]** pounds) domestic product. *Confidential Staff Report* at F-11 (Table-F-3). The majority selected price-based adjustment as "more accurate and reliable than the

'cost-based' approach advocated by {the Israeli producer}, which makes overly simplistic assumptions regarding scrap production and does not take into account the additional costs incurred by domestic producers when they purchase scrap in the open market, or the variance in scrap yield by product and customer." *Confidential Majority Opinion* at 58 n.226.

23.     The majority also found that "the significant underselling by subject imports from Israel led to the **[    ]** percentage point shift in market share from the domestic industry to subject imports from Israel between 2020 and 2022, and the **[    ]** percentage point shift in market share from the domestic industry to subject imports from Israel over the POI inclusive of the interim period." *Confidential Majority Opinion* at 59.  As discussed further below, the majority jumped to a conclusion and failed to acknowledge that the market share of nonsubject imports also increased by **[    ]** percentage points from 2020 to 2021; the market share of imports from all sources other than Israel (including other subject countries) increased by **[    ]** percentage point from 2021 to 2022; and the domestic industry experienced significant supply constraints in 2020, 2021, and interim 2023 that limited U.S. producers' ability to meet demand.  *Confidential Staff Report* at C-3 (Table C-1).

24.     The majority also considered price trends.  The majority did not acknowledge that U.S. producers' commercial shipment average unit values and net sales unit values increased over the full POI, indicating no price depression.  *Id.* at C-4 to C-5 (Table C-1).  With respect to price suppression, the majority found that "the domestic industry's non-toll {cost of goods sold (COGS)} to net sales ratio was higher in 2022, at **[    ]** percent, than in 2020 at **[    ]** percent." *Confidential Majority Opinion* at 63.  However, two of four Commissioners did not share the majority's views on price suppression.  Commissioner Schmidtlein did not join the majority's characterization of price suppression "as she does not rely on trends in 2021 as the basis for her

finding of significant price suppression, given the domestic industry's acknowledged supply constraints in that year." *Id.* at 62 n.242. Chairman Johanson dissented, finding that price suppression (if there even was any) was not significant and listing COVID-era domestic supply shortages as an "important factor{}" that influenced his negative determination. *Confidential Dissenting Views* at 3, 28-31. Given the supply/demand imbalance early in the POI, the majority improperly attributed an increase in the domestic industry's COGS/net sales ratio over the full POI to subject imports from Israel. The small volume increase of [        ] pounds from 2020 to 2021 (at increasing prices) when the domestic industry faced supply constraints does not indicate adverse price effects imports from Israel. *Confidential Staff Report* at C-4 (Table C-1).

25.    Looking at the latter half of the POI when domestic supply constraints eased, the domestic industry's COGS/net sales ratio <u>decreased</u> by [  ] percentage points from 2021 to 2022 and by [  ] percentage points between the interim periods, despite increasing unit COGS. *Id.* at C-5 (Table C-1). A decreasing COGS/net sales ratio demonstrates improvement in the domestic industry's ability to cover costs, not negative price effects.

26.    In addition, the majority (not including Commissioner Schmidtlein) concluded that so-called price suppression occurred when subject imports from Israel increased in quantity and gained [  ] percentage points of market share "largely at the expense of the domestic industry." *Confidential Majority Opinion* at 62. Again, the majority does not acknowledge market share gained by nonsubject imports or other subject countries, attributing without explanation any price suppression to subject imports from Israel. *Confidential Staff Report* at C-3 (Table C-1).

27.    With respect to the impact of subject imports from Israel on the domestic industry, the majority acknowledged that the domestic industry's production, U.S. shipments, capacity utilization, net sales value, gross profit, capital expenditures, and research and development

expenditures improved from 2020 to 2023, with modest declines in interim 2023.  *Confidential Majority Opinion* at 67-72.  "The domestic industry's overall employment remained generally stable."  *Id.* at 68.

