## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LISA W. WANG, JUDGE

|  |  |  |
|---|---|---|
| GOVERNMENT OF ISRAEL, MINISTRY OF ECONOMY AND INDUSTRY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Court No. 24-00197 |
| | : | |
| UNITED STATES, | : | |
| | : | **Non-Confidential Version** |
| Defendant, | : | Business Proprietary |
| | : | Information has been |
| and | : | removed from pages |
| | : | 13, 17-19, 21, 25-26, 28-33, |
| AMERICAN BRASS ROD FAIR TRADE | : | 35, 37-40 |
| COALITION, et al., | : | |
| | : | |
| Defendant-Intervenor. | : | |
| | : | |

### PLAINTIFF'S RULE 56.2 MOTION
### FOR JUDGMENT ON THE AGENCY RECORD

Pursuant to Rule 56.2 of the U.S. Court of International Trade, Plaintiff Government of Israel, Ministry of Economy and Industry, hereby moves for judgment on the agency record with regard to the U.S. International Trade Commission's ("Commission") final affirmative determinations in *Brass Rod from Israel*, 89 Fed. Reg. 78,330 (Int'l Trade Com'n Sept. 25, 2024); *Brass Rod from Israel*, Inv. Nos. 701-TA-687 and 731-TA-1614 (Final), USITC Pub. 5545 (Sept. 2024).  The Commission made these determinations in the context of the antidumping and countervailing duty investigations of brass rod from Israel.  For the reasons explained in the accompanying memorandum, Plaintiff respectfully moves the Court to hold that the Commission's determinations are neither supported by substantial evidence nor in accordance with law.  Plaintiff

further moves the Court to remand this matter to the Commission for disposition consistent with

the order and opinion of the Court.

Respectfully submitted,

/s/ Bernd G. Janzen
Bernd G. Janzen
Devin S. Sikes
Julia K. Eppard
Daniel M. Witkowski
Sydney L. Stringer
Paul S. Bettencourt
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, DC 20006

Dated:  May 9, 2025

*Counsel to Government of Israel, Ministry of Economy and Industry*

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LISA W. WANG, JUDGE

| | |
|---|---|
| GOVERNMENT OF ISRAEL, MINISTRY OF ECONOMY AND INDUSTRY, | : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | :     Court No. 24-00197 |
| UNITED STATES, | : <br> : |
| Defendant, | : <br> : |
| and | : <br> : |
| AMERICAN BRASS ROD FAIR TRADE COALITION, et al., | : <br> : |
| Defendant-Intervenor. | : <br> : |

## **PROPOSED ORDER**

Upon consideration of Plaintiff's Rule 56.2 Motion for Judgment on the Agency Record, as well as all other papers filed in Court No. 24-00197, it is hereby

**ORDERED** that Plaintiff's Motion is **GRANTED**;

**ORDERED** that the U.S. International Trade Commission ("Commission") final determinations in *Brass Rod from Israel,* 89 Fed. Reg. 78,330 (Int'l Trade Comm. Sept. 25, 2024) are neither supported by substantial evidence on the record nor in accordance with law; and

**ORDERED** that the Commission shall issue revised determinations on remand that are supported by substantial evidence, in accordance with law, and otherwise consistent with all aspects of the Court's order and opinion in this matter.


Dated: _____                    _____
      New York, NY                                                  Lisa W. Wang, Judge

## UNITED STATES COURT OF INTERNATIONAL TRADE

BEFORE:  THE HONORABLE LISA W. WANG, JUDGE

| | | |
|---|---|---|
| GOVERNMENT OF ISRAEL, MINISTRY OF ECONOMY AND INDUSTRY, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Court No. 24-00197 |
| | : | |
| UNITED STATES, | : | **<u>Non-Confidential Version</u>** |
| | : | Business Proprietary |
| Defendant, | : | Information has been |
| | : | removed from pages |
| and | : | 13, 17-19, 21, 25-26, 28-33, |
| | : | 35, 37-40 |
| AMERICAN BRASS ROD FAIR TRADE COALITION, et al., | : | |
| | : | |
| Defendant-Intervenor. | : | |
| | : | |

## <u>PLAINTIFF'S MEMORANDUM IN SUPPORT OF ITS RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD</u>

NON-CONFIDENTIAL VERSION

## <u>TABLE OF CONTENTS</u>

I.      Introduction ............................................................................................................1

II.     Statement Pursuant to Rule 56.2(c)(1) ..................................................................2

        A.      Administrative Determinations Under Review ............................................2

        B.      Issues of Law and Bases for Remanding the Commission's Determinations ..........2

III.    Statement of the Case .............................................................................................3

        A.      Statutory Framework ..................................................................................3

                1.      Legal Considerations for the Commission's Final Determinations .............3

                2.      Special Decumulation Provision for Israel ..................................4

        B.      Factual Background ....................................................................................4

                1.      The Commission's Preliminary Determinations ............................4

                2.      The Commission's Final Determinations ......................................5

IV.     Subject Matter Jurisdiction and Standard of Review .............................................6

A.      The Court Has Subject Matter Jurisdiction ............................................................6

        B.      The Commission Must Support its Determinations with Substantial Evidence ..........6

        C.      The Commission's Determinations Must Be in Accordance with Law .................8

                1.      The Commission Must Act Consistently with the Statute .........................9

                2.      The Commission Cannot Act Arbitrarily and Capriciously ......................9

V.      Summary of Argument ..........................................................................................11

VI.     The Commission's Final Determinations Are Not Supported by Substantial Evidence or Otherwise Not in Accordance with Law .......................................13

        A.      The Commission Unlawfully Ignored Record Evidence Regarding Israel's War with Hamas ..................................................................................13

                1.      By Failing to Consider the Effect of the Hamas War on Conditions of Competition, the Commission's Decision is Not Supported by Substantial Evidence and Otherwise Not in Accordance with Law .........14

**NON-CONFIDENTIAL VERSION**

2.      The Commission Unlawfully Failed to Consider Significant Circumstances and Events that Occurred Around the Time of the Injury Vote ....................................................................................................15

B.      The Commission's Volume Analysis Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law .........................................17

C.      The Commission's Pricing Analysis Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law .........................................21

1.      The Commission's Adjustment of Pricing Product Data for its Underselling Analysis is Arbitrary and Unsupported by Substantial Evidence..............................................................................................22

2.      The Commission Improperly Found that Subject Imports Caused Negative Price Effects................................................................................27

D.      The Commission's Determination of Negative Impact from the Israeli-Origin Subject Imports is Not Supported by Substantial Evidence......................30

E.      The Commission Improperly Attributed Changes in the Domestic Industry's Performance to Subject Imports from Israel.........................................36

1.      The Majority Failed to Properly Consider Alternative Causes of Decreased Domestic Industry Market Share...............................................37

2.      The Majority Failed to Address Increased Market Share by Lower-Priced Imports from Countries Other Than Israel ....................................39

VII.    Conclusion ......................................................................................................42

NON-CONFIDENTIAL VERSION

**TABLE OF AUTHORITIES**

## CASES

*Ad Hoc Shrimp Trade Action Comm.*, 791 F. Supp. 2d 1327 (Ct. Int'l Trade 2011) .......... 7, 17, 32
*Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365 (Fed. Cir. 2002) ................................. 8
*Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368 (Fed. Cir. 2003) ............................... 27
*Altx, Inc. v. United States*, 167 F. Supp. 2d 1353 (Ct. Int'l Trade 2001) ..................................... 7
*Altx, Inc. v. United States*, 370 F.3d 1108 (Fed. Cir. 2004) ...................................................... 7
*Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104 (1991) .................................. 1, 20, 36
*Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800 (1973) ................. 27
*Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556 (Fed. Cir. 1984) ......................................... 7, 18
*Bando Chem. Indus., Ltd. v. United States*, 787 F. Supp. 224 (Ct. Int'l Trade 1992) .................. 10
*Bostock v. Clayton County*, 590 U.S. 644 (2020) ..................................................................... 9
*Burlington Truck Lines v. United States*, 371 U.S. 156 (1962) ................................................. 30
*Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367
    (Fed. Cir. 2012) ................................................................................................................ 9, 36
*Chr. Bjelland Seafoods A/S v. United States*, 19 CIT 353 (1992) ............................................ 16
*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ..................................... 8
*Citrosuco Paulista, S.A. v. United States*, 704 F. Supp. 1075 (Ct. Int'l Trade 1988) .................. 10
*Coalition for Preservation of Am. Brake Drum and Rotor Aftermarket Mfrs. v.*
    *United States*, 15 F Supp. 2d 918 (Ct. Int'l Trade 1998) .......................................................... 27
*Consol. Edison Co. v. NLRB*, 305 U.S. 197 (1938) ................................................................. 18
*CS Wind Vietnam Co. v. United States*, 832 F.3d 1367 (Fed. Cir. 2016) ..................................... 6
*Gerald Metals, Inc. v. United States*, 132 F.3d 716 (Fed. Cir. 1997) ................................. 7, 36, 40
*Greater Boston Television Corp. v. FCC*, 444 F.2d 841 (D.C. Cir. 1970) ............................... 8, 11
*Hynix Semiconductor, Inc. v. United States*, 431 F. Supp. 2d 1302 (Ct. Int'l Trade 2006) ..... 14, 41
*Jinan Yipin Corp. v. United States*, 526 F. Supp. 2d 1347 (Ct. Int'l Trade 2007) .................... 8, 26
*JMC Steel Group v. United States*, 24 F. Supp. 3d 1290 (Ct. Int'l Trade 2014) ...................... 7, 41
*LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455 (Fed. Cir. 1990) ..................... 8
*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ..................................................... 1, 9, 21
*Mid Continent Nail Corp. v. United States*, 846 F.3d 1364 (Fed. Cir. 2017) ................................ 9
*Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608 (Ct. Int'l Trade 1993) ............ 7, 34
*Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867 (Fed. Cir. 2008) ............................ 36
*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) ..................... 10
*New Prime Inc. v. Oliveira*, 586 U.S. 105 (2019) ..................................................................... 9
*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) ............................... 6, 19, 41
*Nippon Steel Corp. v. USITC*, 345 F.3d 1379 (Fed. Cir. 2003) ................................................. 36
*NMB Sing. Ltd. v. United States*, 557 F.3d 1316 (Fed. Cir. 2009) ................................. 10, 26, 30
*OSI Pharms., LLC v. Apotex, Inc.*, 939 F.3d 1375 (Fed. Cir. 2019) ........................................ 8, 26
*Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327 (Ct. Int'l Trade 2010) .................... 9, 36
*Royal Thai Gov't v. United States*, 502 F. Supp. 2d 1334 (Ct. Int'l Trade 2007) ..................... 11, 20
*SCM Corp. v. United States*, 487 F. Supp. 96 (Cust. Ct. 1980) ................................................. 8
*Shandong Rongxin Import & Export Co., v. United States*, 163 F. Supp. 3d 1249
    (Ct. Int'l Trade 2016 ............................................................................... 7, 8, 31, 30, 34

i

**NON-CONFIDENTIAL VERSION**

*SKF USA Inc. v. United States*, 263 F.3d 1369 (Fed. Cir. 2001)..............................11, 20

*Timken U.S. Corp. v. United States*, 421 F.3d 1350 (Fed. Cir. 2005) ........................... 10