28.    The majority concluded that "{t}he significant volume of subject imports from Israel that undersold the domestic like product to a significant degree{,} took sales from the domestic industry, gained market share at the expense of the domestic industry over the POI, and suppressed prices for the domestic like product to a significant degree, thereby preventing the domestic industry from fully capitalizing on the [    ] percent increase in apparent U.S. consumption between 2020 and 2021."  *Id.* at 74.    However, as explained above, one Commissioner did not join the others' view that subject imports from Israel caused significant price suppression, as measured by the COGS/net sales ratio, due to domestic supply constraints early in the POI.    Reported lost sales [

].  *Confidential Dissenting Views* at 26.

29.    The majority also does not acknowledge that throughout the POI, nonsubject imports (meaning imports from all countries other than Israel) had more market share and gained more market share than subject imports from Israel.  *Confidential Staff Report* at C-3 (Table C-1).  The other subject countries more often undersold (241 quarters), in greater quantities ([              ] pounds), and at higher underselling margins ([      ] percent) than subject imports from Israel (86 quarters, [              ] pounds, and [      ] percent margins, respectively).  *Confidential Staff Report* at V-50 (Table V-17).  Underselling by subject imports from Israel is even less significant if the pricing product data are adjusted for domestic producers' sales to end users with buyback

programs.  *Id.* at Appendix F.  The majority therefore improperly attributed any negative impact on the domestic industry to subject imports from Israel.

30.    As discussed above, the majority also placed undue weight on data from 2020 and 2021 when the domestic industry experienced COVID-related supply constraints.  Looking at the latter half of the POI, the domestic industry [                    ] its substantial market share of [      ] percent in 2021 and [     ] percent in 2022.  *Id.* at C-3 (Table C-1).  During that same period, market share of subject imports from Israel declined from [     ] percent in 2021 to [     ] percent in 2022.  *Id.*  Between the interim periods, U.S. producers and subject imports from Israel gained market share at the expense of imports from other countries.  *Id.*

## SUMMARY OF DISSENTING VIEWS

31.    In his dissent, Chairman Johanson concluded that there was no material injury or threat of material injury by reason of subject imports from Israel.  Like his fellow Commissioners, Chairman Johanson examined volume effects, price effects, and impact, reaching the exact opposite conclusion in view of the same evidence.

32.    Chairman Johanson concluded that the volume of subject imports was significant in absolute and relative terms but did not have "either significant price effects or a significant adverse impact on the domestic industry."  *Confidential Dissenting Views* at 18.  Although Chairman Johanson agreed that the pricing data showed significant underselling of the domestic like product by subject imports from Israel, he did not find that the underselling had any adverse price effects or led to a significant gain in market share by subject imports at the expense of the domestic industry.  *Id.* at 23.  Citing past agency precedent, Chairman Johanson explained that "the Commission does not regard pervasive underselling as injurious by itself unless the underselling leads to significant adverse impact on the domestic industry such as a significant

increase in subject import volume or market share at the expense of the domestic industry, or significant price effects such as depressing or suppressing prices to a significant degree." *Id.* Prices of subject imports from Israel did not lead to significant increase in market share at the expense of the domestic industry. *Id.* at 24. It was "not surprising" that the domestic industry lost market share "in a period of considerable across-the-board supply constraints {in 2020 and 2021}, irrespective of whether or not underselling existed." *Id.* In the Chairman's view, "these fluctuations in market share were not closely correlated with underselling, which appears to have been continuous." *Id.* Between the interim periods, the domestic industry lost market share when Mueller experienced a factory fire and other import sources gained more market share than Israel. *Id.* at 25. Moreover, as Chairman Johanson noted, "the increase in market share of subject imports from Israel corresponded at most to a few days' U.S. production," which he did not consider significant. *Id.*

33.    Chairman Johanson found no price depression (because prices increased over the POI), *id.* at 28, and no price suppression (because U.S. producers successfully recovered increasing costs and by the end of the POI the COGS/net sales ratio was lower in interim 2023 on an annualized basis than in 2020, despite lower apparent U.S. consumption). *Id.* at 30.