*Transactive Corp. v. United States*, 91 F.3d 232 (D.C. Cir. 1996).................................11

*Tropicana Prods., Inc. v. United States*, 484 F. Supp. 2d 1330 (Ct. Int'l Trade 2007) ....... 7, 10, 41

*Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 533 F. Supp. 2d 1290 (Ct. Int'l Trade 2007) ............................................................................................................11

*U.S. Steel Grp. v. United States*, 96 F.3d 1352 (Fed. Cir. 1996) ............................... 9, 15

*Universal Camera Corp. v. NLRB*, 340 U.S. 474 (1951)...................................... 6, 7, 18

*Usinor v. United States*, 26 CIT 767 (2002) ................................................................ 16

*USX Corp. v. United States*, 655 F. Supp. 487 (Ct. Int'l Trade 1987) .............................. 7

*Wheatland Tube Co. v. United States*, 161 F.3d 1365 (Fed. Cir. 1998) ..................... 1, 27

*Wind Tower Trade Coal. v. United States*, 569 F. Supp. 3d 1221 (Ct. Int'l Trade 2022).... 7, 15, 20

*Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) ..................................................................................................................... 40

*Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333 (Fed. Cir. 2011)........... *passim*

## STATUTES

19 U.S.C. § 1516a(a)(2)(A)(i)(II) ................................................................................. 6

19 U.S.C. § 1516a(a)(2)(B)(i)...................................................................................... 6

19 U.S.C. § 1516a(b)(1)(B)(i)................................................................................... 6, 8

19 U.S.C. § 1671 *et seq*............................................................................................... 3

19 U.S.C. § 1671d(b) ............................................................................................. 6, 36

19 U.S.C. § 1671d(b)(1)(A) ....................................................................................... 15

19 U.S.C. § 1673 *et seq*............................................................................................... 3

19 U.S.C. § 1673d(b) ............................................................................................. 6, 36

19 U.S.C. § 1677(7)(A)........................................................................................... 3, 34

19 U.S.C. § 1677(7)(B)(i) ........................................................................................... 3

19 U.S.C. § 1677(7)(C)................................................................................................ 3

19 U.S.C. § 1677(7)(C)(ii).................................................................................... 22, 27

19 U.S.C. § 1677(7)(C)(ii)(II) .................................................................................... 28

19 U.S.C. § 1677(7)(C)(iii)......................................................................................... 31

19 U.S.C. § 1677(7)(C)(iii)(V) ................................................................................... 14

19 U.S.C. § 1677(7)(G)(ii)(IV) ............................................................................... 4, 18

19 U.S.C. § 1677f(i)(3)(b) .................................................................................... 10, 20

28 U.S.C. § 1581(c) .................................................................................................... 6

## REGULATIONS

19 C.F.R. § 207.4(a) ................................................................................................... 3

19 C.F.R. § 207.15 ...................................................................................................... 3

19 C.F.R. § 207.23 ...................................................................................................... 3

19 C.F.R. § 207.25 ...................................................................................................... 3

**NON-CONFIDENTIAL VERSION**

## ADMINISTRATIVE DECISIONS

*Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final), USITC Pub. 5560 (Nov. 2024) ................................................................................................................ 37

*Brass Rod from Brazil, India, Israel, Mexico, South Africa, and South Korea*, 88 Fed. Reg. 39,477 (Int'l Trade Comm'n June 16, 2023) ................................................................ 5

*Brass Rod from Brazil, India, Israel, Mexico, South Africa, and South Korea: Scheduling of the Final Phase of Countervailing Duty and Antidumping Duty Investigations*, 88 Fed. Reg. 69,229 (Int'l Trade Comm'n Oct. 5, 2023) ............................................................. 5

*Brass Rod from Brazil, India, Israel, Mexico, South Africa, and South Korea; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 88 Fed. Reg. 27,921 (May 3, 2023) ..................................................... 5

*Brass Rod from Israel*, 89 Fed. Reg. 78,330 (Int'l Trade Com'n Sept. 25, 2024) ..................... 2

*Brass Rod from Israel*, Inv. Nos. 701-TA-687 and 731-TA-1614 (Final), USITC Pub. 5545 (Sept. 2024) ............................................................................................... 2, 4, 5, 6

*Certain Carbon Steel Butt-Weld Pipe Fittings from France, India, Israel, Malaysia, the Republic of Korea, Thailand, the United Kingdom, and Venezuela*, Inv. No. 701-TA-360 and 361 and 731-TA-688-695 (Final), USITC Pub. 2870 (Apr. 1995) ......... 18, 19

*Confidential Dissenting Views* ................................................................................. *passim*

*Confidential Majority Opinion* ................................................................................. *passim*

*Forged Steel Fittings from India and Korea*, Inv. Nos. 701-TA-631 & 731-1463-1464 (Final), USITC Pub. 5137 (Nov. 2020) ................................................................... 27

*Glass Containers from China*, Inv. No. 701-TA-630 (Final), USITC Pub. 5068 (June 2020) .................................................................................................... 19, 25

*Silica Bricks and Shapes from China*, Inv. No. 731-TA-1205 at 17 (Final), USITC Pub. 4443 (Jan. 2014) .......................................................................................... 18

*Stainless Steel Round Wire from Canada, India, Japan, Korea, Spain, Taiwan*, Inv. Nos. 731-TA-781-86 (Final), USITC Pub. 3194 (May 1999) .......................................... 27

## LEGISLATIVE HISTORY

Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. I (1994) .................................................................................................... 4

NON-CONFIDENTIAL VERSION

## I.    Introduction

In its determinations before the Court, the Commission found, through misapplication of the governing law and failure to account for key record evidence, that U.S. imports of brass rod from Israel are a cause of material injury to the domestic industry.  Had it properly followed the law and accorded the required consideration of evidence that contradicted its conclusions, it could not have reached the determinations that it did.

The Commission's reversible errors begin with its complete failure to recognize the impact of the war with Hamas, which substantially reduced the volume of subject imports and fundamentally altered the conditions of competition that must inform the Commission's evaluation of all indicia of potential material injury.  Then, in evaluating the volume effects of subject imports, the Commission not only failed to grapple with compelling evidence contradicting its findings but applied the statute so as to "render{} superfluous" a key parameter of its required volume effects analysis.  *Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 112 (1991).  The Court should ensure that the Commission reaches the best reading of the governing statute, giving full effect to each word in the statute.  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 402 (2024).

The Commission also failed to conduct the required "reasoned analysis" in examining the supposed price effects of the subject imports, ignoring defining aspects of the market structure into which subject imports are sold.  *Wheatland Tube Co. v. United States*, 161 F.3d 1365, 1369 (Fed. Cir. 1998).  The Commission's analysis further unreasonably obfuscated data underscoring strong financial and operational performance of the domestic industry, while arbitrarily assigning to Israeli-origin subject imports injurious effects that the weight of the record evidence attributes to other causes.

The Commission's findings in the contested determinations, in their totality, read the word "material" out of the statute.  The Commission's determinations cannot stand under the standard

of review that the Court is directed, by statute and precedent, to apply. The Court should remand for reconsideration.

## II.     Statement Pursuant to Rule 56.2(c)(1)

### A.     Administrative Determinations Under Review

Plaintiff seeks judicial review of the final affirmative injury determinations of the Commission in the antidumping and countervailing duty investigations of brass rod from Israel. *See Brass Rod from Israel*, 89 Fed. Reg. 78,330 (Int'l Trade Com'n Sept. 25, 2024); *Brass Rod from Israel*, Inv. Nos. 701-TA-687 and 731-TA-1614 (Final), USITC Pub. 5545 (Sept. 2024).

### B.     Issues of Law and Bases for Remanding the Commission's Determinations

1.     Whether the relevant law and substantial evidence support the Commission's determination to disregard the impact of the Hamas war on the conditions of competition and on present material injury of the domestic industry.

2.     Whether the relevant law and substantial evidence support the Commission's determination that a minor increase in subject imports from Israel constitutes a significant import volume.

3.     Whether the relevant law and substantial evidence support the Commission's decision to disregard a cost-based adjustment to domestic industry prices and determine that underselling by subject imports from Israel was significant.

4.     Whether the relevant law and substantial evidence support the Commission's determination that the domestic industry experienced a significant negative impact from subject imports from Israel, despite several factors indicating that the domestic industry's performance improved or was unchanged during the POI.

5.     Whether the relevant law and substantial evidence support the Commission's decision to attribute any material injury experienced by the domestic industry to subject imports

from Israel instead of the domestic industry's documented production constraints or imports from other countries.

Because neither substantial evidence nor the law support these decisions made by the Commission, the Court should remand and order the Commission to reconsider them.

## III.    Statement of the Case

### A.    Statutory Framework

#### 1.    Legal Considerations for the Commission's Final Determinations

Under the relevant provisions of the Tariff Act of 1930, as amended, any order imposing antidumping or countervailing duties requires two underlying predicates: (1) a final affirmative determination by the U.S. Department of Commerce ("Commerce") of a countervailable subsidy or sales at less than fair value; and (2) a final affirmative determination of material injury or threat thereof from subject imports by the Commission.  *See* 19 U.S.C. § 1671 et seq. (countervailing duties); 19 U.S.C. § 1673 *et seq*. (antidumping duties).

The record upon which the Commission conducts its injury investigation comprises "{a}ll material properly filed," including briefs and supporting exhibits filed by interested parties. 19 C.F.R. §§ 207.4(a), 207.15, 207.23, 207.25.   As defined in the statute, "material injury" is "harm which is not inconsequential, immaterial, or unimportant."  19 U.S.C. § 1677(7)(A).  To assess whether an industry in the United States ("domestic industry") is experiencing or threatened with material injury by reason of subject imports, the Commission must consider: the "volume" of subject imports; any effects subject imports have on "prices in the United States for domestic like products"; the "impact" of subject imports on domestic producers; and any other "economic factors" that are "relevant."  19 U.S.C. § 1677(7)(B)(i).  Throughout its analysis, the Commission must "evaluate all relevant economic factors . . . within the context of the business cycle and conditions of competition that are distinctive to the affected industry."  19 U.S.C. § 1677(7)(C).

As made clear by the legislative history, the Commission's duty to assess whether any injury is "by reason of" subject imports also requires that it "examine other factors to ensure that it is not attributing injury from other sources to the subject imports." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. I at 851-52 (1994).

### 2.      Special Decumulation Provision for Israel

In determining whether a domestic industry is materially injured, the Commission cumulates imports from all countries subject to the investigation, with certain exceptions. With respect to subject imports from Israel, the Commission shall not cumulatively assess the volume and effects of imports "from any country that is a party to an agreement with the United States establishing a free trade area, which entered into force and effect before January 1, 1987 {i.e., Israel}, unless the Commission determines that a domestic industry is materially injured or threatened with material injury by reason of imports from that country." 19 U.S.C. § 1677(7)(G)(ii)(IV); *Brass Rod from India*, USITC Pub. 5485 at 14. Stated differently, if the Commission finds that subject imports from Israel do not on their own materially injure or threaten material injury to the domestic industry, the Commission makes a negative determination with respect to Israel. However, if the Commission makes an affirmative determination with respect to subject imports from Israel, the Commission will cumulate such imports with imports from all subject countries.