34.    Chairman Johanson also placed more weight on the later part of the POI because "the Commission must consider whether a domestic industry 'is' materially injured, not whether it has been formerly." *Id.* at 31 (citing 19 U.S.C. §§ 1671d(b), 1973d(b) {sic.}). "Furthermore, consistent with the statute's mandate to consider whether material injury presently exists, for purposes of {} making a present injury determination{,} the Commission must address record evidence of 'significant circumstances and events' that occur after the POI and up to the vote day, if that evidence is otherwise reliable." *Id.* at 32 (citing *Usinor v. United States*, 26 CIT 767, 779

(2002); *accord Chr. Bjelland Seafoods A/S v. United States*, 19 CIT 35, 43 (1992)).  Chairman Johanson cited the October 7, 2023 attack on Israel, which occurred one week after the end of the POI and "significantly impaired the ability of Israel's industry to manufacture and export brass rod."  *Id.*  One-third of the Israeli producer's workers were West Bank residents and were prohibited from coming to work; production hours decreased **[      ]** percent since the war's start; production fell by **[    ]** percent; and capacity was expected to decline by nearly **[        ]** in 2024. *Id.* at 32-33.  These conditions were expected to persist for the foreseeable future.  *Id.* at 33.  As a result, the Israeli producer has reduced incentive to undersell domestic products to gain market share because it "reasonably expected to be unable to maintain its previously existing production volume, let alone increase it."  *Id.*  U.S. producers would also have less reason to lower prices because the Israeli producer could not provide as much alternative supply.  *Id.*

35.    With respect to impact, Chairman Johanson pointed to several indicators that improved during the POI, as discussed above, and noted that the domestic industry's market share fell "slightly, from **[     ]** percent in 2020 to **[     ]** percent in 2022, a decline of only **[   ]** percentage points."  *Id.* at 39.  "{O}nly a small amount of that decrease can be attributed to subject imports from Israel, which gained only **[     ]** percentage points of U.S. market share from 2020 to 2022."  *Id.*  The domestic industry's loss of market share between the interim periods was attributable to supply constraints at Mueller and imports from countries other than Israel.  *Id.*  With respect to any "slight{}" deterioration in the domestic industry's financial performance over the POI, "it is not possible to attribute any material amount of that to subject imports from Israel, which did not have significant price effects."  *Id.* at 40.

NON-CONFIDENTIAL VERSION

36.    Based on these findings, Chairman Johanson found no material injury to the domestic industry by reason of subject imports from Israel and determined that the facts on the record supported a negative threat determination with respect to Israel.

### STATEMENT OF CLAIMS

37.    Paragraphs 1 through 36 are incorporated by reference.

38.    In the following respects and for other reasons apparent from the record, the Commission's determination is not supported by substantial evidence and is otherwise not in accordance with law.  *See* 19 U.S.C. § 1516a(b)(1)(B)(i).

### COUNT ONE

39.    Paragraphs 1 through 38 are incorporated by reference.

40.    The statute requires the Commission to "evaluate all relevant economic factors . . . in the context of . . . conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C).  As explained by the Government of Israel before the Commission, the United States and Israel have a close and longstanding economic and security relationship, which is relevant to the Commission's determination in terms of the exception to cumulation that applies exclusively to Israel.  Although the Commission applied 19 U.S.C. § 1677(7)(G)(ii)(IV) by first examining whether subject imports from Israel alone caused material injury to the domestic industry, the Commission failed to take into account the attack on Israel and the ongoing war with Hamas, which was an important condition of competition that impaired (and continues to impair) the volume of brass rod available for export to the United States.  There is no mention of the attack or the war in the majority's opinion, despite evidence of the significant effect on production of brass rod in Israel.

**NON-CONFIDENTIAL VERSION**

41.    By failing to follow the statute's mandate to consider economic factors in the context of conditions of competition, the Commission's decision is not in accordance with law. *United States Steel Group - a Unit of USX Corp. v. United States*, 96 F.3d 1352, 1362 (Fed. Cir. 1996) (holding that the court's role is to "direct the Commission to follow the dictates of its statutory mandate").  To the extent that the majority did not consider the war to be a relevant condition of competition, the determination is not supported by substantial evidence.