### B.      Factual Background

### 1.      The Commission's Preliminary Determinations

On April 27, 2023, The American Brass Rod Fair Trade Coalition and its members, Mueller Brass Co. ("Mueller") and Wieland Chase LLC ("Wieland"), filed petitions with the Commission and Commerce alleging that imports of brass rod from Brazil, India, Israel, Mexico, South Africa, and South Korea were sold in the United States at less than fair value, imports of brass rod from

India, Israel, and South Korea were unfairly subsidized, and those imports materially injured or threatened material injury to the domestic brass rod industry. *See Brass Rod from Brazil, India, Israel, Mexico, South Africa, and South Korea; Institution of Antidumping and Countervailing Duty Investigations and Scheduling of Preliminary Phase Investigations*, 88 Fed. Reg. 27,921 (May 3, 2023). On June 16, 2023, the Commission published its preliminary affirmative determinations of a reasonable indication of material injury by reason of subject imports of brass rod. *Brass Rod from Brazil, India, Israel, Mexico, South Africa, and South Korea*, 88 Fed. Reg. 39,477 (Int'l Trade Comm'n June 16, 2023).

## 2.    The Commission's Final Determinations

On October 5, 2023, the Commission published the schedule for the final phase investigations. *Brass Rod from Brazil, India, Israel, Mexico, South Africa, and South Korea: Scheduling of the Final Phase of Countervailing Duty and Antidumping Duty Investigations*, 88 Fed. Reg. 69,229 (Int'l Trade Comm'n Oct. 5, 2023). The Commission's final phase investigation schedules became staggered when Commerce issued an early final affirmative countervailing duty determination with respect to India because it did not align the schedule of that investigation with the antidumping duty investigation of India. *Brass Rod from Israel*, USITC Pub. 5545 at 2. The investigation schedules became further staggered when Commerce aligned the antidumping and countervailing duty investigations of Israel and tolled all deadlines for those investigations by 90 days, due to the October 7, 2023 attack on Israel by the terrorist organization, Hamas, and the ongoing war. *Id.*

The Commission issued its findings with respect to subject imports from Israel as part of its final determination in the countervailing duty investigation of India. The Commission did so because the determination of whether to cumulate subject imports from Israel affected the outcome of all other investigations. The Commission subsequently incorporated by reference its findings

from the earlier countervailing duty investigation of brass rod from India and made affirmative determinations of material injury in the trailing investigations of subject imports from Israel. *Id.* at 1-6.

Three Commissioners found that the volume of subject imports from Israel was significant, and that such imports caused significant price effects and had a significant impact on the domestic industry. *See Confidential Majority Opinion* at 45-82, C.R. 238. Chairman David S. Johanson made negative determinations, finding that imports of brass rod from Israel neither materially injured the domestic industry nor threatened the domestic industry with material injury. *See Confidential Dissenting Views* at 3, C.R. 239.

## IV.    Subject Matter Jurisdiction and Standard of Review

### A.    The Court Has Subject Matter Jurisdiction

The Government of Israel brings this action pursuant to 19 U.S.C. § 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i) to review final affirmative determinations made by the Commission under 19 U.S.C. §§ 1673d(b) and 1671d(b). As a result, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1581(c).

### B.    The Commission Must Support its Determinations with Substantial Evidence

With respect to factual findings and conclusions, the Commission's determinations shall not be upheld if it is "unsupported by substantial evidence on the record." 19 U.S.C. § 1516a(b)(1)(B)(i). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *CS Wind Vietnam Co. v. United States*, 832 F.3d 1367, 1373 (Fed. Cir. 2016); *Zhejiang DunAn Hetian Metal Co. v. United States*, 652 F.3d 1333, 1340 (Fed. Cir. 2011) (quoting *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1379 (Fed. Cir. 2003)). "{S}ubstantial evidence is more than a mere scintilla." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 477 (1951) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938));

*accord Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004) (quoting *Atl. Sugar, Ltd. v. United States*, 744 F.2d 1556, 1562 (Fed. Cir. 1984)). The existence of substantial evidence is determined by a review of the record as a whole, including whatever "fairly detracts" from the agency's determination. *See, e.g., Universal Camera*, 340 U.S. at 488 (reviewing authority must consider "the record in its entirety . . . , including the body of evidence opposed to the {agency's} view"); *Gerald Metals, Inc. v. United States*, 132 F.3d 716, 720 (Fed. Cir. 1997); *Tropicana Prods., Inc. v. United States*, 484 F. Supp. 2d 1330, 1347 (Ct. Int'l Trade 2007).

The Commission "cannot simply ignore significant contradictory evidence and assert that, nevertheless, its determination was supported by substantial evidence." *Mitsubishi Materials Corp. v. United States*, 820 F. Supp. 608, 624 (Ct. Int'l Trade 1993); *see also Ad Hoc Shrimp Trade Action Comm. v. United States*, 791 F. Supp. 2d 1327, 1334 (Ct. Int'l Trade 2011) (because the agency "failed to take into account record evidence that fairly detracts from the weight of the evidence supporting its . . . determinations, these determinations are not supported by substantial evidence."). Nor can the Commission base its findings on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *Shandong Rongxin Import & Export Co., v. United States*, 163 F. Supp. 3d 1249, 1252 (Ct. Int'l Trade 2016) (quoting *USX Corp. v. United States*, 655 F. Supp. 487, 489 (Ct. Int'l Trade 1987)). While the Commission "need not address every argument and piece of evidence, it must address significant arguments and evidence which seriously undermine{} its reasoning and conclusion." *Wind Tower Trade Coal. v. United States*, 569 F. Supp. 3d 1221, 1248 (Ct. Int'l Trade 2022) (quoting *Altx, Inc. v. United States*, 167 F. Supp. 2d 1353, 1374 (Ct. Int'l Trade 2001) (internal citation omitted), *aff'd Altx*, 370 F.3d at 1116); *JMC Steel Group v. United States*, 24 F. Supp. 3d 1290, 1304 (Ct. Int'l Trade 2014) (the Commission must "address significant arguments of the parties which impact{} the reliability of its reasoning

and conclusions."). The Commission cannot rely on mere speculation or presumptions unsupported by record evidence to avoid examining relevant evidence. *See, e.g.*, *OSI Pharms., LLC v. Apotex, Inc.*, 939 F.3d 1375, 1382 (Fed. Cir. 2019) ("Mere speculation is not substantial evidence."); *LMI-La Metalli Industriale, S.p.A. v. United States*, 912 F.2d 455, 460 (Fed. Cir. 1990) (stating that when there is salient evidence in the record, an agency's "speculation . . . must yield to evidence"); *Jinan Yipin Corp. v. United States*, 526 F. Supp. 2d 1347, 1375 (Ct. Int'l Trade 2007) (remanding where the agency's decision was based on "mere assumptions, which find no apparent support in record evidence").

In determining whether the Commission's determinations are supported by substantial evidence, the Court must ensure that the Commission has taken a "hard look" at the evidence and issues and has not relied on "isolated tidbits of data which suggest a result contrary to the clear weight of the evidence." *Greater Boston Television Corp. v. FCC*, 444 F.2d 841, 851 (D.C. Cir. 1970) (noting that it is the responsibility of the court to reverse a determination where "the agency has not really taken a 'hard look' at the salient problems, and has not genuinely engaged in reasoned decision-making" (footnote omitted)); *Shandong Rongxin*, 163 F. Supp. 3d at 1252. It is not sufficient for the Court to look only at the evidence supporting the Commission's conclusion. The Court must engage in a "thorough, probing, in-depth review" of all material evidence in the record to determine whether the Commission's determinations are supported by substantial evidence. *SCM Corp. v. United States*, 487 F. Supp. 96, 99 (Cust. Ct. 1980) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971)).

## C. The Commission's Determinations Must Be in Accordance with Law

The Commission's determination shall not be upheld if it is "otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The Court "review{s} the Commission's conclusions of law de novo." *Allegheny Ludlum Corp. v. United States*, 287 F.3d 1365, 1369 (Fed. Cir. 2002)

(citing *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1356 (Fed. Cir. 1996)).  The Court must ask whether the Commission has acted consistently with the statute, exercised its discretion reasonably, and avoided acting in a manner that is arbitrary or capricious.

### 1.    The Commission Must Act Consistently with the Statute

Where the Commission has interpreted a provision of Title VII of the Tariff Act of 1930, the Court must "exercise independent judgment in determining the meaning of statutory provisions." *Loper Bright*, 603 U.S. at 394.  The Court starts its inquiry with the text and aims to determine its "ordinary meaning at the time Congress enacted the statute." *New Prime Inc. v. Oliveira*, 586 U.S. 105, 113 (2019) (cleaned up).  "{W}hen the meaning of the statute's terms is plain," the Court's job is "at an end." *Bostock v. Clayton County*, 590 U.S. 644, 674 (2020).  When interpreting ambiguous statutes, the Court is not permitted to defer to the Commission, even on technical aspects of statutory interpretation, because "Congress expects courts to handle technical statutory questions." *Loper Bright*, 603 U.S. at 402.  Instead, the Court is required to "use every tool at {its} disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* at 400.

### 2.    The Commission Cannot Act Arbitrarily and Capriciously

If the Commission acts arbitrarily or capriciously, its determination is not in accordance with law.  *See, e.g.*, *Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017) ("Commerce's decision will be set aside if it is arbitrary and capricious." (quoting *Changzhou Wujin Fine Chem. Factory Co. v. United States*, 701 F.3d 1367, 1374 (Fed. Cir. 2012))).  The exercise of discretion does not excuse the Commission from its obligation to avoid arbitrary action. *Pakfood Pub. Co. v. United States*, 724 F. Supp. 2d 1327, 1337 (Ct. Int'l Trade 2010).  In so doing, the Commission must engage in reasoned decision-making, by "examin{ing} the relevant data and articulat{ing} a satisfactory explanation for its action including a rational

connection between the facts found and the choice made." *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)); *Bando Chem. Indus., Ltd. v. United States*, 787 F. Supp. 224, 227 (Ct. Int'l Trade 1992). Moreover, section 777(i)(3)(B) of the Tariff Act requires the Commission "to include in a final determination of injury an explanation of the basis for its determination that addresses relevant arguments that are made by interested parties . . . concerning volume, price effects, and impact on the industry of imports of the subject merchandise." 19 U.S.C. § 1677f(i)(3)(b). Failure to consider "an important aspect of the problem" renders a determination arbitrary. *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983); *see also Tropicana Prods.*, 484 F. Supp. 2d at 1347 (holding that Commission's determination was "arbitrary and capricious because it did not address many important issues relating to the effects of the short supply of domestic oranges upon the domestic industry"). Similarly, the Commission acts arbitrarily when it "offer{s} an explanation for its decision that runs counter to the evidence before the agency." *State Farm*, 463 U.S. at 43 (internal quotation marks omitted).