## COUNT TWO

42.    Paragraphs 1 through 41 are incorporated by reference.

43.    The Commission improperly determined that the small volume of subject imports from Israel was significant.  Pursuant to 19 U.S.C. § 1677(7)(C)(i), "{i}n evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the subject merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is <u>significant</u>."  (Emphasis added.)  Here, the record evidence shows that the market share of subject imports from Israel remained in the [

] throughout the POI, [    ] percent in 2020, [    ] percent in 2021, [    ] percent in 2022, and [    ] percent in interim 2023—a mere [    ] percentage point increase from 2020 to 2022 and [    ] percentage point increase over the full POI. *Confidential Staff Report* at C-3 (Table C-1). The volume of subject imports from Israel was also very small relative to U.S. production. Shipments of imports from Israel were [        ] pounds in 2020, [        ] pounds in 2021, [        ] pounds in 2022, and [        ] pounds in interim 2023. *Confidential Staff Report* at C-4 (Table C-1).  Meanwhile, U.S. production was [        ] pounds in 2020, [        ] pounds in 2021, [        ] pounds in 2022, and [        ] pounds in interim 2023. *Id.*

**NON-CONFIDENTIAL VERSION**

44.     While the statute may not define a numerical threshold for "significant" volumes, the term must be given meaning.  The U.S. Supreme Court has cautioned to "construe statutes, where possible, so as to avoid rendering superfluous any parts thereof."  *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991).  Based on the record as a whole, the Commission's finding that such a small volume and change in market share is "significant" runs afoul of the plain language of the statute and risks reading the term out of the statute.

45.     Therefore, the Commission's volume analysis was unsupported by substantial evidence and otherwise not in accordance with law.

## **COUNT THREE**

46.     Paragraphs 1 through 45 are incorporated by reference.

47.     The majority improperly found that subject imports had caused negative price effects.  19 U.S.C. § 1677(7)(C)(ii) requires the Commission to consider whether

> (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products in the United States, <u>and</u> (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.  (Emphasis added.)

The Commission must not only find underselling, but it must also find how subject imports affect the prices of the domestic like product or otherwise impacted the domestic industry.  19 U.S.C. § 1677(7)(C)(ii); *Coalition of Brake Drum and Rotor Aftermarket Mfrs. v. United States*, 15 F Supp. 2d 918, 924-25 (Ct. Int'l Trade 1998); *Stainless Steel Round Wire from Canada, India, Japan, Korea, Spain, Taiwan*, Inv. Nos. 731-TA-781-86 (Final), USITC Pub. 3194 at 14-15 (May 1999); *Forged Steel Fittings from India and Korea*, Inv. Nos. 701-TA-631 & 731-1463-1464 (Final), USITC Pub. 5137 at 30 (Nov. 2020); *see also Confidential Dissenting Views* at 23.

48.     The small volume of subject imports from Israel that undersold domestic product did not cause significant price depression (because prices increased over the POI) or suppression

NON-CONFIDENTIAL VERSION

(because the domestic industry consistently recovered increasing costs and was affected by supply constraints during the POI). The small volume of subject imports from Israel that were undersold also did not cause the domestic industry to lose significant market share to subject imports from Israel, which remained at **[                    ]** levels throughout the POI.

49.    The Commission did not explain its departure from past practice that there must be more than underselling; underselling must affect the prices for or volume of the domestic like product. *See Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003) (citing *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) ("{The agency} may find that, although the rule in general serves useful purposes, peculiarities of the case before it suggest that the rule not be applied in that case. Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.").

50.    The Commission also failed to explain adequately why underselling with such a small shift in market share was significant. *See NMB Singapore Ltd. v. United States*, 557 F.3d 1316, 1319-20 (Fed. Cir. 2009) ("While {an agency's} explanations do not have to be perfect, the path of {the agency's} decision must be reasonably discernable."); *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983) (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962) (holding that there must be a "'rational connection between the facts found and the choice made.'")). Therefore, the Commission's pricing analysis was unsupported by substantial evidence and otherwise not in accordance with law.