The Commission's duty not to act in an arbitrary fashion also requires it to engage in consistent and even-handed decision-making. It must act consistently with its past practice or articulate a reasoned explanation for departing from that practice. *See, e.g.*, *NMB Sing. Ltd. v. United States*, 557 F.3d 1316, 1328 (Fed. Cir. 2009) (remanding to Commerce and explaining that "{o}nce Commerce establishes a course of action . . . Commerce is obliged to follow it until Commerce provides a sufficient, reasoned analysis explaining why a change is necessary"); *Citrosuco Paulista, S.A. v. United States*, 704 F. Supp. 1075, 1088 (Ct. Int'l Trade 1988) ("While the Commission is not obligated to follow prior decisions if new arguments or facts are presented

that support a different conclusion, this does not permit the Commission to act arbitrarily. This is because it is also a general rule that an agency must either conform itself to its prior decisions or explain the reasons for its departure." (citations omitted)); *Trustees in Bankr. of N. Am. Rubber Thread Co. v. United States*, 533 F. Supp. 2d 1290, 1297 (Ct. Int'l Trade 2007) (remanding because "Commerce did not attempt to explain why it acted contrary to its own precedent"). The Commission also cannot treat like situations differently without providing adequate explanation. *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir. 2001) ("{A}n agency action is arbitrary when the agency offer{s} insufficient reasons for treating similar situations differently." (quoting *Transactive Corp. v. United States*, 91 F.3d 232, 237 (D.C. Cir. 1996))); *Royal Thai Gov't v. United States*, 502 F. Supp. 2d 1334, 1341 (Ct. Int'l Trade 2007) ("Commerce may not treat two like situations differently without explanation.").

In sum, the Court must ensure that the Commission's decision is reasoned and fair. "The function of the court is to assure that the agency has given reasoned consideration to all the material facts and issues" with "rigorous insistence on the need for conjunction of articulated standards and reflective findings, in furtherance of evenhanded application of law, rather than impermissible whim, improper influence, or misplaced zeal." *Greater Boston Television*, 444 F.2d at 851-52.

## V.    Summary of Argument

The Commission's final determinations suffer from numerous errors, each of which provide a separate basis to remand. For starters, the Commission entirely disregarded information that was critical to its material injury determinations—namely, the Hamas war that began between the end of the POI and the Commission's vote date. The Hamas war impacted the conditions of competition by affecting the operations of the only Israeli producer of subject merchandise and the condition of the domestic injury at the time of the Commission's determination regarding present

**NON-CONFIDENTIAL VERSION**

material injury.  Without considering this critical information, the Commission's determinations are unlawful and unsupported by substantial evidence.

As a separate deficiency, the Commission reached several decisions that are not supported by substantial evidence by mischaracterizing the record and disregarding contradictory information.  First, in determining that the volume of subject imports from Israel was significant, the majority incorrectly applied the statute and contradicted its past practice to find that a minor increase in subject imports from Israel constitutes a significant import volume.  Second, in determining that subject imports from Israel significantly undersold the domestic industry, the majority declined to adopt a cost-based price adjustment that would account for a pricing premium that was used more frequently by the domestic industry than foreign producers, thereby overstating the frequency and magnitude of underselling.  Third, in determining that subject imports from Israel had a significant negative impact on the domestic industry, the majority relied on a small number of datapoints stripped from context and disregarded overwhelming record evidence showing that the domestic industry's financial performance improved during the POI.

Aside from these material missteps, the Commission also erred by attributing material injury to subject imports from Israel, improperly disregarding record evidence showing other contributing factors to any such injury.  For example, the majority disregarded the supply constraints that plagued the domestic industry throughout the POI.  The majority also failed to adequately account for the impact of subject imports from other countries in its analysis of subject imports from Israel.

Finally, the Commission applied an unlawful interpretation of the term "significant" and "material" that essentially reads those words out of the statute.  The application of these erroneous interpretations in turn tainted the Commission's determinations.

NON-CONFIDENTIAL VERSION

**VI.    The Commission's Final Determinations Are Not Supported by Substantial Evidence or Otherwise Not in Accordance with Law**

    **A.    The Commission Unlawfully Ignored Record Evidence Regarding Israel's War with Hamas**

During briefing, Plaintiff and the only Israeli producer of subject merchandise placed information on the record demonstrating changes in production capacity at time of the Commission's vote. *See* Prehearing Brief of Finkelstein Metals, C.R. 193/P.R. 127; Prehearing Statement of Government of Israel, P.R. 121; Posthearing Brief of Finkelstein Metals, C.R. 210/P.R. 151; Posthearing Brief of Government of Israel, P.R. 139. On October 7, 2023, (one week after the end of the period of investigation ("POI") from January 2020 to September 2023), the terrorist organization, Hamas, attacked Israel, instigating a war that is still ongoing. Prehearing Statement of Government of Israel at 1, P.R. 121. The Israeli producer was significantly impaired by the war. The Israeli producer reported that one-third of its production employees are West Bank residents who, at the time of the vote, were prohibited from coming to work and could not be temporarily replaced, resulting in a reduction in production hours of [      ] percent since the war began. *Confidential Dissenting Views* at 32-33, C.R. 239; Posthearing Brief of Finkelstein Metals at 25, Exh. 9, C.R. 210/P.R. 151. The Israeli producer also reported that production of new finished goods decreased by [   ] percent between the October 7, 2023 attack and briefing. *Confidential Dissenting Views* at 32-33, C.R. 239; Posthearing Brief of Finkelstein Metals at 25-26, C.R. 210/P.R. 151. As a result of these constraints, the Israeli producer expected a reduction in its practical brass rod capacity from [          ] pounds to [         ] pounds in 2024. *Confidential Dissenting Views* at 32-33, C.R. 239; Prehearing Brief of Finkelstein Metals at 28, C.R. 193/P.R. 127. As the dissenting opinion explained, these impairments reduced the Israeli producer's incentive to cut prices to gain U.S. market share and do not incentivize U.S. producers to cut prices

because the Israeli producer cannot increase exports to the United States. *Confidential Dissenting Views* at 33, C.R. 239.

The majority opinion contained only a single passing reference to the Hamas war and did not address its effects on Israeli brass rod production. *Confidential Majority Opinion* at 34, C.R. 238 ("After the end of the POI, Finkelstein reported that the war in Gaza following Hamas's October 7, 2023 attack on Israel caused labor shortages and logistical constraints that forced it to reduce production of brass rod."). The Commission's failure to address substantial, relevant information on the record renders the determinations unlawful in two ways. First, the Commission was required to address the effect of the Hamas war on conditions of competition. Second, the Commission was required to address the effect of the Hamas war on Israeli brass rod production as a significant circumstance and event that occurred between the petition date and the vote day. In either context, the Commission's decision is not supported by substantial evidence or otherwise not in accordance with law.

### 1. By Failing to Consider the Effect of the Hamas War on Conditions of Competition, the Commission's Decision is Not Supported by Substantial Evidence and Otherwise Not in Accordance with Law

The determinations are inconsistent with the statutory requirement for the Commission to "evaluate all relevant economic factors . . . within the context of . . . conditions of competition that are distinctive to the affected industry." 19 U.S.C. § 1677(7)(C)(iii)(V). The law requires the Commission to consider the unique context of each examined country and industry to "prevent{} the {Commission} from attributing to subject imports an injury whose cause lies elsewhere." *Hynix Semiconductor, Inc. v. United States*, 431 F. Supp. 2d 1302, 1316 (Ct. Int'l Trade 2006). The attack on Israel and the ongoing war with Hamas are important conditions of competition that impaired (and continue to impair) the volume of brass rod available for export to the United States. The war significantly reduced production hours by the only Israeli producer of subject

merchandise, resulting in decreased capacity to export subject merchandise.  While constraining supply, the war increased Israeli demand for brass rod, which has military uses.  *See, e.g.*, Prehearing Statement of Government of Israel at 4-5, P.R. 121.

The Commission is required to follow the statute's mandate to consider economic factors in the context of conditions of competition.  *U.S. Steel Group v. United States*, 96 F.3d at 1362 (holding that the court's role is to "direct the Commission to follow the dictates of its statutory mandate").  In its determinations, the Commission failed to consider economic factors in the conditions of competition as required by statute.  The dissenting opinion recognized that the war fundamentally shifted certain conditions of competition, including by reducing the risk that subject imports from Israel would affect U.S. prices.  *See Confidential Dissenting Views* at 33, C.R. 239. If the majority had properly considered the economic data in the context of the war's significant impact on Israeli production, it would likely have reached the same conclusion.  However, the majority did not address the Hamas war at all in its determinations.  By failing to address the significant factual information on the record, the Commission ignored "significant arguments and evidence which seriously undermine{} its reasoning and conclusion."  *Wind Tower Trade Coal.*, 569 F. Supp. 3d at 1248.  The determinations are therefore not supported by substantial evidence and otherwise not in accordance with law.

2.   **The Commission Unlawfully Failed to Consider Significant Circumstances and Events that Occurred Around the Time of the Injury Vote**

Separately, the determinations failed to address information on the record indicating that subject imports from Israel were not causing material injury to the domestic industry.  The statute requires (in the present tense) the Commission to determine whether the domestic injury "is materially injured" or "is threatened with material injury."  19 U.S.C. § 1671d(b)(1)(A) (emphasis added).  In other words, the Commission is not permitted to end its analysis at the end of the POI.

15

Rather, the statute requires the Commission to make a determination of present material injury, warranting greater emphasis on events at the end of or after the POI. *See Usinor v. United States*, 26 CIT 767, 779 (2002); *accord Chr. Bjelland Seafoods A/S v. United States*, 19 CIT 35, 43 (1992). This court has explained that the Commission's obligation to consider events after the POI is consistent with the intent of law to "balance the future competitive environment between the domestic industry and various foreign importers." *Usinor*, 26 CIT at 779. Accordingly, the Commission was required to "address record evidence of significant circumstances and events that occur between the petition date and the vote day." *Id*.

The Commission could not properly assess present material injury under this legal standard without first considering the impact of the Hamas war, which occurred and continued while the record remained open and therefore was relevant to the Commission's determinations. As explained above, Israel was attacked shortly after the end of the POI, close in time to the period for which the Commission collected data, instigating a war that is still ongoing. Because of the war, Israel's ability to produce and export subject merchandise has been fundamentally altered, limiting the usefulness of the data covering the entirety of the POI. The war significantly reduced production hours by the only Israeli producer of subject merchandise, resulting in decreased capacity to export subject merchandise in the future compared to the POI. As the dissenting opinion recognized, the war constitutes a significant circumstance or event that occurred before the vote date. *See Confidential Dissenting Views* at 33, C.R. 239. However, the majority offered only a single passing reference to the war in its opinion, despite being relevant to whether the domestic industry "is" (at the time of the Commission's determinations) materially injured by reason of subject imports.

**NON-CONFIDENTIAL VERSION**

By failing to substantively address the record evidence regarding the Hamas war in its material injury analysis, the Commission "ignore{d} significant contradictory evidence" to its finding that subject imports from Israel materially injured the domestic industry.  *See Mitsubishi Materials*, 820 F. Supp. at 624.  In doing so, the Commission "failed to take into account record evidence that fairly detracts from the weight of the evidence supporting {the} determination." *Ad Hoc Shrimp Trade Action Comm.*, 791 F. Supp. 2d 1327, 1334 (Ct. Int'l Trade 2011).  Therefore, the Commission's determinations that the domestic industry was materially injured by reason of subject imports from Israel were unsupported by substantial evidence and otherwise not in accordance with law.