## **COUNT FOUR**

51.    Paragraphs 1 through 50 are incorporated by reference.

**NON-CONFIDENTIAL VERSION**

52.     The majority's attempt to explain away deficiencies in the selected price-based adjustment to U.S. producers' pricing data is arbitrary and unsupported by substantial evidence. The majority acknowledged that **[          ]** price lists show **[                    ]** but rejected arguments that the price-based adjustment failed to account for such discounts because "further reducing U.S. producers' prices by **[          ]** percentage points would not reverse the majority underselling for subject imports from Israel shipped to end users." *Confidential Majority Opinion* at 57 n.226.   However, the Commission typically considers the frequency and magnitude of underselling.  The majority nonetheless intentionally selected a dataset that fails to provide relevant data to assess the magnitude of underselling.  Furthermore, the majority unreasonably rejected the cost-based adjustment, which applied actual scrap purchase data on the record, as collected by the Commission, to more closely calculate the net price of brass rod purchased through scrap buyback programs.

53.     The majority's dismissal of relevant facts on the record does not constitute "reasoned analysis" in support of its findings.  *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).  Additionally, "{s}ufficiency of written description is a question of fact, which {the court} review{s} for substantial evidence. However, failure to consider the totality of the record in assessing written description constitutes legal error."  *In re Tropp*, 2017-2503 (Fed. Cir. Dec. 12, 2018) (citing *Gen. Hosp. Corp. v. Sienna Biopharmaceuticals, Inc.*, 888 F.3d 1368, 1371 (Fed. Cir. 2018); *In re Alton*, 76 F.3d 1168, 1176 (Fed. Cir. 1996)).  For these reasons, the Commission's pricing analysis was unsupported by substantial evidence and otherwise not in accordance with law.

**<u>COUNT FIVE</u>**

54.     Paragraphs 1 through 53 are incorporated by reference.

**NON-CONFIDENTIAL VERSION**

55.    The majority improperly attributed changes in the domestic industry's performance to subject imports from Israel.  The statute requires the Commission to determine whether the domestic industry is "materially injured or threatened with material injury by reason of" subject imports but does not define the phrase "by reason of."  *Confidential Majority Opinion* at 25 (citing 19 U.S.C. §§ 1671d(b), 1673d(b)).  The Commission's "evaluation under the 'by reason of' standard must ensure that subject imports are more than a minimal or tangential cause of injury and that there is a sufficient causal, not merely a temporal, nexus between subject imports and material injury."  *Confidential Majority Opinion* at 25-26 (citing *Nippon Steel Corp. v. USITC*, 345 F.3d 1379, 1384 (Fed. Cir. 2003); *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 873 (Fed. Cir. 2008) (quoting explanation from *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 722 (Fed. Cir. 1997), that "this court requires evidence in the record 'to show that the harm occurred 'by reason of' the {less than fair value} imports, not by reason of a minimal or tangential contribution to material harm caused by {less than fair value} goods")).  Furthermore, "{t}he legislative history explains that the Commission must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold."  *Confidential Majority Opinion* at 26.  The Commission has previously considered nonsubject imports and domestic producer supply constraints as other relevant factors.

56.    The majority erred by repeatedly concluding that subject imports from Israel caused the domestic industry to lose significant market share.  Early in the POI (in 2020 and 2021), the domestic industry acknowledged COVID-related supply constraints and in 2023, Mueller had a factory fire.  At such times, lost sales or market share cannot be attributed to purported underselling

**NON-CONFIDENTIAL VERSION**

(however calculated) by the small volume of subject imports from Israel.  The majority also failed to address increased market share by lower priced imports from countries other than Israel.

57.     The Commission's attribution of the effect of other causal factors to subject imports from Israel was arbitrary and an abuse of discretion for failure to follow the statute and past practice.  *See, e.g., SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001).  The Commission's determination also lacks substantial evidence that there was material injury to the domestic industry (if any) "by reason" of the small volume of subject imports from Israel. Therefore, the Commission's pricing and impact analysis was unsupported by substantial evidence and otherwise not in accordance with law.