    **B.**    **The Commission's Volume Analysis Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law**

The Commission improperly determined that the small volume of subject imports from Israel was significant.  *See Confidential Majority Opinion* at 45-46, C.R. 238.  Pursuant to 19 U.S.C. § 1677(7)(C)(i), "{i}n evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the subject merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is <u>significant</u>."  (Emphasis added.)  For three reasons, the Commission's volume analysis is unsupported by substantial evidence and not in accordance with law.

First, the increase in subject import volumes was minor, in absolute terms and relative to apparent U.S. consumption and domestic production.  The record evidence shows that the market share of subject imports from Israel remained [             ] throughout the POI, [  ] percent in 2020, [  ] percent in 2021, [  ] percent in 2022, and [  ] percent in interim 2023—[     ] percentage point increase from 2020 to 2022 and [  ] percentage point increase over the full POI.  *Confidential Staff Report* at C-3 (Table C-1), C.R. 218.  The volume

of subject imports from Israel was very small relative to U.S. production.  Shipments of imports

from Israel were approximately [          ] pounds in 2020, [          ] pounds in 2021, [

          ] pounds in 2022, and [          ] pounds in interim 2023, increasing by only around

[          ] pounds over the three full years of the POI.  *Id.* at C-4 (Table C-1), C.R. 218.  By

comparison, U.S. production was [          ] pounds in 2020, [          ] pounds in 2021,

[          ] pounds in 2022, and [          ] pounds in interim 2023.  *Id.*

"{S}ubstantial evidence is more than a mere scintilla."  *Universal Camera*, 340 U.S. at 477

(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)); *accord Altx*, 370 F.3d at 1116

(quoting *Atl. Sugar*, 744 F.2d at 1562).  In this case, during the POI, the increase in subject import

volumes was minor, in absolute terms and relative to apparent U.S. consumption and domestic

production.  Based on similar facts, the Commission previously made negative determinations.

For example, in *Pipe Fittings*, the Commission applied section 1677(7)(G)(ii)(IV) of the statute

and undertook a decumulated analysis of subject imports from Israel.  *See Certain Carbon Steel

Butt-Weld Pipe Fittings from France, India, Israel, Malaysia, the Republic of Korea, Thailand, the

United Kingdom, and Venezuela*, Inv. No. 701-TA-360 and 361 and 731-TA-688-695 (Final),

USITC Pub. 2870 (Apr. 1995) ("*Pipe Fittings*").  The annual volume of pipe fittings from Israel

increased by over 300 percent but Israel's market share remained below 1.6 percent throughout the

POI.  *Id.* at I-20.  The Commission determined that subject import volumes were not significant

because "{e}ven if the domestic industry increased its sales by the entire amount of the imports

from Israel, domestic sales would not have increased significantly."  *Id.* at I-21.  The Commission

has also reached negative determinations under other analogous fact patterns.  *See e.g., Silica

Bricks and Shapes from China*, Inv. No. 731-TA-1205 at 17 (Final), USITC Pub. 4443 (Jan. 2014)

(finding no "significant increase in shipments of subject imports relative to consumption over the

POI" because the market share of subject imports "changed little" during the POI); *Glass Containers from China*, Inv. No. 701-TA-630 (Final), USITC Pub. 5068 at 33-34 (June 2020) (explaining in its negative determination that "subject imports market share remained essentially flat" during the POI).

In *Brass Rod*, Israel's market share ranged from **[     ]** percent to **[     ]** percent during the POI and import volumes increased at a much lower rate (**[                                    ]**) than the rate of increase for subject imports from Israel in the *Pipe Fittings* case. *Compare Confidential Staff Report* at C-3 to C-4 (Table C-1), C.R. 218, *with Pipe Fittings*, USITC Pub. 2870 at I-20 to I-21. Here, too, the volume of brass rod from Israel during any year of the POI was a fraction of U.S. shipments. If the domestic industry had captured the entirety of subject import volumes from Israel as its own sales, domestic sales would not have increased significantly. Indeed, "the increase in market share of subject imports from Israel corresponded at most to a few days' U.S. production." *Confidential Dissenting Views* at 25, C.R. 239. Viewed in this context, the Commission's determinations were not supported by substantial evidence because "a reasonable mind" would not "accept" the facts on the record as "adequate to support {its} conclusion." *Zhejiang DunAn Hetian Metal Co.*, 652 F.3d at 1340 (quoting *Nippon Steel Corp.*, 337 F.3d at 1379).

Furthermore, the majority's determination with respect to the volume of subject imports was arbitrary and otherwise not in accordance with law, for several reasons. First, parties raised the *Pipe Fittings* case multiple times in briefing during the final phase of the investigations. *See, e.g.*, Prehearing Brief of Finkelstein Metals at 39, C.R. 193/P.R. 127; Posthearing Brief of Finkelstein Metals at 31, C.R. 210/P.R. 151. Despite having similar facts before it, the Commission did not address why it reached the opposite conclusion with regard to subject imports

from Israel. The Commission's determinations are therefore not in accordance with law because the Commission failed "to include in a final determination of injury an explanation of the basis for its determination that addresses" interested parties' arguments that subject imports from Israel were not significant. 19 U.S.C. § 1677f(i)(3)(B); *see also Wind Tower Trade Coal.*, 569 F. Supp. 3d at 1248 (holding that the Commission "must address significant arguments and evidence which seriously undermine{} its reasoning and conclusion"). The Commission also acted arbitrarily when it provided no reasoned explanation for treating subject imports from Israel in these investigations differently from subject imports from Israel in *Pipe Fittings*. *SKF*, 263 F.3d at 1382; *Royal Thai Gov't*, 502 F. Supp. 2d at 1341 (holding that agencies "may not treat two like situations differently without explanation").

Second, in finding that import volumes from Israel were significant, the majority impermissibly read the word "significant" out of the statute. The majority interpreted the statute as providing "no minimum threshold for the market share or increase to be 'significant.'" *Confidential Majority Opinion* at 46 n.189, C.R. 238. In other words, the Commission interpreted the statute such that <u>any</u> subject import volume or market share is significant, regardless of how small. While the statute may not define a numerical threshold for "significant" volumes, the term is an express statutory limitation that must be given meaning. A court should "construe statutes, where possible, so as to avoid rendering superfluous any parts thereof." *Astoria Fed. Sav. & Loan*, 501 U.S. at 112. "Superfluous" is defined as "not needed" (Merriam-Webster Dictionary), "extra and not necessary" (Cambridge Dictionary), or "unnecessary" (Oxford English Dictionary). By failing to place any limits on its construction of the word "significant," the Commission impermissibly read the word out of the statute. The Commission interpreted the statutory term "significant" as "superfluous" ("unnecessary," "not needed," and "extra") because <u>any</u> volume

could be significant. "Congress expects courts to handle technical statutory questions." *Loper Bright*, 603 U.S. at 402. The Court is therefore empowered to read every word in the statute and find that the volume of subject imports from Israel was not significant.

Third, and relatedly, the Commission's finding that such a small volume and change in market share is "significant" runs afoul of the plain language of the statute. The word "significant" is defined as "having or likely to have influence or effect" or "of a noticeably or measurably large amount" (Merriam-Webster Dictionary); "sufficiently great or important to be worthy of attention" (Oxford English Dictionary); or "important, large, or great, esp. in leading to a different result or to an important change" (Cambridge Dictionary). By any of these definitions, the imports from Israel were not significant because the market share of subject imports from Israel remained in the [                    ] throughout the POI, and the absolute volume remained extremely low relative to U.S. production. *See Confidential Staff Report* at C-3 (Table C-1), C.R. 218. Such low volumes were not "having or likely to have influence or effect" and could not reasonably be construed as "a noticeably or measurably large amount," "important," or "great." Therefore, no reasonable reading of the statute supports the Commission's finding that subject import volumes were significant. Instead, the Court is required to "use every tool at {its} disposal to determine the best reading of the statute and resolve the ambiguity," *Loper Bright*, 603 U.S. at 400, and find subject import volumes from Israel were not significant.

For these reasons, the Commission's volume analysis was unsupported by substantial evidence and otherwise not in accordance with law.

### C.     The Commission's Pricing Analysis Was Unsupported by Substantial Evidence and Otherwise Not in Accordance with Law

The statute requires the Commission to "consider whether-- (I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like

products of the United States, and (II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii).  The majority conducted a pricing analysis that concluded that underselling by subject imports from Israel caused negative price effects for the domestic industry. *See Confidential Majority Opinion* at 47-66, C.R. 238.  Chairman Johanson dissented from the majority's price analysis, and Commissioner Schmidtlein did not join portions of the majority's opinion. *See Confidential Dissenting Views* at 19-38, C.R. 239; *Confidential Majority Opinion* at 62 n.242, C.R. 238 (declining to rely on trends in 2021 as the basis for her finding of significant price suppression, given the domestic industry's acknowledged supply constraints in that year).  For the reasons provided below, the Commission's pricing analysis lacks factual and legal support.

1. **The Commission's Adjustment of Pricing Product Data for its Underselling Analysis is Arbitrary and Unsupported by Substantial Evidence**

The majority found "pervasive subject import underselling" and that "subject imports from Israel undersold the domestic like product to a significant degree." *Confidential Majority Opinion* at 58, 66, C.R. 238.  To reach this conclusion, the majority adjusted quarterly quantity and value data collected from U.S. producers and U.S. importers for U.S. shipments of three "pricing products," defined by physical characteristics (alloy series, diameter, and length). *Id*. at 47-48 n.192, C.R. 238.  To account for sales methods particular to the brass rod market in the United States, the Commission collected data for the three pricing products by three channels of distribution.[1]  As explained further below, the majority attempted to adjust the pricing data to

---

[1] "The nine pricing products represent sales for three products broken out by channel of distribution: sales to end users through scrap buyback programs (products 1, 4, and 7), sales to end users not through scrap buyback programs (products 2, 5, and 8), and sales to distributors (products 3, 6, and 9)." *Confidential Majority Opinion* at 47, C.R. 238.

account for price differences distinct to the channels of distribution, but in so doing, the majority failed to quantify the true net price to the Petitioners, undermining the comparison of domestic prices to subject import prices. When properly adjusted, the degree of underselling by subject imports from Israel was not significant, as required by the statute to support a finding of adverse price effects. The majority's determination of significant underselling was therefore not supported by substantial evidence and not in accordance with law.

For context, Petitioners "Mueller and Wieland both sell brass rod to participating end user customers under a scrap buyback program whereby the customer can sell back to the respective petitioner the scrap the customer generates in producing its product from the brass rod." *Id*. at 40, C.R. 238. "Mueller and Wieland typically charge a higher price for the brass rod sold through scrap buyback programs than not through scrap buyback." *Id*. at 40-41, C.R. 238. Mueller and Wieland also purchased a significant majority of scrap back from their customers at a premium over the market price, resulting in effectively a refund or discount to the price initially paid by U.S. customer for brass rod. *See* Prehearing Brief of Finkelstein Metals at 4, 45-48, C.R. 193/P.R. 127. By contrast, U.S. importers reported no U.S. shipments of brass rod from Israel through a buyback program. *See Confidential Majority Opinion* at 48 n.193, C.R. 238.