## COUNT SIX

58.     Paragraphs 1 through 57 are incorporated by reference.

59.     The statute requires the Commission to make a determination of present material injury, warranting greater emphasis on events at the end of the POI.  In particular, the majority failed to consider significant circumstances and events that occurred around the time of the injury vote, in accordance with past practice. *See Usinor v. United States*, 26 CIT 767, 779 (2002); *accord Chr. Bjelland Seafoods A/S v. United States*, 19 CIT 35, 43 (1992).  One week after the end of the POI, the terrorist organization, Hamas, attacked Israel, instigating a war that is still ongoing.  The Israeli producer has been significantly impaired by the war, losing workers who cannot travel from the West Bank, declining production, and likely enduring reductions in capacity.  These impairments reduce the Israeli producer's incentive to cut prices to gain U.S. market share and do not incentivize U.S. producers to cut prices because the Israeli producer cannot increase exports to the United States.  The war is a significant circumstance and event, warranting a negative present material injury determination with respect to Israel.

**NON-CONFIDENTIAL VERSION**

60.    In its determination, the majority failed to account for substantial, relevant information on the record and did not follow the Commission's past practice with respect to significant circumstances and events around the time of the vote.  Therefore, the Commission's determination that the domestic industry was materially injured by reason of subject imports from Israel was unsupported by substantial evidence and otherwise not in accordance with law.

<u>**COUNT SEVEN**</u>

61.    Paragraphs 1 through 60 are incorporated by reference.

62.    The majority concluded that subject imports from Israel had a significant impact on the domestic industry.  *Confidential Majority Views* at 82.  The majority noted many factors that indicate improvement in the performance of the domestic industry, or at least little change, including production, capacity, capacity utilization, employment, shipments, capital expenditures, and research and development expenditures.  *Confidential Majority Views* at 67-69, 72.  The domestic industry was also [                                    ] throughout the POI with an operating margin that increased from [        ] percent in 2021 to [        ] percent in interim 2023.  *Confidential Staff Report* at C-5 (Table C-1).

63.    However, the majority found that subject imports from Israel "took sales from the domestic industry {and} gained market share at the expense of the domestic industry over the POI," in addition to the price effects addressed in Counts Three and Four.  *Confidential Majority Views* at 74.  The domestic industry lost [          ] percentage points of market share, maintained a [                                    ] share of the market, and experienced significant supply constraints over the POI.  *Confidential Staff Report* at C-3 (Table C-1).  In the context of the domestic industry's overall [                                                    ] performance over

**NON-CONFIDENTIAL VERSION**

the full POI, the Commission's determination of negative impact from the Israeli-origin subject imports is not supported by substantial evidence.

**COUNT EIGHT**

64.    Paragraphs 1 through 63 are incorporated by reference.

65.    The statute defines "material injury" as harm that is not "inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A).

66.    The errors described above in the Commission's findings and analyses render the Commission majority's ultimate conclusion that the domestic industry is materially injured by reason of subject imports from Israel unsupported by substantial evidence and otherwise not in accordance with law.

67.    Moreover, the Commission's ultimate determination primarily rests on a [

] decline in the domestic industry's overwhelming market share and a slight increase in the domestic industry's COGS/net sales ratio. In light of the economic conditions during the POI and the domestic industry's strong performance with respect to a number of performance indicators, no reasonable fact finder could conclude that the domestic industry is suffering from "material injury," as that term is defined in the statute, by reason of subject imports from Israel. For that reason, the Commission majority's ultimate determination is also unsupported by substantial evidence, and by effectively reading the word "material" out of the statute, the determination is arbitrary and capricious and not in accordance with law. *See Astoria Fed. Sav. & Loan Ass'n*, 501 U.S. at 112.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff respectfully requests that this Court (1) hold that the Commission's determinations in the subject investigations are unsupported by substantial evidence and otherwise not in accordance with law; (2) remand the investigations to the Commission for disposition

**NON-CONFIDENTIAL VERSION**

consistent with any orders and opinions of this Court; and (3) provide such other relief as this Court deems proper.

Respectfully submitted,

/s/ Bernd G. Janzen
Bernd G. Janzen
Julia K. Eppard
Daniel M. Witkowski
Sydney L. Stringer
Paul S. Bettencourt
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, N.W.
Washington, D.C. 20006

*Counsel to the Government of Israel*

Dated: November 22, 2024