The Commission found evidence that "the same end users have purchased brass rod from domestic producers through a scrap buyback program and from subject importers not through a scrap buyback program." *Id*. at 55, C.R. 238. Before the Commission, "{p}arties argue{d} that end user purchasers consider the price that domestic producers charge for brass rod to the price (based on scrap buyback or no buyback prices), along with the return they could expect for selling their scrap, based on the expected price for their scrap (either through a scrap buyback program or market prices)." *Id*. at 52, C.R. 238. End user purchasers also consider "the quantity of scrap

NON-CONFIDENTIAL VERSION

produced" and "compare their resulting 'net cost' for purchasing from the domestic industry with the net cost charged for purchasing brass rod from other suppliers such as {the Israeli producer}." *Id*. at 52, C.R. 238.  Therefore, scrap buyback is a critical aspect of purchasing decisions and affects the ultimate price paid.

Having no pricing product data for subject imports from Israel pursuant to a buyback program, the majority "combine{d} the pricing data for sales {of each pricing product} to end users participating in the scrap buyback program and for sales to end users not participating in a buyback program with adjustments to account for the higher price paid by buyback program participants." *Id*. at 55, C.R. 238.  Unadjusted price comparisons would have generated subject import underselling without taking into account the entirety of the transaction with the customer. Indeed, the Respondent argued that "when the 'rebate' is appropriately deducted from petitioners' prices, the majority of sales of subject imports from Israel oversold the domestic like product . . . ." *Id*. at 55, C.R. 238.

The Commission Staff produced three alternative datasets to determine the extent to which prices of subject imports from Israel undersold the domestic industry: (1) no adjustment (Table F-1); (2) replacing the prices with scrap buyback with the prices with no buyback (Table F-2); and (3) a cost-based adjustment that uniformly reduced all U.S. producers' reported prices for sales to end customers that participated in scrap buyback programs by a net scrap buyback cost premium (Table F-3).  *See Confidential Majority Opinion* at 56-57, 57 n.226, C.R. 238; *Confidential Staff Report* at F-3, C.R. 218.[2]  The majority selected the second of the three alternatives, acknowledging that its approach "has certain limitations, including limitations in the available

---

[2] The Commission Staff calculated the cost premium as the average POI differential between the amount domestic producers paid for scrap from buyback programs and the amount paid for scrap on the open market.  Confidential Staff Report at F-3 to F-4, C.R. 218.

data." *See Confidential Majority Opinion* at 57 n.226, C.R. 238.  The majority's attempt to explain away deficiencies in the selected price-based adjustment (option 2 above) to U.S. producers' pricing data is arbitrary and unsupported by substantial evidence.

First, the majority's reliance on the price-based adjustment does not result in accurate comparisons because it does not account for Petitioners' volume discounts to large end users that are more likely to buy through scrap buyback programs, based on evidence from the record.  *Id.* at 57 n.226, C.R. 238.  In his dissenting opinion, Chairman Johanson declined to rely on the price-based adjustment because it "would result in skewed comparisons if purchasers in buyback programs are on average significantly larger than their non-buyback counterparts and thus receive larger quantity discounts."  *Confidential Dissenting Views* at 22, C.R. 239.  Additionally, as Chairman Johanson explained, "it is not possible to rely on price comparisons that fail to account for" the effective discounts provided by scrap buyback programs.  *Id.* at 22, C.R. 239.  The majority acknowledged that accounting for volume discounts would result in even larger downward adjustments to domestic prices, from [    ] percent to [        ] percent, further reducing the extent of any subject import underselling.  *Confidential Majority Opinion* at 57 n.226, C.R. 238.  The majority nonetheless rejected arguments that the price-based adjustment failed to account for such discounts because "further reducing U.S. producers' prices by [        ] percentage points would not reverse the majority underselling for subject imports from Israel shipped to end users."  *Id.* at 57 n.226, C.R. 238.

In doing so, the Commission deviated from its past practice, in which it typically considers the frequency and magnitude of underselling.  *See, e.g.*, *Glass Containers from China*, Inv. No. 701-TA-630 (Final), USITC Pub. 5068 at 23-31 (June 2020).  Here, the majority's explanation that reducing U.S. producers' prices "would not reverse the majority underselling for subject imports

from Israel" disregards the importance of actually and accurately accounting for the magnitude of underselling. The majority's selected price-based adjustment does not account for Petitioners'

[                                                    ] to large end users, and, therefore, does not accurately capture pricing to these fundamentally different customers. *See Confidential Dissenting Views* at 22, C.R. 239. The price-based adjustment also "ignores the likelihood . . . that larger producers in the dataset had [

                                                    ]. Given the potential importance of quantity or volume-based discounts, it is not possible to rely on price comparisons that fail to account for them." *See id*. at 22, C.R. 239. Without properly adjusting prices for sales to scrap buyback customers, the majority did not adequately consider the frequency and magnitude of underselling. By failing to provide a sufficient, reasoned analysis explaining why a change from past practice is necessary, the Commission's analysis was not supported by substantial evidence. *See NMB Sing.*, 557 F.3d at 1328 .

Second, the majority unreasonably rejected the third alternative, cost-based adjustment. The majority explained that the cost-based adjustment fails to account for all costs that U.S. producers may incur during the scrap buyback process and assumes a standard buyback price. *Confidential Majority Opinion* at 55-56, C.R. 238. The majority speculated that "U.S. producers may incur additional costs to test, clean, sort, and process scrap purchased in the open market, costs incurred after purchasing the scrap that are not reflected in their brass scrap purchase costs." *Id*. at 56, C.R. 238 (emphasis added). But the Commission cited no evidence to support this speculation, and "{m}ere speculation is not substantial evidence." *See, e.g.*, *OSI Pharms.*, 939 F.3d at 1382; *Jinan Yipin Corp.*, 526 F. Supp. 2d at 1375 (remanding where the agency's decision was based on "mere assumptions, which find no apparent support in record evidence").

**NON-CONFIDENTIAL VERSION**

Instead, substantial evidence supports using a cost-based adjustment, which applied <u>actual</u> scrap purchase data on the record, as collected by the Commission. *See, e.g.*, Prehearing Brief of Finkelstein Metals at 46-53, C.R. 193/P.R. 127. It is the only approach that could calculate the net price of brass rod purchased through scrap buyback programs.

The majority's dismissal of relevant facts on the record does not constitute "reasoned analysis" in support of its findings. *Wheatland Tube*, 161 F.3d at 1369. For these reasons, the Commission's pricing analysis was unsupported by substantial evidence and otherwise not in accordance with law.

## 2. The Commission Improperly Found that Subject Imports Caused Negative Price Effects

Even if underselling occurred, the majority improperly found that subject imports caused negative price effects. *See Confidential Majority Opinion* at 47-66, C.R. 238. The statute requires the Commission to not only find underselling but also examine how subject imports affected the prices of the domestic like product or otherwise impacted the domestic industry. 19 U.S.C. § 1677(7)(C)(ii); *Coalition for Preservation of Am. Brake Drum and Rotor Aftermarket Mfrs. v. United States*, 15 F Supp. 2d 918, 924-25 (Ct. Int'l Trade 1998); *Stainless Steel Round Wire from Canada, India, Japan, Korea, Spain, Taiwan*, Inv. Nos. 731-TA-781-86 (Final), USITC Pub. 3194 at 14-15 (May 1999); *Forged Steel Fittings from India and Korea*, Inv. Nos. 701-TA-631 & 731-1463-1464 (Final), USITC Pub. 5137 at 30 (Nov. 2020); *see also Confidential Dissenting Views* at 23, C.R. 239. The Commission did not explain its departure from past practice that there must be more than underselling; underselling must affect the prices for or volume of the domestic like product. *See Allegheny Ludlum Corp. v. United States*, 346 F.3d 1368, 1373 (Fed. Cir. 2003) (quoting *Atchison, Topeka & Santa Fe Ry. Co. v. Wichita Bd. of Trade*, 412 U.S. 800, 808 (1973) ("{The agency} may find that, although the rule in general serves useful purposes, peculiarities of

the case before it suggest that the rule not be applied in that case. Whatever the ground for the departure from prior norms, however, it must be clearly set forth so that the reviewing court may understand the basis of the agency's action and so may judge the consistency of that action with the agency's mandate.")).

The majority determined that "subject imports from Israel undersold the domestic like product to a significant degree, leading to a market share shift from the domestic industry to subject imports from Israel from 2020 to 2022, and prevented price increases, which otherwise would have occurred, to a significant degree." *Confidential Majority Opinion* at 66, C.R. 238. However, the record contradicts the Commission's finding that the small volume of subject imports from Israel that undersold domestic product caused adverse price effects.

First, the statute directs the Commission to determine whether subject imports "depress{} prices to a significant degree." 19 U.S.C. § 1677(7)(C)(ii)(II). As the majority acknowledged, the record does not support a finding of significant price depression because net sales unit values and prices of all pricing products increased **[                    ]** during the POI. *See Confidential Staff Report* at V-44 (Table V-14), VI-3 (Table VI-1), C.R. 218. Therefore, there could not have been significant price depression during the POI.

Second, the statute directs the Commission to determine whether subject imports "prevent{} price increases, which otherwise would have occurred, to a significant degree." 19 U.S.C. § 1677(7)(C)(ii)(II). The record does not support a finding of significant price suppression, contrary to the majority's assertion that "significant underselling by subject imports from Israel prevented the domestic industry from raising its prices to cover its increasing costs." *See Confidential Majority Opinion* at 66, C.R. 238. As a practice, the Commission measures price suppression by changes in the ratio of the domestic industry's cost of goods sold ("COGS") to total

net sales on an annual basis.  *See Confidential Staff Report* at C-6 (Table C-1), C.R. 218.  Under the practice, an increase in the ratio over the POI indicates that the domestic industry could not raise prices to cover rising costs and maintain a profitable margin.  *See id*. at C-6 (Table C-1), C.R. 218.

From 2020 through 2021, the domestic industry's total costs increased more than its prices, increasing the domestic industry's COGS/net sales ratio.  *See id*. at C-6 (Table C-1), C.R. 218.  However, this increase was almost entirely reversed from 2021 to 2022 and during the interim period.  *See id*. at C-6 (Table C-1), C.R. 218.  As a result, by the end of the POI, the domestic industry managed to restore its COGS-to-net sales ratio to almost the same level it enjoyed in 2020.  *See id*. at C-6 (Table C-1), C.R. 218.  As the dissenting opinion recognizes, "{t}his is indicative of an industry that was quite successful at passing higher costs on to its customers."  *Confidential Dissenting Views* at 31, C.R. 239.  The increase in unit gross profit from 2020 to 2022 and in interim 2023 confirms that the domestic industry fully passed on all of its increased cost of goods sold.  *See Confidential Staff Report* at G-7 (Table G-1), C.R. 218.  These patterns do not show that the domestic industry's prices were significantly suppressed by subject imports from Israel, and in fact prove that they were not.

As discussed above, the Commission also typically assesses the effect of subject import underselling in light of the volume of the domestic like product.  In this case, the small volume of subject imports from Israel that were purportedly undersold did not cause the domestic industry to lose significant market share to subject imports from Israel, which remained at [                    ] levels throughout the POI.  As Chairman Johanson explained in the dissenting opinion, "{s}ubject imports from Israel increased in annual volume by [      ] million pounds from 2020 to 2022 – an amount that is less than [      ] days' average production by the domestic industry in 2022 – and

gained just **[    ]** percentage points of market share." *See Confidential Dissenting Views* at 24, C.R. 239. Moreover, the timing of underselling and changes in market share do not support the majority's conclusion that underselling caused changes in market share. The majority claims that underselling occurred throughout the POI; however, the domestic industry lost market share only from 2020 to 2021. *See Confidential Staff Report* at C-3 (Table C-1), C.R. 218. From 2021 to 2022 and in interim 2023, the domestic industry gained market share while purported underselling continued. *Compare Confidential Staff Report* at C-3 (Table C-1), C.R. 218 *with id.* at F-11 (Table F-3), C.R. 218. Therefore, the record does not support the majority's assertion that "the significant underselling by subject imports from Israel led to the **[    ]** percentage point shift in market share from the domestic industry to subject imports from Israel between 2020 and 2022, and the **[    ]** percentage point shift in market share from the domestic industry to subject imports from Israel." *See Confidential Majority Opinion* at 59, C.R. 238.

The Commission's pricing analysis and explanations run contrary to the record evidence, making it both arbitrary and capricious and unsupported by substantial evidence. *See NMB Singapore Ltd.*, 557 F.3d at 1319-20; *State Farm*, 463 U.S. at 43 (holding that there must be a "rational connection between the facts found and the choice made." (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962))).

### D.    The Commission's Determination of Negative Impact from the Israeli-Origin Subject Imports is Not Supported by Substantial Evidence

In the determinations, the majority concluded that subject imports from Israel had a significant negative impact on the domestic industry. *See Confidential Majority Opinion* at 82, C.R. 238. To support its conclusion, the majority points to "isolated tidbits of data." *Shandong Rongxin*, 163 F. Supp. 3d at 1252. However, no reasonable mind would consider these limited data points as adequate to support the Commission's conclusion. *Zhejiang DunAn Hetian Metal*,

**NON-CONFIDENTIAL VERSION**

652 F.3d at 1340. The Commission compounded its error when it concluded that these limited data points were sufficient to demonstrate significant negative impact, reading the critical term "material" out of the statute.

In concluding that subject imports from Israel significantly negatively impacted the domestic industry, the majority found that such imports "took sales from the domestic industry {and} gained market share at the expense of the domestic industry over the POI." *Confidential Majority Opinion* at 74, C.R. 238. The majority relied on isolated data points to support its determinations. For example, the majority relied on a small (i.e., **[      ]** percentage point) change in the market share of imports from Israel from 2020 to 2022. However, the statute requires the Commission to "evaluate all relevant economic factors which have a bearing on the state of the industry{.}" 19 U.S.C. § 1677(7)(C)(iii). The majority acknowledged other record evidence indicating that the domestic industry was **[                    ]** and did not experience declining performance during the POI. Because the Commission's conclusion contradicts "the clear weight of the evidence," it is not supported by substantial evidence and otherwise not in accordance with law. *See Shandong Rongxin*, 163 F. Supp. 3d at 1252.

As the majority acknowledged, many factors indicate the domestic industry's performance improved or was unchanged during the POI, including production, capacity, capacity utilization, employment, shipments, capital expenditures, and research and development expenditures. *See Confidential Majority Opinion* at 67-69, 72, C.R. 238. In particular, from 2020 to 2022, the domestic industry's production volume increased by **[    ]** percent; capacity utilization improved by **[    ]** percentage points; shipment volume increased by **[    ]** percent; shipment value increased by **[    ]** percent; the number of production-related workers increased by **[    ]** percent; hours worked increased by **[    ]** percent; and wages paid increased by **[    ]** percent. *See Confidential*

*Staff Report* at C-4 (Table C-1), C.R. 218.  Additionally, the change in market share was **[          ]**, as the domestic industry lost **[          ]** percentage points of market share and maintained a **[                    ]** share of the market, even as it experienced significant supply constraints over the POI.  *Id*. at C-3 (Table C-1), C.R. 218.

Rather than engage with these clear indicators of the domestic industry's success during the POI, the majority simply dismissed these positive numbers as evidence that the domestic industry could have been more successful in the absence of subject imports from Israel.  *See Confidential Majority Opinion* at 75, C.R. 238.  To the extent these indicators declined during the interim period, the dissenting opinion correctly concluded that "it is not possible to attribute any material amount of that to subject imports from Israel," for the reasons explained below.  *See Confidential Dissenting Views* at 40, C.R. 239.  By failing to take into account record evidence that fairly detracts from its conclusions, the majority's impact analysis is not supported by substantial evidence.  *See Ad Hoc Shrimp Trade Action Comm.*, 791 F. Supp. 2d at 1334.

As further evidence that it was not materially injured by subject imports from Israel, the domestic industry was also **[                    ]** throughout the POI.  Contrary to the majority's focus on the domestic industry's operating income, the domestic industry's gross profit increased by **[     ]** percent from 2020 to 2022, **[          ]** the **[     ]** percent increase in apparent consumption during the same time period.  *Confidential Staff Report* at C-3, C-6 (Table C-1), C.R. 218.  The domestic industry's financial performance **[          ]** at the end of the POI into the interim period, even as apparent consumption declined, as unit operating and net income reached their highest level in interim 2023, and the domestic industry's operating margin increased from **[     ]** percent in 2021 to **[     ]** percent in interim 2023.  *Id*.; *see also Confidential Dissenting Views* at 40, C.R. 239.  As a result, Chairman Johanson correctly determined in his dissenting opinion that these

financial metrics are "not indicative of present material injury." *Confidential Dissenting Views* at 4, C.R. 239.

In the context of the domestic industry's overall **[**

**]** performance over the full POI, the Commission's determination of significant negative impact from the Israeli-origin subject imports is not supported by substantial evidence.

First, the majority's claim that the domestic industry lost significant market share to subject imports from Israel is deficient because the change of **[      ]** percentage points from 2020 to 2022 accounts for less than **[      ]** percent of the domestic industry's lowest market share during the POI. *See Confidential Majority Opinion* at 74, C.R. 238; *see Confidential Staff Report* at C-3 (Table C-1), C.R. 218.

Second, the majority emphasized aberrational metrics while ignoring other metrics that more clearly explained the domestic industry's financial improvements. For example, the domestic industry's sales volume and profitability increased from 2020 to 2022, but the majority instead based its conclusion on declines in operating income. *See Confidential Majority Opinion* at 73-74, C.R. 238. However, the domestic industry's temporary decline in operating income was driven by a **[      ]** percent increase in SG&A expenses in 2020-2021 compared to a **[      ]** percent increase in 2021-2022 and a **[      ]** percent decline during interim 2023. *Confidential Staff Report* at C-6 (Table C-1). The majority did not explain why it relied on a clearly aberrational metric that contradicted several other measures of financial performance.

Third, the majority selected metrics based on misleading timelines. For example, the majority claimed that subject imports from Israel caused the domestic industry's production and shipments to lag behind increases in consumption from 2020-2022. *See Confidential Majority Opinion* at 74, C.R. 238. However, the **[**

33

]. *See Confidential Staff Report* at C-3 to C-4 (Table C-1). The majority's reliance on the 2020-2022 timeframe for this comparison obfuscates the only reasonable interpretation of the data. By contrast, the significant amount of record evidence showing improvements in the domestic industry's financial performance demonstrates that the majority's conclusion is "contrary to the clear weight of the evidence." *Shandong Rongxin*, 163 F. Supp. 3d at 1252. Because it "ignore{s} significant contradictory evidence," the majority's impact analysis is not supported by substantial evidence or otherwise in accordance with law. *Mitsubishi Materials*, 820 F. Supp. at 624.

The majority's conclusion that subject impots from Israel significantly impacted the domestic industry led to its ultimate determination that "a domestic industry is materially injured by reason of subject imports from Israel, and accordingly, that the U.S.-Israel Free Trade Agreement exception to cumulation does not apply . . . ." *Confidential Majority Opinion* at 19, C.R. 238. Considering the substantial evidence of no negative impact on the domestic industry by reason of subject imports from Israel, the majority's determinations were contrary to the plain meaning of the statute.

The statute defines "material injury" as harm that is not "inconsequential, immaterial, or unimportant." 19 U.S.C. § 1677(7)(A). However, the record is clear that any injury suffered by the domestic industry was in fact "inconsequential, immaterial, or unimportant," as those terms are ordinarily understood.

Dictionaries define "inconsequential" as "irrelevant" (Merriam-Webster Dictionary), "of no consequence" (Cambridge Dictionary), and "of little or less importance" (Oxford English Dictionary). "Immaterial" is defined as "of no substantial consequence" (Merriam-Webster

Dictionary), "not pertinent to the case or matter" (Cambridge Dictionary), and "not important" (Oxford English Dictionary). "Unimportant" is defined as "lacking in importance" (Merriam-Webster Dictionary), "of no importance or moment" (Cambridge Dictionary), and "not important" (Oxford English Dictionary).

The Commission's ultimate determinations primarily rest on a [          ] decline in the domestic industry's overwhelming market share and a slight increase in the domestic industry's COGS/net sales ratio. *See Confidential Majority Opinion* at 74-75, C.R. 238. The change in the domestic industry's market share was [          ] as to be "of no consequence" of "of little or less importance." The record simultaneously shows that the domestic industry experienced strong performance with significant headwinds in the form of COVID-related constraints at the beginning of the POI and declining apparent consumption at the end of the POI. *See supra* Section V.D. After a decline in market share from 2020 to 2021, the domestic industry's market share increased from 2021 to 2022 and in the interim period, remaining above [    ] percent for the entire POI. *See Confidential Staff Report* at C-3 (Table C-1), C.R. 218.

In light of the economic conditions during the POI and the domestic industry's strong performance with respect to a number of performance indicators, no reasonable fact finder could conclude that the domestic industry is suffering from "material injury," as that term is defined in the statute, by reason of subject imports from Israel. For that reason, the Commission majority's ultimate determinations are also unsupported by substantial evidence. *See Zhejiang DunAn Hetian Metal Co.*, 652 F.3d at 1340 ("{s}ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (internal quotation marks omitted); *Mitsubishi Materials*, 820 F. Supp. at 624 (remanding the Commission's determination because it "ignore{d} significant contradictory evidence"). Furthermore, by effectively reading the word

NON-CONFIDENTIAL VERSION

"material" out of the statute, the determinations are arbitrary and capricious and not in accordance with law. *See Astoria Fed. Sav. & Loan Ass'n*, 501 U.S. at 112; *see also Changzhou Wujin*, 701 F.3d at 1379 (remanding an agency determination because the agency "acted in an arbitrary and capricious manner" by "cherry-pick{ing} the single data point that would have the most adverse effect possible" on the foreign producer)*; Pakfood*, 724 F. Supp. at 1337 (holding that an agency's exercise of discretion is not in accordance with law if it is arbitrary).

### E.    The Commission Improperly Attributed Changes in the Domestic Industry's Performance to Subject Imports from Israel

The majority improperly attributed changes in the domestic industry's performance to subject imports from Israel.  The statute requires the Commission to determine whether the domestic industry is "materially injured or threatened with material injury by reason of" subject imports but does not define the phrase "by reason of."  *See Confidential Majority Opinion* at 25, C.R. 238 (citing 19 U.S.C. §§ 1671d(b), 1673d(b)).  The Commission's "evaluation under the 'by reason of' standard must ensure that subject imports are more than a minimal or tangential cause of injury and that there is a sufficient causal, not merely a temporal, nexus between subject imports and material injury." *Confidential Majority Opinion* at 25-26, C.R. 238 (citing *Nippon Steel Corp. v. USITC*, 345 F.3d 1379, 1384 (Fed. Cir. 2003); *Mittal Steel Point Lisas Ltd. v. United States*, 542 F.3d 867, 873 (Fed. Cir. 2008) ("{T}his court requires evidence in the record 'to show that the harm occurred 'by reason of' the {less than fair value} imports, not by reason of a minimal or tangential contribution to material harm caused by {less than fair value} goods.") (quoting *Gerald Metals, Inc.*, 132 F.3d at 722)).   Furthermore, "{t}he legislative history explains that the Commission must examine factors other than subject imports to ensure that it is not attributing injury from other factors to the subject imports, thereby inflating an otherwise tangential cause of injury into one that satisfies the statutory material injury threshold." *Confidential Majority*

**NON-CONFIDENTIAL VERSION**

*Opinion* at 26, C.R. 238. The Commission has previously considered non-subject imports and domestic producer supply constraints as other relevant factors. *See, e.g.*, *Aluminum Extrusions from China, Colombia, Ecuador, India, Indonesia, Italy, Malaysia, Mexico, South Korea, Taiwan, Thailand, Turkey, United Arab Emirates, and Vietnam*, Inv. Nos. 701-TA-695-698 and 731-TA-1643-1644 and 1646-1657 (Final), USITC Pub. 5560 at 74-75 (Nov. 2024).

The majority erred by making unsupported findings that subject imports from Israel caused the domestic industry to lose significant market share. The majority also failed to address increased market share by lower-priced imports from countries other than Israel.

      1.      **The Majority Failed to Properly Consider Alternative Causes of Decreased Domestic Industry Market Share**

During the POI, there were several constraints on the domestic industry's production, which together underscore that subject imports from Israel could not be a cause of any present injury suffered by the domestic industry.

For starters, the Commission disregarded record evidence demonstrating that supply constraints injured the domestic industry. Early in the POI (in 2020 and 2021), the domestic industry acknowledged COVID-related supply constraints, including [

]. *See Confidential Majority Opinion* at 33, C.R. 238. These supply constraints resulted in domestic producers [                                                                                  ]. *Id*. at 33, C.R. 238. The entirety of the domestic industry's loss of market share occurred from 2020 to 2021, when these constraints were affecting production. *Id*. at C-3 (Table C-1), C.R. 218. From 2021 to 2022 and in the interim period, the domestic industry gained market share. *See id*. at C-3 (Table C-1), C.R. 218. As the majority acknowledges, the market share of subject imports from Israel also declined from 2021 to 2022. *See Confidential Majority Opinion* at 75, C.R. 238.

**NON-CONFIDENTIAL VERSION**

In 2023, during the interim period and after the supply constraints lessened, Mueller had a [        ] that resulted in [          ] of lost production, resulting in Mueller [      ]. *Confidential Staff Report* at III-6 n.6, C.R. 218.  Mueller reported weekly average shipments in interim 2023 of [        ] pounds. *Confidential Dissenting Views* at 13, C.R. 239.  The majority dismissed this event as a cause of increased market share of subject imports from Israel during interim 2023 because the domestic industry reported low capacity utilization during the interim period. *See Confidential Majority Opinion* at 76 n.299, C.R. 238.  However, as the dissenting opinion pointed out, "[      ].*" Confidential Dissenting Views* at 10, C.R. 239.  Chairman Johanson found this to be surprising because of the production constraints that the domestic industry faced during certain parts of the POI. *See id*. at 12, C.R. 239.  Chairman Johanson concluded that the domestic industry's reported capacity utilization figures do not "give a complete picture of practical brass rod capacity fluctuations," which in turn calls into question the majority's reliance on capacity utilization figures. *See Confidential Dissenting Views* at 10, C.R. 239.

Moreover, Chairman Johanson considered the [          ] to be a reasonable explanation for increased subject imports from Israel during the interim period. *See Confidential Dissenting Views* at 12, C.R. 239.  While the majority focused on a [    ] percentage point increase in subject import market share during the interim period, the increase in absolute terms of [      ] pounds was less than half of Mueller's average weekly shipments. *Confidential Staff Report* at C-4 (Table C-1), C.R. 218; *Confidential Dissenting Views* at 13, C.R. 239.  During the hearing, Israel's only producer of subject merchandise reported an increase in demand around the

time of the **[                  ]**.  Hrg. Tr. 133 (Apeloig).  Therefore, substantial evidence demonstrates that the increased volume of subject imports from Israel resulted from increased demand after the **[                  ]**.

Therefore, any lost sales or market share during the POI cannot reasonably be attributed to purported underselling (however calculated) by the small volume of subject imports from Israel.

### 2.    The Majority Failed to Address Increased Market Share by Lower-Priced Imports from Countries Other Than Israel

As a separate deficiency, the majority attributed material injury to subject imports from Israel without addressing the impact of subject imports from other countries.  For much of the majority's impact analysis for cumulated imports, the majority simply incorporates or repeats its analysis of the impact of subject imports from Israel alone.  *Compare Confidential Majority Opinion* at 67-82, C.R. 238, *with Confidential Majority Opinion* at 96-103, C.R. 238.  For example, the majority explained that, because "low-priced <u>subject imports from Israel</u> continued to increase over the interim periods, reaching a period high of **[    ]** percent of apparent U.S. consumption in interim 2023, the domestic industry's market share remained lower and its non-toll COGS to net sales ratio higher in interim 2023 than at the beginning of the POI."  *See Confidential Majority Opinion* at 75, C.R. 238 (emphasis added).  The majority simultaneously explained that, because "<u>cumulated subject imports</u> remained elevated in interim 2023, at **[    ]** percent of apparent U.S. consumption, the domestic industry's market share remained lower and its non-toll COGS to net sales ratio higher in interim 2023 than at the beginning of the POI."  *See Confidential Majority Opinion* at 98, C.R. 238 (emphasis added).  The majority also attributed the fact that "the industry's production and U.S. shipments increased by less than apparent U.S. consumption, at **[    ]** percent and **[    ]** percent, respectively" to subject imports from Israel and the fact that "the industry's production and U.S. shipments increased by less, at **[    ]** percent and **[    ]** percent, respectively,

than apparent U.S. consumption" to cumulated subject imports. *Compare Confidential Majority Opinion* at 74, C.R. 238 *with Confidential Majority Opinion* at 98, C.R. 238.

However, it is not plausible that the impact of subject imports from Israel would be exactly the same as cumulated imports from all subject countries because Israel accounts for only a small portion of subject imports, which itself is a tiny fraction of apparent U.S. consumption. Throughout the POI, imports from sources other than Israel collectively accounted for larger volumes than imports from Israel alone. *See Confidential Staff Report* at C-3 (Table C-1), C.R. 218. Imports of subject merchandise from Israel never exceeded **[    ]** percent of total imports during the POI. *See Confidential Staff Report* at C-3 (Table C-1), C.R. 218. The majority's repetition of its impact analysis for subject imports from Israel and cumulated subject imports indicates that the Commission has not thoroughly "examine{d} the record and articulate{d} a satisfactory explanation for its action." *Yangzhou Bestpak Gifts & Crafts Co., Ltd. v. United States*, 716 F.3d 1370, 1378 (Fed. Cir. 2013). In addition, to the extent there is evidence that the domestic industry suffered material injury because of underselling by subject imports, the record confirms that subject imports from Israel were not a significant contributor. Other subject sources undersold the domestic like product. *See Confidential Staff Report* at V-50 (Table V-17), C.R. 218. The average margin of underselling by subject imports from Israel was less than the average margin of underselling for other cumulated subject sources according to each of the Commission's pricing methodologies. *See Confidential Staff Report* at V-50 (Table V-17), F-5 to F13 (Tables F-1 to F-3), C.R. 218. If the Commission had analyzed the record with regard to the impact of other import sources, it would have found that imports from Israel made at most a minimal contribution to any injury caused by underselling, given the relative import volumes from subject imports and magnitude of underselling. *See Gerald Metals, Inc.*, 132 F.3d at 722 (holding that "evidence of de

minimis (e.g., minimal or tangential) causation of injury does not reach the causation level required under the statute").

The Commission's decision to attribute the effect of other causal factors to subject imports from Israel was unlawful and arbitrary because it ignores significant record evidence and foregoes the Commission's obligation to avoid "attributing to subject imports {from Israel} an injury whose cause lies elsewhere." *Hynix*, 431 F. Supp. 2d at 1317.  By failing to provide reasoned explanations regarding the impact of the domestic industry's supply constraints and subject imports from other countries, the Commission "fail{ed} to analyze compelling arguments that purport to demonstrate the comparatively marginal role of subject imports {from Israel) in causing" any injury to the domestic industry.  *Id*.  The Commission's determinations also lack substantial evidence that there was material injury to the domestic industry (if any) "by reason" of the small volume of subject imports from Israel.  *See Zhejiang DunAn Hetian Metal Co.*, 652 F.3d at 1340 (holding that "{s}ubstantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion") (quoting *Nippon Steel*, 337 F.3d at 1379).  Whatever the domestic industry's challenges during the POI, the Commission arbitrarily attributed material injury to the small volume of subject imports of Israel instead of other, more plausible explanations. *Tropicana Prods.*, 484 F. Supp. 2d at 1347 (holding that the Commission's determination was "arbitrary and capricious because it did not address many important issues relating to the effects of the short supply of domestic oranges upon the domestic industry"); *see also JMC Steel*, 24 F. Supp. 3d at 1304 (holding that the Commission must "address significant arguments of the parties which impact{} the reliability of its reasoning and conclusions").

Therefore, the Commission's attribution of material injury to subject imports from Israel was unsupported by substantial evidence and otherwise not in accordance with law.

**NON-CONFIDENTIAL VERSION**

**VII.    Conclusion**

For the foregoing reasons, we respectfully request that the Court grant Plaintiff's motion for judgment on the agency record and remand this matter to the Commission for disposition in a manner consistent with the judgment of this Court.

<div style="margin-left:50%">

Respectfully submitted,

/s/ Bernd G. Janzen
Bernd G. Janzen
Devin S. Sikes
Julia K. Eppard
Daniel M. Witkowski
Sydney L. Stringer
Paul S. Bettencourt
AKIN GUMP STRAUSS HAUER & FELD LLP
2001 K Street, NW
Washington, DC 20006

*Counsel to Government of Israel, Ministry of Economy and Industry*

</div>

Dated:  May 9, 2025

## <u>CERTIFICATE OF COMPLIANCE</u>

I, Bernd G. Janzen, an attorney with Akin Gump Strauss Hauer & Feld LLP, certify that Consolidated Plaintiffs' Rule 56.2 Motion for Judgment on the Agency Record contains 13,139 words (according to the word count feature of the Microsoft Word processing program) and therefore complies with the word count limitation set forth in Paragraph 2(B)(1)(a) of the Standard Chambers Procedures of the Court.

Dated: May 9, 2025                                          /s/ Bernd G. Janzen
                                                            Bernd G. Janzen
                                                            AKIN GUMP STRAUSS HAUER & FELD LLP

                                                            *Counsel to Government of Israel, Ministry of Economy and Industry*