*PUBLIC VERSION*

## IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE:  HON. LISA W. WANG, JUDGE

Court No. 24-00197

GOVERNMENT OF ISRAEL, MINISTRY OF ECONOMY AND INDUSTRY,

*Plaintiff*,

v.

UNITED STATES,

*Defendant*,

and

AMERICAN BRASS ROD FAIR TRADE COALITION, et al.,

*Defendant-Intervenors*.

## DEFENDANT U.S. INTERNATIONAL TRADE COMMISSION'S MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON THE AGENCY RECORD

JOHN D. HENDERSON
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2130
Facsimile: (202) 205-3111
john.henderson@usitc.gov

MARGARET D. MACDONALD
General Counsel
Telephone: (202) 205-2561
margaret.macdonald@usitc.gov

KARL S. VON SCHRILTZ
Assistant General Counsel for Litigation
Telephone: (202) 205-3096
karl.von-schriltz@usitc.gov

**DATED:  August 15, 2025**

# <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES ................................................................................. iv

I.   STATEMENT PURSUANT TO RULE 56.2 ....................................................1

    A.   Administrative Determinations under Review ..................................1

    B.   Issues Presented and Summary of Argument ...................................1

        1.   In the Commission's analysis of present material injury, was it required to address events relating to the Gaza war that took place after the end of the Commission's period of investigation? .................................................................1

        2.   Were the Commission's findings that the volume of subject imports from Israel was significant supported by substantial evidence and in accordance with law? ........................................2

        3.   Was the Commission's finding that subject imports from Israel caused significant price effects supported by substantial evidence and in accordance with law? ..................................3

        4.   Was the Commission's finding that subject imports from Israel had a significant impact on the domestic industry supported by substantial evidence and in accordance with law? ........................................................................4

        5.   Was the Commission's non-attribution analysis supported by substantial evidence and in accordance with law? .................5

II.  STATEMENT OF FACTS ...............................................................................5

III. ARGUMENT ..................................................................................................12

    A.   Standard of Review ...........................................................................12

    B.   The Commission Reasonably Considered the October 7, 2023, Hamas Attack and the Gaza War ....................................15

    C.   The Commission Reasonably Found Subject Import Volume Significant ......................................................................18

    D.   The Commission Reasonably Found Significant Underselling by Subject Imports from Israel ....................................22

    E.   The Commission Reasonably Found that Subject Imports from Israel Caused Significant Adverse Price Effects ............................29

## <u>TABLE OF CONTENTS (cont'd)</u>

F.    The Commission Reasonably Found that Subject Imports from
      Israel Had a Significant Impact.............................................................34

G.    The Commission's Non-Attribution Analysis Was Reasonable
      and in Accordance with Law ................................................................39

IV.    CONCLUSION ......................................................................................45

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                 **Page(s)**

*AWP Indus., Inc. v. United States,*
    35 CIT 774, 783 F. Supp. 2d 1266 (2011) ...........................................................2, 16

*Chemours Co. FC, LLC v. United States,*
    443 F. Supp. 3d 1315 (Ct. Int'l Trade 2020) ...........................................................16

*Cleveland-Cliffs Inc. v. United States,*
    693 F. Supp. 3d 1341 (Ct. Int'l Trade 2024) ...........................................................42

*Coal. of Gulf Shrimp Indus. v. United States,*
    71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015) ...........................................................3, 25

*Consolo v. Fed. Mar. Comm'n,*
    383 U.S. 607 (1966)...........................................................................................13, 14, 42

*Copperweld Corp. v. United States,*
    12 CIT 148, 682 F. Supp. 552 (1988) ...........................................................19

*Goss Graphics Sys., Inc. v. United States,*
    22 CIT 983, 33 F. Supp. 2d 1082 (1998), *aff'd,* 216 F.3d 1357 (Fed. Cir.
    2000) ...........................................................................................................13

*Grupo Industrial Camesa v. United States,*
    85 F.3d 1577 (Fed. Cir. 1996)...........................................................................14, 15, 42

*Hynix Semiconductor, Inc. v. United States,*
    30 CIT 1208, 431 F. Supp. 2d 1302 (2006)...........................................................19, 20

*Metallverken Nederland B.V. v. United States,*
    13 CIT 1013, 728 F. Supp. 730 (1989)...........................................................15

*Mitsubishi Heavy Indus., Ltd. v. United States,*
    275 F.3d 1056 (Fed. Cir. 2001)...........................................................................14

*Nippon Steel Co. v. U.S. Int'l Trade Comm'n,*
    345 F.3d 1379 (Fed. Cir. 2003)...........................................................................44

*Nippon Steel Corp. v. United States,*
    25 CIT 1415, 182 F. Supp. 2d 1330 (2001)...........................................................2, 20

*Nippon Steel Corp. v. United States,*
    458 F.3d 1345 (Fed. Cir. 2006)...........................................................................13, 14

*Nucor Corp. v. United States,*
    28 CIT 188, 318 F. Supp. 2d 1207 (2004) ...........................................................13

## <u>TABLE OF AUTHORITIES (cont'd)</u>

**Cases (cont'd)**                                                                  **Page(s)**

*Nucor Corp. v. United States*
    414 F.3d 1331 (Fed. Cir. 2005)............................................................2, 16, 20

*OCTAL, Inc, v. United States,*
    539 F. Supp. 3d 1291 (Ct. Int'l Trade 2021) ..........................................39

*Siemens Energy, Inc. v. United States,*
    806 F.3d 1367 (Fed. Cir. 2015)...........................................14, 41, 42

*Taiwan Semiconductor Indus. Ass'n v. Int'l Trade Comm'n,*
    266 F.3d 1339 (Fed. Cir. 2001)...........................................................44

*Timken U.S. Corp. v. United States,*
    421 F.3d 1350 (Fed. Cir. 2005)...........................................................14

*U.S. Steel Grp. v. United States,*
    96 F.3d 1352 (Fed. Cir. 1996)............................................................13

*United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Service*
    *Workers Int'l Union,* 425 F. Supp. 3d 1374 (Ct. Int'l Trade 2020) ..................................25, 39

*Universal Camera Corp. v. NLRB,*
    340 U.S. 474 (1951)....................................................................12, 13

*USEC Inc. v. United States,*
    34 F. App'x 725 (Fed. Cir. 2002) ......................................................13

*Usinor v. United States,*
    26 CIT 767 (2002) ...........................................................................16

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..............................................................12

19 U.S.C. § 1675(b) ...........................................................................18

19 U.S.C. § 1677(7)(C)(i)....................................................................18

19 U.S.C. § 1677(7)(C)(iii)..................................................................38

19 U.S.C. § 1677(7)(C)(iii)(I)..............................................................37

19 U.S.C. § 1677(7)(C)(iii)(II).............................................................38

19 U.S.C. § 1677(7)(C)(iii)(III)............................................................38

## TABLE OF AUTHORITIES (cont'd)

**Statutes (cont'd)**                                                    **Page(s)**

19 U.S.C. § 1677(7)(G)(ii)(IV) ................................................................................7

19 U.S.C. § 1677(7)(J) .....................................................................................5, 36

28 U.S.C. § 2639(a)(1) ...........................................................................................12

**USITC Publications**

*Certain Carbon Steel Butt-Weld Pipe-Fittings from France, India, Israel,*
   *Malaysia, The Republic of Korea, Thailand, The United Kingdom, and*
   *Venezuela*, Inv. Nos. 701-TA-360-361 and 731-TA-688-695 (Final), USITC
   Pub. 2870 (Apr. 1995) .................................................................................19, 20

**Legislative Materials**

H.R. Rep. 96-317, 96th Cong., 1st Sess. (1979) .............................................20, 44

S. Rep. 96-249, 96th Cong., 1st Sess. (1979) .......................................................44

Statement of Administrative Action to the Uruguay Round Agreements Act,
   H.R. Rep. No. 103-316, vol. I (1994) ...........................................13, 14, 39, 44

Tariff Act of 1930 ...................................................................................................12

Defendant United States opposes the Motion for Judgment on the Agency Record filed by Plaintiff Government of Israel, Ministry of Economy and Industry.  The affirmative final determinations of the United States International Trade Commission ("the Commission") in the antidumping and countervailing investigations on imports of brass rod from Israel are supported by substantial evidence and in accordance with law.  This Court should therefore affirm them.

# I.    STATEMENT PURSUANT TO RULE 56.2

## A.    Administrative Determinations under Review

Plaintiff seeks review of the Commission's affirmative determinations in the investigations of brass rod from Israel.  Notice of the determinations was published in the Federal Register on September 25, 2024.  89 Fed. Reg. 78,330 (Sept. 25, 2024) (PR216).[1]  The Commission's Views for these investigations are contained in *Brass Rod from India,* Inv. No. 701-TA-686 (Final), USITC Pub. 5485 (Feb. 2024) ("*Brass Rod I*") (PR172); *Brass Rod from Israel,* Inv. Nos. 701-TA-687, 731-TA-1314 (Final), USITC Pub. 5545 (Sept. 2024) ("*Brass Rod II*") (PR215).[2]

## B.    Issues Presented and Summary of Argument

### 1.    In the Commission's analysis of present material injury, was it required to address events relating to the Gaza war that took place after the end of the Commission's period of investigation?

No.  The Hamas attack and the war in Gaza took place after the September 2023 end of the Commission's period of investigation ("POI").  Views at 13.  The Commission appropriately based its determination of present material injury on the dataset from its POI, and it is well

---

[1] Citations to the public record are indicated by "PR," list number 1 on the index of the administrative record, and citations to the confidential record are indicated by "CR," list number 2 on the index of the administrative record.

[2] Citations to the Commission's confidential views ("Views") are to CR232 and to the confidential staff report ("Staff Report") are to CR218.

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

settled that the Commission need not include post-POI data in its present material injury

analysis. *AWP Indus., Inc. v. United States*, 35 CIT 774, 783 F. Supp. 2d 1266 (2011). The

Commission requested information on post-POI developments with respect to the war in Gaza,

and Plaintiff and other parties addressed these developments for the Commission's threat

analysis. Because the Commission made affirmative determinations that subject imports from

Israel caused present material injury to the domestic industry, it had no occasion to address threat

of material injury.

> ### 2. Were the Commission's findings that the volume of subject imports from Israel was significant supported by substantial evidence and in accordance with law?

Yes. The Commission reasonably found that the volume of subject imports from Israel

was significant in absolute terms and relative to U.S. consumption, with volume ranging from

[ ▮▮▮▮▮ ] to [ ▮▮▮▮▮ ] pounds during the POI, overall market share ranging from [ ▮ ]

to [ ▮ ] percent, and market share in sales to distributors ranging from [ ▮ ] to [ ▮ ] percent,

and that the [ ▮ ] percent increase in the volume of subject imports from Israel from 2020 to

2022 was significant in absolute terms. Views at 45-46. Contrary to Plaintiff's argument, there

is no minimum threshold for subject import volume and market share to be found significant.

*Nippon Steel Corp. v. United States*, 25 CIT 1415, 1419-20, 182 F. Supp. 2d 1330, 1335 (2001).

Moreover, the Commission explained in its price effects analysis that the substantial price

sensitivity and transparency in the U.S. brass rod market indicate that seemingly small volumes

of low-priced subject imports had significant adverse effects on the domestic industry. Views at

63-65. Plaintiff's reliance on a 1995 Commission determination involving Israel is irrelevant,

since each Commission investigation is *sui generis,* and the relevant conditions of competition in

the 1995 case were very different from those in this case. *Nucor Corp. v. United States*, 414

F.3d 1331, 1340 (Fed. Cir. 2005).

**3.    Was the Commission's finding that subject imports from Israel caused significant price effects supported by substantial evidence and in accordance with law?**

Yes.  Plaintiff does not dispute the Commission's finding that underselling by subject imports from Israel in 98.9 percent of quarterly comparisons corresponding to [ ▇ ] percent of reported subject import sales volume from Israel in the Commission's pricing data was pervasive, based on pricing data covering head-to-head competition between the domestic industry and subject imports from Israel during the POI.  Views at 49.  Nor does Plaintiff dispute or even acknowledge the substantial volume of confirmed lost sales by the domestic industry to subject imports from Israel, equivalent to [ ▇ ] percent of U.S. shipments of subject imports from Israel during the POI.  *Id.* at 50.  These uncontested findings alone support the Commission's conclusion that underselling was significant.

Plaintiff's challenge is limited to the Commission's adjustment to certain domestic pricing data to take into account the higher prices received by petitioners from customers participating in a scrap buyback program, which continued to show significant underselling by subject imports from Israel in [ ▇ ] percent of quarterly comparisons.  *Id.* at 58. Notwithstanding Plaintiff's preference for a different methodology, the Court should affirm the Commission's methodology because it was reasonable, and the Commission reasonably explained why its methodology was more reliable than Plaintiff's preferred methodology.  *Id.* at 56-58; *see Coal. of Gulf Shrimp Indus. v. United States*, 71 F. Supp. 3d 1356, 1367 (Ct. Int'l Trade 2015).

The Commission also reasonably found that the significant underselling by subject imports from Israel significantly suppressed domestic prices and led to a market share shift from the domestic industry to subject imports from Israel.  It is undisputed that the industry's non-toll cost of goods sold ("COGS") to net sales ratio increased by [ ▇ ] percentage points from 2020

*PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED*

to 2022, an increase that Plaintiff acknowledges generally indicates an industry unable to cover rising costs.  Views at 59; PlBr. at 29.  The Commission's finding that the industry experienced a cost-price squeeze was supported by additional evidence, including the larger increases in the industry's unit raw material costs and unit total costs than in its unit sales value between 2020 and 2022, despite an increase in apparent U.S. consumption, as well as evidence that domestic producers had to reduce prices, or forgo needed price increases, to compete with low-priced subject imports from Israel.  Views at 60-63.

Similarly, it is undisputed that subject imports from Israel gained [ ▉ ] percentage points of market share at the expense of the domestic industry from 2020 to 2022.  *Id.* at 59.  While Plaintiff argues that subject import volumes from Israel were too small for the underselling to have any effect, the Commission reasonably explained that the relevant conditions of competition in the U.S. market, including price sensitivity and transparency, indicated that seemingly small volumes of low-priced subject imports and confirmed lost sales had significant adverse effects on domestic prices and market share.  *Id.* at 63-65.

### 4.    Was the Commission's finding that subject imports from Israel had a significant impact on the domestic industry supported by substantial evidence and in accordance with law?

Yes.  The Commission reasonably found that low-priced subject imports from Israel gained market share at the expense of the domestic industry, suppressed domestic prices, and prevented the industry from fully capitalizing on the increase in apparent U.S. consumption during the POI.  *Id.* at 74.  The Commission further found that as the industry lost market share, its production and shipments increased by less than apparent U.S. consumption and most of its financial indicators declined.  *Id.* at 74-75.  The Commission found that the suppression of domestic prices by subject imports from Israel contributed to an increase in the industry's non-toll COGS to net sales ratio between 2020 and 2022, and declines in the industry's operating

income and operating ratio. *Id.* The Commission considered the whole record, including evidence that detracted from its findings, and its finding of material injury was not based on "isolated tidbits" as Plaintiff claims, but rather on declines in statutory factors that the Commission is required to evaluate. Contrary to Plaintiff's argument that the Commission was required to reach negative determinations because the industry was profitable and some performance indicators improved over the POI, the statute provides that the Commission "may not" make a negative determination "merely because that industry is profitable or because {its performance} has recently improved." 19 U.S.C. § 1677(7)(J).

### 5. Was the Commission's non-attribution analysis supported by substantial evidence and in accordance with law?

Yes. The Commission addressed a number of other factors, including domestic industry supply constraints and imports from sources other than Israel, to ensure that it was not attributing to subject imports from Israel any injury that may have been caused by other factors. The Commission reasonably found that none of these factors explained the injury that the Commission attributed to subject imports from Israel, and that subject imports from Israel had a significant impact on the industry that was distinct from the impact of imports from other sources. Views at 75-82. Plaintiff's reliance on findings by the dissenting Commissioner is misplaced, since it is the Commission's determinations that are at issue here.

## II.    STATEMENT OF FACTS

On April 27, 2023, the American Brass Rod Fair Trade Coalition and its members, Mueller Brass Co. ("Mueller") and Wieland Chase LLC ("Wieland"), U.S. brass rod producers, filed antidumping and countervailing duty petitions with respect to imports of brass rod from Brazil, India, Israel, Mexico, South Africa, and South Korea, and the Commission accordingly instituted antidumping and countervailing duty investigations. Petition (PR1); Notice of

Institution (PR3).  The sole Israeli producer/exporter of brass rod, Finkelstein Metals, Ltd., and its affiliated U.S. importer, Finkelstein Metals USA Inc. (collectively "Finkelstein"), actively participated in the Commission's investigations, and Plaintiff likewise participated.  *See* Views at 4-5.

In February 2024, the Commission determined that an industry in the United States was materially injured by reason of imports of brass rod from India found by the U.S. Department of Commerce ("Commerce") to be subsidized by the government of India.  Views at 3. Subsequently, in September 2024, in the staggered portion of the final phase investigations,[3] the Commission likewise reached affirmative determinations with respect to imports of brass rod from Israel found by Commerce to be sold in the United States at less than fair value and subsidized by the government of Israel.  *Brass Rod II* at 3 (PR215).  In reaching affirmative determinations, the Commission defined a single domestic like product coextensive with Commerce's scope and defined the domestic industry as all domestic producers of brass rod, Mueller, Wieland, and Chicago Extruded Metals Co.[4]  Views at 12-14.

Under a statutory exception to cumulation, the Commission cannot cumulate imports from Israel with imports from other countries unless the Commission first determines that a domestic industry is materially injured or threatened with material injury by reason of imports

---

[3] Although all the petitions were filed on the same day, the investigation schedules became staggered when Commerce postponed its final antidumping duty determinations with respect to all six subject countries, and its final countervailing duty determinations with respect to Israel and South Korea (collectively, "the trailing investigations"), but did not postpone its final countervailing duty determination with respect to India (the "leading investigation"). Views at 3-4.  In *Brass Rod II*, the Commission adopted its findings and analyses from *Brass Rod I* with respect to issues concerning the domestic like product, domestic industry, cumulation, conditions of competition, and injury.  *Brass Rod II* at 4 (PR215).  Accordingly, this Brief references the first set of Views, set out in *Brass Rod I.*

[4] Plaintiff has not appealed these issues.

from Israel.  19 U.S.C. § 1677(7)(G)(ii)(IV).  As part of its cumulation analysis in *Brass Rod I*,

the Commission determined that the domestic industry was materially injured by reason of

subject imports from Israel, and that the Israel statutory exception to cumulation accordingly did

not apply.  Views at 17-19, 45-82.[5]  Plaintiff challenges the analysis in this determination, set

forth in the Commission's Views in *Brass Rod I.*

The Commission defined the POI for its investigations as 2020-2022 and January-

September 2022 ("interim 2022") and January-September 2023 ("interim 2023").  *Id.* at 13, 29.

With respect to conditions of competition, the Commission found that apparent U.S.

consumption increased between 2020 and 2022 by [ ▓ ] percent, but was lower in interim 2023

than in interim 2022.  *Id.* at 29.  The Commission found that the domestic industry experienced

supply constraints in the 2020-2021 period resulting from the COVID-19 pandemic, as did U.S.

importers and foreign producers, but that such constraints had been resolved by 2022.  *Id*. at 34.

The Commission found that there was at least a moderate-to-high degree of substitutability

between the domestic like product and subject imports from Israel, and that price is an important

factor in purchasing decisions for brass rod, along with other important factors such as quality

and availability.  *Id.* at 35, 38.

The Commission found that up to 98 percent of the raw materials used to produce brass

rod comes from scrap, and that brass rod producers therefore need to obtain scrap to produce

brass rod.  *Id.* at 10, 40-41.  It found that domestic producers Mueller and Wieland both sell brass

rod to participating end user customers under a scrap buyback program whereby a brass rod

---

[5] Chairman Johanson determined that a domestic industry was not materially injured nor
threatened with material injury by reason of subject imports from Israel, and that the Israel
statutory exception to cumulation did apply for purposes of the Commission's determination in
the leading investigation, as to which he made a negative determination.  Views at 3 n.1, 19 n.53.
*See* Separate and Dissenting Views of Chairman Johanson (CR233).

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

customer can sell back to the respective domestic producer the scrap the customer generated in producing its product from the brass rod. *Id.* at 40-42. The Commission found that both Mueller and Wieland typically charge a higher price to customers for brass rod sold through scrap buyback programs than for brass rod not sold through such programs. *Id.* at 40-41.

The Commission observed that both Mueller and Wieland reported benefiting from getting scrap back from their customers, because each producer can ensure that the scrap it gets back has the same quality as its own brass rod. *Id.* at 41. By contrast, these firms reported that purchasing scrap from a middleman on the open market might involve scrap with a different chemistry that could bring a risk of contamination, causing them to typically incur higher costs to test and make adjustments to the scrap. *Id.* at 41 & n.165. The Commission found that the amount of scrap generated by brass rod purchasers varies widely depending on the product produced from the scrap. *Id.* at 42 n.167.

The Commission found that U.S. producers Wieland and Mueller reported offering quantity discounts to purchasers, and importer [ ███████ ] reported offering [ ████ ] discounts. *Id.* at 39 n.151, 57-58 n.226. The Commission found that Wieland and Mueller sell brass rod based on published price lists, which are frequently revised following market developments, and that price revisions are updated for all customers receiving the price list. *Id.* at 42-43.

The Commission found that the domestic like product was sold to end users through scrap buyback programs, end users not through scrap buyback programs, end users under tolling arrangements, and distributors. *Id.* at 22. Subject imports from Israel were sold mainly to distributors, and to end users not through scrap buyback programs, but were not sold to end users through scrap buyback programs. *Id.* at 22 & n.68.

The Commission found that the volume of subject imports from Israel was significant in absolute terms and relative to consumption in the United States, and that the increase in the volume of subject imports from Israel was significant in absolute terms. *Id.* at 46.

For its analysis of the price effects of subject imports from Israel, the Commission collected questionnaire pricing data with respect to sales of the domestic like product and subject imports from Israel with respect to three sets of three pricing products each broken out by channels of distribution, corresponding to sales to distributors, sales to end users through scrap buyback programs, and sales to end users not through buyback programs. *Id.* at 47. With respect to sales to distributors, subject imports from Israel undersold the domestic like product in [ ▮ ] of [ ▮ ] quarterly comparisons. *Id.* at 49. With respect to sales to end users not through scrap buyback programs, subject imports from Israel undersold the domestic like product in [ ▮ ] quarterly comparisons. *Id.*

The Commission made a price-based adjustment to the questionnaire data to account for the higher prices that Mueller and Wieland received for their brass rod from certain end user customers that participated in scrap buyback programs. *Id.* at 56-58. As a result of this adjustment, the Commission found that subject imports from Israel undersold the domestic like product in sales to all end users combined in 36 of 42 quarterly comparisons, corresponding to [ ▮ ] percent of subject imports from Israel sold to end users in the pricing data by volume. *Id.* at 57-58 & n.226.

The Commission found that ten of eleven purchasers that purchased subject imports from Israel instead of the domestic like product during the POI reported that subject imports from Israel were priced lower than the domestic like product. *Id.* at 50. The Commission found that six of these ten purchasers reported that the lower price was a primary reason for the decision to

purchase [        ] pounds of subject imports from Israel rather than the domestic like

product during the POI, equivalent to [      ] percent of U.S. shipments of subject imports from

Israel during the period.  *Id.*

The Commission found that competition between subject imports from Israel and the

domestic industry was not attenuated, finding that subject imports from Israel competed head-to-

head with the domestic industry in sales to both distributors and sales to end users not through

scrap buyback programs.  *Id.* at 50-52.  Moreover, the Commission found that competition from

Finkelstein affected the industry's sales to end users through scrap buyback programs, as some

of the industry's scrap buyback customers chose to purchase from Finkelstein because of lower

prices.  *Id.* at 52-53.

The Commission found the underselling by subject imports from Israel to be significant,

in light of the at least moderate to high degree of substitutability of subject imports from Israel

with the domestic like product, the importance of price in purchasing decisions for brass rod, the

Commission's pricing data showing pervasive subject import underselling, and the substantial

volume of confirmed lost sales.  *Id.* at 58-59.

The Commission further found that the significant underselling by subject imports from

Israel led to a market share shift from the domestic industry to subject imports from Israel from

2020 to 2022, and prevented price increases, which otherwise would have occurred, to a

significant degree.  *Id.* at 66.[6]  The Commission found that the domestic industry lost [    ]

---

[6] The Commission found that prices of subject imports from Israel and the domestic like
product increased during the POI, and made no finding as to significant price depression by
subject imports from Israel.  Views at 59.

percentage points of market share to subject imports from Israel from 2020 to 2022, as the industry's ratio of non-toll COGS to net sales increased by [ █ ] percentage points. *Id.* at 59.[7]

In its analysis of the impact of subject imports from Israel, the Commission found that low-priced subject imports from Israel gained sales and market share at the expense of the domestic industry, suppressed domestic producers' prices, and prevented the industry from fully capitalizing on the increase in apparent U.S. consumption during the POI. *Id.* at 74. The Commission further found that as the industry lost market share, its production and shipments increased by less than apparent U.S. consumption, and most of the industry's financial indicators declined. *Id.* The Commission found that the suppression of domestic prices by subject imports from Israel contributed to an increase in the industry's non-toll COGS to net sales ratio between 2020 and 2022, and declines in the industry's operating income and operating ratio. *Id.* at 74-75. The Commission noted that the volume of low-priced subject imports from Israel continued to increase over the interim periods, reaching a period high in market share in interim 2023, as the domestic industry's market share remained lower and its non-toll COGS to net sales ratio higher than they were at the beginning of the POI. *Id.* at 75.

The Commission also examined other factors to ensure that it was not attributing injury caused by other factors.to subject imports from Israel. *Id.* at 75-82. The Commission found that domestic industry supply constraints in 2021 related to the COVID-19 pandemic did not explain

---

[7] The Commission found that [ █ ] percent of the domestic industry's net sales quantity in 2022 were tolled sales, while no subject imports were sold through tolling arrangements. Views at 60 n.233. In a tolling arrangement, the tollee provides raw materials (while retaining title to them) to the toller brass rod producer, and thus the producer's sales through tolling arrangements do not reflect raw material costs. *Id.* Accordingly, the Commission relied on the domestic industry's data for non-toll sales as the most probative indicator for its price suppression analysis. *Id.* The Commission observed that the relevant ratios and trends were very similar for the industry's non-toll operations alone and its combined toll and non-toll operations. *Id.*

the increase in subject imports from Israel during the POI, and that supply constraints resulting from a fire at a Mueller plant in 2023 did not explain the increase in subject imports from Israel in interim 2023. *Id.* at 75-77 & n.299. The Commission addressed the effects of imports from sources other than Israel, and found that subject imports from Israel had an adverse impact on the domestic industry's market share, sales, and prices that was distinguishable from that attributable to imports from other sources. *Id.* at 79-81.

Thus, the Commission determined that the domestic industry was materially injured by reason of subject imports from Israel, cumulated them with subject imports from other sources, and found that the industry was materially injured by reason of cumulated subject imports. *Id.* at 19, 24, 82-101. The Commission consequently reached affirmative determinations with respect to subject imports from Israel in the trailing investigations. *Brass Rod II* (PR215). This appeal followed.

## III.    ARGUMENT

### A.    Standard of Review

Under the Tariff Act of 1930, the Court reviews a Commission determination by assessing whether it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The Commission's determinations are presumed to be correct and the burden is on the party challenging a determination to demonstrate otherwise. 28 U.S.C. § 2639(a)(1).[8]

The Supreme Court has defined "substantial evidence" as being "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera*

---

[8] Plaintiff argues that the Commission's determinations should also be reviewable under an "arbitrary and capricious" standard, PlBr. at 9-11, but that is not the standard of review for these determinations under the statute.

*Corp. v. NLRB*, 340 U.S. 474, 477 (1951).  According to the Court, substantial evidence is

"something less than the weight of the evidence, and the possibility of drawing two inconsistent

conclusions from the evidence does not prevent an administrative agency's finding from being

supported by substantial evidence."  *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

Thus, under the substantial evidence standard, a Court may not, "even as to matters not requiring

expertise . . . displace the {agency's} choice between two fairly conflicting views, even though

the court would justifiably have made a different choice had the matter been before it de novo."

*Universal Camera Corp.*, 340 U.S. at 488.

The Commission is the trier of fact in injury investigations.  As such, "{i}t is the

Commission's task to evaluate the evidence it collects during its investigation" and "{c}ertain

decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that

evaluative process." *U.S. Steel Grp. v. United States*, 96 F.3d 1352, 1357 (Fed. Cir. 1996);

*Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350 (Fed. Cir. 2006).  Accordingly, the

Commission has "discretion to make reasonable interpretations of the evidence and to determine

the overall significance of any particular factor in its analysis."  *Goss Graphics Sys., Inc. v.*

*United States*, 22 CIT 983, 1005, 33 F. Supp. 2d 1082, 1100 (1998), *aff'd,* 216 F.3d 1357 (Fed.

Cir. 2000).

Furthermore, because the Commission "is presumed to have considered all of the

evidence on the record," it is "'not required to explicitly address every piece of evidence

presented by the parties'" during an investigation.  *Nucor Corp. v. United States*, 28 CIT 188,

234, 318 F. Supp. 2d 1207, 1247 (2004) (*quoting USEC Inc. v. United States*, 34 F. App'x 725

(Fed. Cir. 2002)).  Instead, the Commission need only address the "issues material to {its}

determination" so that the "path of the agency may reasonably be discerned."  Statement of

Administrative Action to the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. I at 892 (1994) ("SAA"); *Timken U.S. Corp. v. United States*, 421 F.3d 1350, 1354-57 (Fed. Cir. 2005).

In the end, when a party challenges the Commission's determination under the substantial evidence standard, as Plaintiff does here, it has "'chosen a course with a high barrier to reversal.'" *Nippon Steel*, 458 F.3d at 1352 (*quoting Mitsubishi Heavy Indus., Ltd. v. United States*, 275 F.3d 1056, 1060 (Fed. Cir. 2001)). As the Federal Circuit stated, "when the totality of the evidence does not illuminate a black-and-white answer to a disputed issue, it is the role of the expert fact-finder – here the majority of the Presidentially-appointed, Senate-approved Commissioners – to decide which side's evidence to believe." *Nippon Steel*, 458 F.3d at 1359. Thus, "{s}o long as there is adequate basis in support of the Commission's choice of evidentiary weight, the Court of International Trade and {the Federal Circuit}, reviewing under the substantial evidence standard, must defer to the Commission." *Id.*

Plaintiff's reliance on the dissenting views of one Commissioner is misplaced. *See, e.g.*, PlBr. at 16, 19, 25-26, 29-30, 32-33, 38. That the dissenting Commissioner, this Court, or Plaintiff, may have weighed the evidence differently, does not provide grounds to overrule the Commission's determinations. Indeed, "{a}lthough individual Commissioners reached divergent conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Siemens Energy, Inc. v. United States*, 806 F.3d 1367, 1372 (Fed. Cir. 2015) (quoting *Consolo,* 383 U.S. at 620); *see also Grupo Industrial Camesa v. United States*, 85 F.3d 1577, 1582 (Fed. Cir. 1996) ("Although {a party} points to evidence supporting the dissenting commissioners' decision that the domestic industry was not materially injured, this

does not mean that the Commission's affirmative determination is unsupported by substantial evidence").

Plaintiff's numerous efforts to have the Court compare the dissent's findings with those of the Commission (or to ignore the Commission's findings entirely) is simply another way of asking the Court to reweigh evidence. *See Metallverken Nederland B.V. v. United States,* 13 CIT 1013, 1017, 728 F. Supp. 730, 734 (1989) ("In asking the Court to negate a commissioner's determination based upon the findings of dissenting commissioners, plaintiffs are, in essence, asking the Court to reweigh the evidence."). Plaintiff's recitation of the dissent's findings and failure to acknowledge the Commission's findings demonstrate its failure to appreciate the standard of review applicable to this appeal.

### B. The Commission Reasonably Considered the October 7, 2023, Hamas Attack and the Gaza War

The Commission collected questionnaire data in these investigations for the POI ending September 2023, while also collecting certain post-POI data for its analysis of threat of material injury. *See, e.g.,* Staff Report at Table VII-44. The October 7, 2023, Hamas attack on Israel and subsequent war in Gaza occurred after the end of the POI. Accordingly, the Commission and the parties, including Plaintiff, addressed the war as relevant to the Commission's analysis of whether subject imports from Israel caused a threat of material injury to the domestic industry.

The Commission made a final determination that subject imports from Israel caused present material injury to the domestic industry, and thus did not have occasion to address in its Views whether subject imports from Israel threatened material injury to the industry. However, in its discussion of supply constraints affecting various market participants, the Commission specifically noted Finkelstein's report that the Hamas attack and subsequent Gaza war caused shortages and constraints affecting its production in the post-POI period. Views at 34. Despite

this express reference in the Views, Plaintiff's Complaint inexplicably alleged that "there is no mention of the attack or the war in the majority's opinion…." Compl. ¶ 40 (ECF 9). Plaintiff has apparently withdrawn this mistaken allegation, but nevertheless argues that the Commission improperly "ignored" the war in its analysis of present material injury. PlBr. at 13-17. Plaintiff's argument is without merit.

It is well settled that the Commission has broad discretion to select the appropriate POI for its material injury investigation. *Nucor Corp.*, 414 F.3d at 1337; *Chemours Co. FC, LLC v. United States*, 443 F. Supp. 3d 1315, 1330-31 (Ct. Int'l Trade 2020). Having reasonably selected the January 2020-September 2023 POI and collected data with respect to that POI, the Commission appropriately relied on these data for its determination of present material injury, and not on post-POI data. In *AWP Industries*, the Court found that the Commission appropriately based its determination on the dataset from the POI in that investigation, even though Plaintiff argued that post-POI data showed a different trend that allegedly supported a different determination. The Court stated that "{w}hile {the Commission} has the discretion to use post-POI data to bolster POI data or to further support its decision, there is no requirement to include such post-POI data, as the POI is the centerpiece of the investigation's time frame." 35 CIT at 791, 783 F. Supp. 2d at 1282 (citations omitted). Plaintiff's citations to earlier decisions to argue that the Commission must consider post-POI events in its analysis of present material injury are thus inapposite.[9]

Moreover, Plaintiff fails to acknowledge that the parties, including Plaintiff itself, recognized in their arguments to the Commission that the October 7 attack and Gaza war were

---

[9] Plaintiff relies upon a 2002 decision involving a challenge to a Commission determination in a five-year review, not an original investigation as in this case. *Usinor v. United States*, 26 CIT 767 (2002). PlBr. at 15-16.

relevant only to the Commission's analysis of threat of material injury. Plaintiff argued "{a}dditionally, the ongoing war in Israel, and the resulting production constraints for Finkelstein Metals, render it impossible for Finkelstein Metals to maintain, much less increase, its exports to the United States, eliminating any possible *threat of material injury* by these imports." Gov't of Israel Posthearing Br. at 3 (PR139) (emphasis added). Similarly, Finkelstein argued that "{r}ecord evidence establishes that subject imports from Israel *do not threaten material injury*, particularly taking into account Israel's precarious security situation." Finkelstein Posthearing Br. at 14 (PR151) (emphasis added).

At the Commission hearing on December 12, 2023, Commissioner Kearns specifically asked Finkelstein to address these post-POI developments in relation to threat of material injury, but not present material injury:

> I think my last question for you, Mr. Apeloig {Finkelstein Chairman}, *this goes to whether or not {imports from} Israel will be a threat in the future.* And I've read your brief. I know there's all the arguments that we normally have about looking at during the POI, what imports were doing and so forth. I think you want us to focus on sort of what impact the war is having on Israel….

Hr'g. Tr. at 237 (PR135) (emphasis added). Accordingly, Commissioner Kearns requested that Finkelstein "document and … quantify" the post-POI effects of the war in Gaza on the firm's operations, for purposes of the Commission's analysis of threat of material injury. Hr'g. Tr. at 240. Thus, the Commission did not "ignore" the Hamas attack and war, as Plaintiff mistakenly claims, but in fact requested and collected additional information for its threat analysis. However, given the Commission's affirmative determinations of present material injury with respect to subject imports from Israel based on data covering the POI, it had no occasion to address the post-POI information it had collected for the threat analysis. As a logical matter, any impact that the post-POI war in Gaza might have had on Finkelstein's ability to export to the

United States in the imminent future could have had no bearing on whether subject imports from Israel had materially injured the domestic industry during the POI.[10]  For these reasons, the Court should reject Plaintiff's argument and sustain this aspect of the Commission's determinations.

### C.    The Commission Reasonably Found Subject Import Volume Significant

The statute provides six possible findings that the Commission must consider with respect to the volume of subject imports: "In evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  The Commission found subject import volume from Israel significant as to three of these six criteria.  Specifically, the Commission found that in absolute terms, the volume of subject imports from Israel ranged from [       █    ] pounds to [        █        ] pounds during the full years in the POI, and was [      █      ] pounds in interim 2023 compared with [      █      ] pounds in interim 2022, and thus reasonably determined that this volume was significant in absolute terms.  Views at 45-46.  The Commission also found that the volume of subject imports from Israel increased by [   █   ] percent between 2020 and 2022, and was [   █   ] percent higher in interim 2023 compared with interim 2022, and thus reasonably found that this increase was significant in absolute terms.  *Id.*  The Commission found that subject imports from Israel as a share of apparent U.S. consumption ranged from [  █  ] percent to [  █  ] percent during the POI, and that the market share of subject imports from Israel sold to distributors ranged from [  █  ] percent to [  █  ] percent during the

---

[10] Moreover, if events after the POI substantially changed the condition of the Israeli brass rod industry, Finkelstein or Plaintiff could request that the Commission conduct a changed circumstances review under 19 U.S.C. § 1675(b).

POI, and thus reasonably found that the volume of subject imports from Israel was significant relative to U.S. consumption. *Id.* at 46 & n.187.

None of Plaintiff's challenges to the Commission's volume analysis withstand scrutiny. First, Plaintiff contends that subject imports from Israel were small relative to U.S. production and that the increase in subject import market share was also small. PlBr. at 17-18, 21. After considering the data, however, the Commission made no finding that subject import volume was significant relative to U.S. production or that subject import market share increased significantly. It is well settled that the Commission need not find subject import volume significant with respect to all six criteria to find the volume of subject imports to be significant. *Hynix Semiconductor, Inc. v. United States*, 30 CIT 1208, 1212; 431 F. Supp. 2d 1302, 1308 (2006); *see Copperweld Corp. v. United States*, 12 CIT 148, 167, 682 F. Supp. 552, 570 (1988) (finding that the statute's disjunctive language indicates a broad Congressional intent to give the Commission broad discretion to analyze import volume in the context of the industry concerned). Thus, Plaintiff's arguments as to findings the Commission did not make are irrelevant to the reasonableness of the volume findings the Commission made.

Second, Plaintiff argues that the Commission should have addressed a prior negative determination with respect to imports from Israel under a predecessor statute in an investigation from three decades ago, which Plaintiff contends had "similar facts" to those in this case and warranted a different result. PlBr. at 18-20; *see Certain Carbon Steel Butt-Weld Pipe-Fittings from France, India, Israel, Malaysia, The Republic of Korea, Thailand, The United Kingdom, and Venezuela*, Inv. Nos. 701-TA-360 and 361 and 731-TA-688-695 (Final), USITC Pub. 2870 (Apr. 1995) ("*Pipe Fittings*"). The one "similar fact" it adduces is that both *Pipe Fittings* and this case involved subject imports from Israel. However, the Commission's analysis in this case

was in no way bound by its analysis in the previous one because each Commission investigation is *sui generis*. *Nucor Corp.,* 414 F.3d at 1340.

Nor does Plaintiff identify similarities in the relevant conditions of competition between the two investigations, three decades apart. To the contrary, while the Commission found in this case that the domestic industry lost market share from 2020 to 2022 as subject imports from Israel gained market share, Views at 46 n.185, the Commission in *Pipe Fittings* found that the domestic industry *gained* 20 percentage points of market share during the POI of that investigation. *Pipe Fittings,* USITC Pub. 2870 at I-20. Thus, the Commission's determination with respect to Israel in *Pipe Fittings* three decades ago is irrelevant to this case, and there was no reason for the Commission to address that determination in its Views.

Similarly unavailing is Plaintiff's invitation for the Court to reweigh evidence the Commission reasonably considered concerning the significance of subject import volume. Despite Plaintiff's strenuous efforts to parse dictionary definitions of the word "significant" to rebut the Commission's volume findings (PlBr. at 20-21), it is also well settled that there is no minimum threshold for import volumes to be found significant, and that the significance of the volume of imports may be affected by the conditions of competition for the industry at issue. As this Court has explained,

> There is no minimum rate of increase in subject import volume or a baseline percentage of market share for subject imports, above which volume will be considered "significant." Congress has specified that "for one industry, an apparently small volume of imports may have a significant impact on the market, for another the same volume may not be significant."

*Nippon Steel*, 25 CIT at 1419-20, 182 F. Supp. 2d at 1335 (quoting H.R. Rep. 96-317, 96th Cong., 1st Sess., at 381, 474 (1979)); *Hynix Semiconductor*, 30 CIT at 1212-13, 431 F. Supp. 2d at 1308.

- 20 -

Here, the conditions of competition in the U.S. brass rod market found by the Commission support its conclusion that the volume of subject imports from Israel was significant. The Commission found at least a moderate-to-high degree of substitutability between subject imports from Israel and the domestic like product, and that price is an important factor in purchasing decisions for brass rod. Views at 47. It found that the U.S. brass rod market has substantial price transparency and sensitivity, with domestic producers selling from published price lists that they revise frequently in response to developments in the market. *Id.* at 63-64. Given the price sensitivity of the market, the Commission explained, competition from seemingly small volumes of low-priced subject imports from Israel, and sales lost to such imports, prompted domestic producers to downwardly revise their price lists, or forgo price increases necessary to cover increased costs, affecting their prices to all customers using those price lists, and their revenues from sales to such customers. *Id.* at 64*; see* Hr'g Tr. at 25, 63-64, 112-113 (Mitchell); 31 (Christie) (PR135).

Because the Commission reasonably found the volume of subject imports from Israel significant, the Court should reject Plaintiff's arguments and sustain the finding.

### D.     The Commission Reasonably Found Significant Underselling by Subject Imports from Israel

The Commission found that underselling by subject imports from Israel was significant in light of the at least moderate to high degree of substitutability of subject imports from Israel with the domestic like product, the importance of price in purchasing decisions for brass rod, the Commission's pricing data showing pervasive subject import underselling, and the substantial volume of confirmed lost sales. Views at 58-59. As discussed below, the Commission's underselling analysis was reasonable, notwithstanding Plaintiff's narrow challenge to it.

Plaintiff does not challenge the Commission's questionnaire pricing data showing pervasive underselling by subject imports from Israel in the two channels of distribution in which those subject imports competed head-to-head with the domestic industry. Views at 51. Specifically, in sales to distributors, subject imports from Israel undersold the domestic like product in [ ▆ ] of [ ▆ ] quarterly comparisons, by an average margin of underselling of [ ▆ ] percent. *Id.* at 49. In sales to end users not through scrap buyback programs, subject imports from Israel undersold the domestic like product in [ ▆ ] quarterly comparisons by an average margin of underselling of [ ▆ ] percent. *Id.* In these two channels combined, the Commission found that subject imports from Israel undersold the domestic like product in 86 of 87 quarterly comparisons, with an average margin of underselling of [ ▆ ] percent, corresponding to subject import sales of [ ▆ ] pounds, equivalent to [ ▆ ] percent of reported subject import sales volume from Israel in the pricing data. *Id.* Importers reported no subject imports from Israel in the third channel of distribution, sales to end users through scrap buyback programs. *Id.* at 48 n.193.

Plaintiff does not challenge, or even acknowledge, the substantial volume of confirmed lost sales by the domestic industry to subject imports from Israel found by the Commission. The Commission found that ten of eleven purchasers that purchased subject imports from Israel instead of the domestic like product during the POI reported that subject imports from Israel were priced lower than the domestic like product. *Id.* at 50. The Commission further found that six of these ten purchasers reported that the lower price was a primary reason for the decision to purchase [ ▆ ] pounds of subject imports from Israel rather than the domestic like product during the POI, equivalent to [ ▆ ] percent of U.S. shipments of subject imports from Israel during the POI. *Id.* Based on these uncontested findings alone, as well as the at least

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

moderate to high degree of substitutability and the importance of price in purchasing decisions, the Commission reasonably concluded that subject import underselling was significant. *Id.* at 58-59.

Rather, Plaintiff's challenge to the Commission's underselling analysis is limited to the adjustment the Commission made to the pricing data reported by the two petitioning domestic producers to account for the higher prices they received for their brass rod from end user customers that participated in scrap buyback programs, so that these data could be compared to subject import prices on sales to end users that did not participate in such programs. As an initial matter, the Commission relied on its analysis of these data as additional support for its finding that underselling by subject imports from Israel was pervasive, based on quarterly price comparisons concerning sales to distributors and end users not through scrap buyback programs. Views at 49. As the Commission explained, the domestic industry's sales to end users in scrap buyback programs did not attenuate subject import competition, as Finkelstein argued, because the majority of subject imports from Israel were sold to distributors in competition with the domestic industry, and subject imports from Israel also competed for sales to end users not through scrap buyback programs, increasing their share of sales to such purchasers by [ ▮ ] percentage points from 2020 to 2022 at the industry's expense. Views at 50-52. It also found that Finkelstein's underselling with respect to distributors and end users not through scrap buyback programs affected the domestic industry's sales prices to end users through scrap buyback programs, and that there was substantial overlap between the largest customers served by Finkelstein and the domestic industry. *Id.* at 52-54. Plaintiff challenges none of these findings, which support the Commission's finding that subject import underselling was pervasive even excluding the additional analysis challenged by Plaintiff.

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

Nevertheless, in response to arguments by Finkelstein, and in light of evidence that the same end users had purchased brass rod both from the domestic industry through scrap buyback programs and from Finkelstein not through a scrap buyback program, the Commission considered three options presented in the Staff Report for adjusting pricing data on sales to end users participating in scrap buyback programs to account for the premium included in such prices:  no adjustment to the questionnaire data (Table F-1), a price-based adjustment (Table F-2), and a cost-based adjustment advocated by Finkelstein during the investigations and now advocated by Plaintiff (Table F-3).  Views at 55; Staff Report at Appendix F.

The Commission reasonably found that, notwithstanding some limitations, including limitations in the available data, the price-based adjustment presented in Table F-2 of the Commission report was the most reliable approach.  Views at 56-57.  To make the price-based adjustment, the Commission calculated the weighted average price at the firm level for each petitioner's sales to non-buyback customers (both distributors and non-buyback end user customers) as a proxy and then applied that "non-buyback" price to each petitioner's sales to scrap buyback end user customers.  *Id.* at 57.  This adjustment resulted in reducing on a weighted average basis the domestic industry's reported prices for sales to end users in the scrap buyback program by [ ▮ ] percent.  *Id.* at 57 n.226.  The Commission then combined the adjusted data for sales to scrap buyback end users with the unadjusted data for sales to non-buyback end users to calculate an overall domestic industry price for all sales to end users combined, which it compared on a quarterly basis to the prices of subject imports from Israel sold to end users not through scrap buyback programs.  *Id.*  As a result of this adjustment, the Commission found that subject imports from Israel undersold the domestic like product in sales to all end users combined in [ ▮ ] percent of quarterly comparisons, corresponding to [ ▮ ] percent of

reported subject import sales volume to end users. *Id.* at 58. Thus, the Commission found that even after this price-based adjustment, the Commission's pricing data continued to show pervasive underselling by subject imports from Israel.

Plaintiff makes two arguments. First, it argues that the Commission should have utilized a cost-based adjustment (as in Table F-3 of the Staff Report) rather than a price-based adjustment. PlBr. at 25-26. Second, it argues that the Commission's price-based adjustment should have made further adjustments to take into account certain volume discounts accorded by the two petitioners to some large end users participating in the scrap buyback program. *Id.* Both arguments are without merit.

As this Court has held, "{w}hen evaluating challenges to the ITC's methodology, the court will affirm the chosen methodology as long as it is reasonable… The Court examines 'not what methodology {Plaintiff} would prefer, but … whether the methodology actually used by the Commission was reasonable.'" *Coal. of Gulf Shrimp Indus.*, 71 F. Supp. 3d at 1367 (citations omitted); *United Steel, Paper and Forestry, Rubber, Mfg., Energy, Allied Indus. and Service Workers Int'l Union,* 425 F. Supp. 3d 1374, 1379 (Ct. Int'l Trade 2020). Here, the Commission fully explained the substantial problems with the proposed cost-based adjustment, why it found the price-based adjustment to be the most reliable of the available options, and why it found that it would be inappropriate to make further adjustments based on volume discounts from petitioners to some scrap buyback end users. Because the Commission's methodology was reasonable, the Court should reject Plaintiff's request that its preferred methodology be substituted, and sustain this aspect of the Commission's determinations.

The Commission explained that the proposed cost-based adjustment erroneously assumed a uniform scrap yield by scrap buyback customers, with the adjustment proposed by Finkelstein

assuming an 80 percent scrap return rate.  Views at 56 & n.223.  However, the Commission

found that the record, including witness testimony, showed that scrap yields can vary

considerably from product to product and from end user to end user.  *Id.* at 42 n.167, 56 n.223;

Hr'g Tr. at 53 (Mitchell), 68, 73-74 (Christie) (PR135).  Indeed, Mueller reported scrap

generation rates for its customers ranging from [ █ ] percent to [ █ ] percent, while Wieland

reported scrap generation rates for its customers ranging from [ █ ] percent to [ █ ] percent.

Views at 42 n.167, 56 n.223; Petitioners' Posthearing Brief at Exh. 10 (CR209).

     Moreover, the Commission further explained that the cost-based approach did not

account for additional costs that domestic producers may incur, such as the cost of testing,

cleaning, sorting, and processing scrap, when they purchase scrap in the open market rather than

purchasing scrap with their own chemistry from scrap buyback end users. Views at 55-56.

Contrary to Plaintiff's assertion that the Commission's reference to these costs was

"speculation," PlBr. at 26, the Commission reasonably found that domestic producers

substantially benefit from purchasing scrap with their own chemistry from buyback end users,

which minimizes adjustment costs from these procedures, while purchasing scrap with unknown

chemistry from a middleman, entailing a risk of contamination from that scrap, increases those

costs.  Views at 41-42 & n.163, 55-56 & n.222.  It is undisputed that, regardless of the source of

the scrap, domestic brass rod producers sort and test the scrap to ensure that only scrap with the

appropriate characteristics goes forward into the production process, and determine whether

adjustments are needed to meet product specifications.  *Id.;* Staff Report at I-12; Petitions,

Volume I, at 10 (PR1).

     The Commission also relied on extensive hearing testimony concerning additional costs

that purchasing scrap from middlemen imposed on domestic producers.  At the hearing, Mr.

- 26 -

Christie of Wieland testified that "{w}e want the high-quality products to ensure that we get that

back, you know, from our customers.  We know it's already our chemistry."  Hr'g Tr. at 53

(PR135) (cited in Views at 56 n.222).  He further testified:

> From a mill perspective, we want to make sure we're getting high-quality scrap back.  We don't want to be going through a middleman where there's a risk of contamination.…  If we have to start with other raw materials we purchase on the free market, there's typically a higher cost related to yield loss potentially because those products are not already at our chemistry, so we have to make adjustments and additions to that.  So getting our own chemistry back is to our advantage.

Hr'g Tr. at 120-21 (PR135) (cited in Views at 56 n.222).  Mr. Mitchell of Mueller similarly

testified that "{w}e want that scrap {from the firm's customers} because we know the chemistry

of it, we know the quality of it…"  Hr'g Tr. at 58 (PR135) (cited in Views at 56 n.222).  Because

the Commission's finding that U.S. producers incur additional costs not reflected in the cost-

based adjustment when they purchase scrap without their own chemistry in the open market was

supported by substantial evidence, the Commission's reliance on the price-based adjustment,

rather than the cost-based adjustment advocated by Plaintiff, was reasonable.

Similarly misplaced is Plaintiff's argument that the Commission's analysis using the

price-based approach did not reflect certain volume discounts accorded by petitioners to some

large end users participating in the scrap buyback program.  PlBr. at 25.  The Commission

recognized that Mueller and Weiland each had separate published price lists providing specified

volume discounts for high volume purchases by both end user and distributor customers.  Views

at 57-58 n.226.  As the Commission explained, however, a further adjustment to the underselling

data to account for volume discounts to scrap buyback end users was not necessary or

appropriate, because these scrap buyback end users were not the only customers receiving

volume discounts from petitioners, and not all of petitioners' scrap buyback end user customers

were large volume customers receiving discounts.  *Id.*  Petitioners' price lists showed that

distributors could also receive high volume discounts, and some of the domestic industry's

largest customers were distributors.  *Id.*  Moreover, the Commission noted that importer

[ ████████████ ] also reported offering [ ██████ ] discounts to its customers for [ ██████

███████████ ].  *Id.* at 39 n.151.  Thus, petitioners' adjusted pricing data on sales to scrap

buyback end users, influenced to some extent by volume discounts, were already compatible

with petitioners' pricing data on sales to non-scrap buyback end users and distributors, as well as

[ ███████████ ] pricing data on [ ██████████ ] sales, which were also influenced to

some extent by volume discounts, making no further adjustments necessary or appropriate.

Furthermore, the Commission explained that even if it assumed a maximum volume discount for

all of petitioners' sales to scrap buyback end users, and further assumed no volume discount for

any of their sales to distributors and non-buyback end users, the resulting adjustment to U.S.

producers' prices would not change the majority underselling it had found for subject imports

from Israel sold to end users.  *Id.* at 57 n.226.[11]

Thus, the Commission fully explained the basis for its adjustment to the pricing data,

explaining the problems with the cost-based adjustment advocated by Plaintiff, and why the

price-based adjustment, based on actual prices reported by domestic producers, was the most

reliable methodology, despite its limitations.  It further explained why making further

---

[11] Plaintiff mistakenly argues that the Commission's finding in this regard somehow
constitutes "a deviat{ion} from its past practice."  PlBr. at 25-26.  As an initial matter, Plaintiff
does not and cannot establish that the Commission has any "practice" with respect to such
calculations, given the unique facts of this case and that each Commission investigation is *sui
generis*.  Furthermore, the Commission reasonably found that reducing the petitioners' adjusted
sales prices to scrap buyback end users by [ ██ ] to [ ██ ] percentage points, assuming the
maximum adjustment for volume discounts, would not eliminate an underselling margin that
averaged [ ██ ] percent.  Views at 57 n.226.

adjustments to the data based on possible volume discounts for certain end user customers of petitioners was neither necessary nor appropriate. Because the Commission's price-based methodology for adjusting the domestic pricing data on sales to scrap buyback end users was reasonable, regardless of Plaintiff's preferred alternative, the Court should affirm it.

### E. The Commission Reasonably Found that Subject Imports from Israel Caused Significant Adverse Price Effects

The Commission found, based on substantial evidence, that the significant underselling it found by subject imports from Israel prevented price increases, which otherwise would have occurred, to a significant degree, and led to a market share shift from the domestic industry to subject imports from Israel from 2020 to 2022. Views at 66. Despite the Commission's detailed analysis of these adverse price effects, Plaintiff inexplicably argues that "{t}he Commission did not explain its departure from past practice that there must be more than underselling," but then goes on to acknowledge (and dispute) the Commission's findings that significant underselling by subject imports from Israel suppressed domestic prices and captured market share from the industry. PlBr. at 27-28.

Plaintiff notes that the Commission typically looks at the domestic industry's COGS to net sales ratio in its price suppression analysis, and states that an increase in this ratio over the POI generally indicates that "the domestic industry could not raise prices to cover rising costs and maintain a profitable margin." PlBr. at 28-29. Plaintiff acknowledges that the industry's COGS to net sales ratio increased from 2020 to 2021, but claims that this increase "was almost entirely reversed" from 2021 to 2022 and during the interim periods, restoring the ratio to "almost the same level" as in 2020. *Id.* at 29. Plaintiff's numerical contentions do not withstand scrutiny.

- 29 -

The Commission found that the domestic industry's ratio of non-toll COGS to net sales increased from [ ▮ ] percent in 2020 to [ ▮ ] percent in 2021, before decreasing to [ ▮ ] percent in 2022, for an increase of [ ▮ ] percentage points between 2020 and 2022; the ratio was [ ▮ ] percent in interim 2023 compared with [ ▮ ] percent in interim 2022. Views at 59-60.[12] Contrary to Plaintiff's argument, the [ ▮ ] percentage point decrease in the ratio in 2022 hardly "reversed" the [ ▮ ] percentage point increase in 2021, and thus the Commission found that the COGS to net sales ratio remained elevated at [ ▮ ] percent in 2022. *Id.* at 59, 66. Similarly, while the [ ▮ ] percent ratio in interim 2023 was lower compared with interim 2022, it was higher than the [ ▮ ] percent ratio in 2020. *Id.* at 61 n.240. Thus, the Commission reasonably found that the [ ▮ ] percentage point increase in the industry's COGS to net sales ratio from 2020 to 2022 supported its finding that the significant underselling by subject imports from Israel significantly suppressed domestic prices. *Id.* at 59-60, 66.

Furthermore, the Commission found that additional information in the record showed that the domestic industry experienced a cost-price squeeze during the POI. *Id.* at 61. It found that the industry's cost of raw materials increased over the POI, with yellow brass scrap prices increasing by 47.2 percent and copper prices increasing by 37.2 percent. *Id.* at 60. It further found that the increase in the industry's non-toll net sales average unit values from 2020 to 2022, [ ▮ ] percent, did not keep up with the [ ▮ ] percent increase in its non-toll unit raw material costs and the [ ▮ ] percent increase in its non-toll unit total COGS over the same period, despite the [ ▮ ] percent increase in apparent U.S. consumption. *Id.* at 60-61. The Commission

---

[12] As previously noted, because sales through tolling arrangements do not reflect raw material costs, the Commission relied on the domestic industry's data for non-toll sales as the most probative indicator for its price suppression analysis. Views at 60 n.231.

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

also found that the cost-price squeeze led to declines in the domestic industry's non-toll

operating income and ratio of non-toll operating income to net sales.  *Id.* at 61.

Plaintiff nevertheless asserts that an increase in the domestic industry's non-toll

unit gross profit between 2020 and 2022 of $[ ██ ] per pound somehow "prove{s}" that the

industry's prices were not significantly suppressed by subject imports from Israel.  PlBr. at 29.[13]

However, in addition to ignoring the Commission's finding of a [ ██ ] percentage point decline

in the industry's non-toll ratio of operating income to net sales between 2020 and 2022, Views at

61 n.240, Plaintiff 's reliance on gross profit per pound data also ignores the Commission's

finding that the industry's non-toll gross profit to net sales ratio in fact also declined by [ ██ ]

percentage points, from [ ██ ] percent in 2020 to [ ██ ] percent in 2022.  Views at 61 n.239,

73.  These declines supported the Commission's price suppression finding.

The Commission also found that the domestic industry was forced to limit price increases

to avoid continued lost sales to subject imports from Israel.  *Id.* at 62.  The Commission found

substantial overlap in customers of the domestic like product and subject imports from Israel,

including large customers and customers that buy domestic product through scrap buyback

programs.  *Id*.  The Commission specifically found that purchaser [ ████ ] reported that

U.S. producers had reduced prices by [ ██ ] percent to compete with lower-priced subject

imports from Israel, and purchaser [ ██ ] reported buying [ ████ ] pounds of subject

imports from Israel instead of domestic product primarily due to the lower prices of the imports.

*Id.* at 62-63.  The Commission further found that petitioners had documented that competition

with low-priced subject imports from Israel had prevented domestic producers from adequately

---

[13] The domestic industry's unit gross profit on non-toll sales increased from $[ ██ ] per
pound in 2020 to $[ ██ ] per pound in 2022.  Staff Report at Table VI-7.

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

raising prices in response to rising costs. *Id.* at 63. As low-priced subject imports from Israel gained market share from the domestic industry from 2020 to 2022, the Commission explained, the industry's non-toll COGS to net sales ratio increased [ ▮ ] percentage points and its non-toll operating income margin reached a POI-low, despite the absence of domestic supply constraints in 2022 and apparent U.S. consumption that was [ ▮ ] percent higher. *Id.*

Plaintiff nevertheless argues that the volume of subject imports from Israel was too small for the underselling to have caused adverse price effects for the industry. PlBr. at 29-30. However, Plaintiff ignores the substantial volume of confirmed lost sales resulting from that underselling, equivalent to [ ▮ ] percent of U.S. shipments of subject imports from Israel during the POI. Views at 50. Furthermore, as previously noted, the Commission found that the U.S. brass rod market has substantial price transparency and sensitivity, with domestic producers selling brass rod off published price lists that they revise frequently following developments in the market. Views at 63-64. In light of this, the Commission explained, domestic producers reported that lost sales to Finkelstein had prompted them to downwardly revise their prices or forgo needed price increases to avoid losing further sales, thereby affecting their prices to all customers using the price lists and their revenues from sales to such customers. *Id.* at 63-64 & nn.250-251, citing Hr'g Tr. at 25, 63-64, 112-113 (Mitchell); 31 (Christie) (PR135).

Finally, Plaintiff argues, unpersuasively, that the market share shift from the domestic industry to subject imports from Israel from 2020 to 2022 cannot be attributed to the underselling by subject imports from Israel during the POI, because after the industry lost market share in 2021, it gained market share in 2022 and interim 2023 while the underselling continued. PlBr. at 30. The Commission recognized that the industry's market share increased [ ▮▮ ] by [ ▮ ] percentage points from 2021 to 2022 and was [ ▮ ] percentage points higher in interim 2023

than in interim 2022.  Views at 29-30.  Notwithstanding these increases, however, the

Commission reasonably found that underselling by subject imports from Israel led to a shift in

market share from the domestic industry to subject imports from Israel of [ ■ ] percentage

points from 2020 to 2022 and [ ■ ] percentage points from 2020 to interim 2023.  Views at 59.

As the Commission explained, because the industry's market share remained lower in 2022 than

in 2020, while the market share of subject imports from Israel was higher, subject imports from

Israel increased their market share at the industry's expense over the period.  *Id.* at 75-76.

Similarly, as apparent U.S. consumption was [ ■ ] percent lower but subject imports from

Israel were [ ■ ] percent higher in interim 2023 compared with interim 2022, the market share

of subject imports from Israel increased to a POI-high of [ ■ ] percent in interim 2023.  *Id.* at

76.  Because the domestic industry's market share remained [ ■ ] percentage points lower in

interim 2023 than in 2020, this market share was lost to subject imports from Israel.  Staff Report

at Table IV-11.  Thus, the Court should reject Plaintiff's argument and affirm this aspect of the

Commission's determinations.

Because the Commission reasonably found that subject imports from Israel caused

significant price effects the Court should affirm the findings.

**F.    The Commission Reasonably Found that Subject Imports from Israel Had a
       Significant Impact**

In its analysis of the impact of subject imports from Israel, the Commission again found

that the significant volume of subject imports from Israel undersold the domestic like product

and took sales from the domestic industry, gained market share at the expense of the industry,

suppressed domestic producers' prices, and prevented the industry from fully capitalizing on the

[ ■ ] percent increase in apparent U.S. consumption from 2020 to 2022.  Views at 74.  The

Commission further found that, as the domestic industry lost [ ■ ] percentage points of market

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

share to subject imports from Israel between 2020 and 2022, its production and U.S. shipments increased by less than apparent U.S. consumption, and most of the industry's financial indicators declined. *Id.*[14] Specifically, the Commission found that the suppression of domestic producers' prices by subject imports from Israel contributed to a [ ▮ ] percentage point increase in the domestic industry's non-toll COGS to net sales ratio between 2020 and 2022, an [ ▮ ] percent decline in the industry's operating income, and a [ ▮ ] percentage point decline in its overall ratio of operating income to net sales. *Id.* at 74-75.[15] Thus, the Commission found a causal nexus between subject imports from Israel and the industry's declining financial performance. *Id.* at 74. Furthermore, the Commission noted that the volume of low-priced subject imports from Israel continued to increase over the interim periods, reaching a POI-high in market share in interim 2023, as the domestic industry's market share remained lower and its non-toll COGS to net sales ratio higher than at the beginning of the POI. *Id.* at 75. Because the Commission's analysis of the impact of subject imports from Israel was reasonable, the Court should affirm it.

The Commission discussed all relevant indicators of the domestic industry's performance during the POI, including those that improved or were unchanged. *Id.* at 67-74. The Commission specifically noted irregular increases in the industry's capacity utilization, net sales value, gross profits, and capital expenditures between 2020 and 2022, among other factors. *Id.* While conceding that the Commission acknowledged these positive trends, Plaintiff argues that they reflect "the domestic industry's success during the POI" and somehow required a different

---

[14] The Commission found that from 2020 to 2022, apparent U.S. consumption increased by [ ▮ ] percent, while the domestic industry's production increased by [ ▮ ] percent and its U.S. shipments increased by [ ▮ ] percent. Views at 74.

[15] As previously noted, the Commission found that the industry's non-toll operating ratio declined by [ ▮ ] percentage points. Views at 61 n.240.

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

result.  PlBr. at 31-32.  The Court should reject Plaintiff's invitation to reweigh evidence reasonably considered by the Commission.

First, there is no merit to Plaintiff's contention that the Commission's findings that subject imports from Israel took sales from the domestic industry and gained market share at the expense of the industry are based on "isolated tidbits of data."  PlBr. at 30-31.  Plaintiff fails to acknowledge the Commission's reliance on confirmed lost sales of [ ███ ] pounds, the equivalent of [ ██ ] percent of U.S. shipments of subject imports from Israel during the POI. Views at 50.  The significant volume of confirmed lost sales, as well as the other evidence discussed in section II.E above, reasonably supported the Commission's finding that significant underselling by subject imports from Israel caused a market share shift from the domestic industry to subject imports from Israel.

Similarly misplaced is Plaintiff's argument that the market share shift from the domestic industry to subject imports from Israel was too small to be significant.  PlBr. at 31, 33, 35.  As discussed in section II.E. above, the Commission found that given the price transparency and price sensitivity of the U.S. brass rod market, seemingly small volumes of domestic sales lost to subject imports from Israel resulted in downward revisions to domestic producers' price lists, affecting their prices to all customers using those price lists and contributing to the suppression of domestic prices by low-priced subject imports from Israel.  Views at 63-64.  Moreover, as previously noted, the Commission found that as the domestic industry lost market share to subject imports from Israel, it was unable to benefit fully from the increase in apparent U.S. consumption from 2020 to 2022, as its shipments and production increased by less than apparent U.S. consumption, most of its financial indicators declined, and its non-toll COGS to net sales ratio was higher.  *Id.* at 74-75.

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

In addition, Plaintiff mistakenly contends that because the domestic industry was profitable and certain indicators of its financial performance improved at the end of the POI, the Commission should have reached negative determinations.  PlBr. at 31-33.  However, Plaintiff's argument conflicts with the statutory provision that "{t}he Commission may not determine that there is no material injury or threat of material injury to an industry in the United States merely because that industry is profitable or because the performance of that industry has recently improved."  19 U.S.C. § 1677(7)(J).

Plaintiff's argument also conflicts with the record.  As the Commission found, most of the domestic industry's financial indicators declined between 2020 and 2022, as low-priced subject imports from Israel captured market share from the industry and suppressed domestic prices to a significant degree.  Views at 67.  In addition to the declines in the industry's operating income and operating ratio from 2020 to 2022, the Commission also found that the industry's net income and net income ratio both declined.  Views at 71.  Plaintiff nevertheless contends that the Commission should have given greater weight to the industry's increase in gross profit between 2020 and 2022 rather than what it views as "aberrational" declines in operating income, net income, operating income ratio, and net income ratio found by the Commission.  PlBr. at 32-33.  Plaintiff contends that the decline in operating income between 2020 to 2022 was a "temporary" decline "driven" by an increase in sales, general, and administrative ("SG&A") expenses in 2021, and was thus "aberrational," while further asserting that the record showed improvements in the domestic industry's financial performance in 2022.  PlBr. at 33.  However, the industry's operating income declined by [ ███ ] percent from 2021 to 2022, belying Plaintiff's contention that the decline between 2020 and 2022 was a temporary decline driven by increased SG&A expenses in 2021.  *See* Staff Report at Table C-1.  Moreover, Plaintiff fails to acknowledge that

the Commission also found that the ratio of gross profits to net sales declined on an overall basis

from [ █ ] percent in 2020 to [ █ ] percent in 2022.  Views at 70.[16]  Because the

Commission reasonably found that the domestic industry's financial performance declined from

2020 to 2022, the Court should reject Plaintiff's invitation to reweigh the evidence, and affirm

this aspect of the Commission's analysis.

 Finally, there is no merit to Plaintiff's argument that the declines in the domestic

industry's performance caused by subject imports from Israel do not rise to the level of "material

injury," based on Plaintiff's extended review of dictionary definitions of "inconsequential,"

"immaterial," and "unimportant."  PlBr. at 34-36.  Despite Plaintiff's repeated contention that the

Commission's analysis relies upon "isolated tidbits," PlBr. at 30, the Commission based its

impact analysis on declines in the relevant economic factors the statute directs the Commission

to examine.  Among the relevant factors the statute directs the Commission to evaluate are

"actual and potential decline in output, sales, market share, gross profits, operating profits and

net profits, ability to service debt, productivity, return on investments, return on assets, and

utilization of capacity." 19 U.S.C. § 1677(7)(C)(iii)(I).  The Commission recognized that there

were improvements between 2020 and 2022 in some domestic industry performance indicators,

including production, net sales value, U.S. shipments, and gross profits, Views at 69-72, but

found that the increases in production and U.S. shipments were less than the increase in apparent

U.S. consumption over the period.  *Id.* at 74.  The Commission found actual declines in the

---

[16] As previously noted, the domestic industry's non-toll ratio of gross profits to net sales
declined from [ █ ] percent in 2020 to [ █ ] percent in 2022.  Views at 73.

statutory factors of market share, operating profits, net profits, productivity, and return on assets. *Id.* at 69-72.[17]

The statute also directs the Commission to address factors affecting domestic prices, 19 U.S.C. § 1677(7)(C)(iii)(II), and, as previously discussed, the Commission found that significant underselling by subject imports from Israel suppressed domestic prices to a significant degree. Similarly, the statute directs the Commission to consider negative effects on inventories as another relevant factor, 19 U.S.C. § 1677(7)(C)(iii)(III), and the Commission found that the industry's end-of-period inventories increased by [ ▋ ] percent between 2020 and 2022. Views at 69-70.  Thus, the adverse impact of subject imports from Israel on the domestic industry found by the Commission was not based on "isolated tidbits," but rather on a thorough analysis of the statutory factors that the Commission is directed to evaluate.  Based on this analysis, the Commission reasonably found that subject imports from Israel had a significant impact on the domestic industry.

Moreover, the statute directs the Commission to evaluate these factors "within the context of the business cycle and conditions of competition that are distinctive to the affected industry."  19 U.S.C. §1677(7)(C)(iii).  Here, the Commission reasonably found that subject imports from Israel prevented the domestic industry from fully capitalizing on the [ ▋ ] percent increase in apparent U.S. consumption from 2020 to 2022, by taking sales and market share from the industry and suppressing domestic prices, causing the industry's production and shipments to increase by less than apparent U.S. consumption and its operating income and operating income margin to decline over the period.  Views at 74-75.  This Court has held that where the

---

[17] The Commission found that the domestic industry's productivity declined by [ ▋ ] percent between 2020 and 2022, and that its return on assets declined irregularly from [ ▋ ] percent in 2020 to [ ▋ ] percent in 2022.  Views at 69 n.268, 72

Commission finds that subject imports significantly undersold and suppressed prices of the domestic like product, taking sales and market share from the domestic industry, evidence that some industry output indicators lagged behind growth in market demand supports a finding that subject imports had a significant impact on the domestic industry, notwithstanding improvements in other indicators. *United Steel Union,* 425 F. Supp. at 1380; *see also OCTAL, Inc. v. United States*, 539 F. Supp. 3d 1291, 1313-14 (Ct. Int'l Trade 2021) (upholding Commission causation analysis in affirmative remand determination where the Commission found that subject imports took sales and market share from the domestic industry, and the industry's production and shipments were lower than they would have been otherwise, despite improvements in some other performance indicators). The Court should likewise sustain the Commission's impact analysis here.

### G. The Commission's Non-Attribution Analysis Was Reasonable and in Accordance with Law

The SAA provides that the Commission must examine other factors to ensure that it is not attributing injury from other sources to subject imports. SAA at 851-852. Here, after the Commission fully explained the causal nexus it found between subject imports from Israel and the injury to the domestic industry, Views at 74-75, it then addressed a number of other factors to ensure that it was not attributing to subject imports from Israel any injury that may have been caused by other factors. It addressed, *inter alia,* domestic industry supply constraints, imports from sources other than Israel, and demand trends during the POI. *Id.* at 75-82. The Commission found that none of these factors explained the injury that the Commission attributed to subject imports from Israel, and that subject imports from Israel had a significant impact on the domestic industry that was distinct from the impact of imports from other sources. *Id.* at 80-81.

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

Plaintiff argues that the Commission "disregarded record evidence" regarding the effect of supply constraints on the domestic industry. PlBr. at 37. To the contrary, the Commission thoroughly discussed the industry's supply constraints during the POI, Views at 32-35, 75-77, but found that they did not explain the industry's loss of market share to subject imports from Israel from 2020 to 2022. *Id.* at 75. As the Commission explained, the domestic industry experienced supply constraints stemming from the COVID-19 pandemic in the 2020-2021 period, as did importers and foreign producers, but such constraints were resolved by 2022. *Id.* at 32-34, 77. Despite the absence of domestic industry supply constraints in 2022, the Commission found that the market share of subject imports from Israel remained higher in 2022 than in 2020, and the domestic industry's market share remained lower than in 2020, as subject imports from Israel increased their market share at the expense of the domestic industry by [ ██ ] percentage points from 2020 to 2022. *Id.* at 75-76. The Commission also noted that large majorities of responding purchasers found that the domestic industry was comparable or superior to subject imports from Israel in terms of availability, delivery time, and reliability of supply. *Id.* at 77. Furthermore, the Commission found that in 2022, the domestic industry's production quantity declined and its capacity utilization rate was only [ ██ ] percent, suggesting that the industry had ample unused capacity with which it could have increased its production and U.S. shipments. *Id.* Thus, the Commission reasonably concluded that domestic industry supply constraints did not explain the industry's loss of market share to subject imports from Israel, and Plaintiff simply seeks to have this Court reweigh the evidence.

Similarly, Plaintiff argues that the increase in subject imports from Israel in interim 2023 compared with interim 2022 resulted from a fire at domestic producer Mueller's plant. PlBr. at 38-39. Addressing this issue in detail, however, the Commission found that any supply

constraints resulting from this fire did not explain the increase in the volume of subject imports from Israel in interim 2023.  Views at 76 n.299.  While recognizing that Mueller [ ███████ ] from this incident, the Commission found that the domestic industry had substantial available capacity in interim 2023 with which it could have supplied the U.S. market, notwithstanding the fire.  *Id.*  Moreover, the Commission noted that subject imports from Israel were [ ███ ] percent higher in interim 2023 compared with interim 2022, while imports from other sources were lower, in accordance with the [ ███ ] percent decline in apparent U.S. consumption in interim 2023.  *Id.*  Thus, the Commission reasonably found that the increase in low-priced subject imports from Israel in interim 2023, occurring during a period of declining U.S. demand when imports from other subject sources declined and the domestic industry had substantial available capacity, was not explained by domestic industry supply constraints.  *Id.*  Accordingly, the Commission's finding was supported by substantial evidence and the Court should sustain it.

Without arguing that there were flaws in the Commission's analysis on this issue, Plaintiff presents an alternative factual argument based on the findings of the dissenting Commissioner.  It argues, contrary to the Commission's finding of lower apparent U.S. consumption in interim 2023, that the increase in subject imports from Israel in interim 2023 resulted from increased demand after the fire, and contends that this is demonstrated by "substantial evidence."  PlBr. at 38-39.  However, it is the Commission's determination that is under review by this Court, not that of the dissenting Commissioner, and an argument that the dissenting Commissioner's determination was supported by substantial evidence in no way establishes that the Commission's determination was not supported by substantial evidence.  As the Federal Circuit has stated, "{a}lthough individual Commissioners reached divergent

conclusions, '{t}he possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence.'" *Siemens Energy*, 806 F.3d at 1372 (quoting *Consolo*, 383 U.S. at 620); *see also Grupo Industrial Camesa,* 85 F.3d at 1582 ("Although {a party} points to evidence supporting the dissenting commissioners' decision that the domestic industry was not materially injured, this does not mean that the Commission's affirmative determination is unsupported by substantial evidence."); *see also Cleveland-Cliffs Inc. v. United States,* 693 F. Supp. 3d 1341, 1358 n.12 (Ct. Int'l Trade 2024). Thus, the Court should reject Plaintiff's invitation to reweigh the evidence based on the dissenting Commissioner's findings.

In addition, Plaintiff mistakenly argues that the Commission "attributed material injury to subject imports from Israel without addressing the impact of subject imports from other countries." PlBr. at 39. However, the Commission thoroughly addressed the effects of imports from sources other than Israel, including imports from the other subject countries in these investigations, to ensure that it was not attributing injury caused by those imports to subject imports from Israel. Views at 79-81. The Commission acknowledged that imports from sources other than Israel gained more market share than subject imports from Israel during the 2020-2022 period, and that cumulated subject imports from countries other than Israel undersold the domestic like product and gained sales and market share at the industry's expense. *Id.* at 79-80. Nevertheless, the Commission found that any pricing pressure exerted by those imports on the domestic industry did not negate the pricing pressure from subject imports from Israel. *Id.* Regardless of the effects of other subject imports, the Commission explained, significant and increasing volumes of subject imports from Israel significantly undersold the domestic like product throughout the POI, to the same customers and in the same channels of distribution as

PROPRIETARY INFORMATION SUBJECT
TO PROTECTIVE ORDER REDACTED

the domestic industry, and purchasers used lower prices for subject imports from Israel to ask for

domestic price reductions.  *Id.* at 80.  The market share of subject imports from Israel increased

by [ ▮ ] percentage points from 2020 to 2022 at the expense of the domestic industry.  *Id.*  The

Commission also noted that purchasers confirmed purchasing [ ▮▮▮▮ ] pounds of subject

imports from Israel instead of the domestic like product primarily due to their lower price, and

that a purchaser reported that U.S. producers reduced their prices to compete with lower-priced

subject imports from Israel.  *Id.*  Based on this evidence, as well as the other evidence discussed

in its price effects analysis, the Commission concluded that the record showed that subject

imports from Israel had an adverse impact on domestic market share, sales, and prices that could

not be attributed to imports from other sources, and was distinct from the impact of imports from

other sources.  *Id.* at 80-81.

Plaintiff does not address or even acknowledge the Commission's actual non-attribution

analysis in its determination with respect to subject imports from Israel, the determination that

Plaintiff is challenging here.  Rather, Plaintiff challenges the Commission's non-attribution

analysis based solely on its separate analysis of the impact of cumulated subject imports (which

include subject imports from Israel).  PlBr. at 39-41; *see* Views at 96-103.  Plaintiff contends that

some portions of the Commission's impact analysis in the determination on cumulated subject

imports were repeated from, or similar to, the Commission's separate impact analysis on subject

imports from Israel alone.  PlBr. at 39-40.  This is hardly surprising or significant, however,

since the condition of the domestic industry, and the underlying quantitative indicators of that

condition, were the same for both analyses.  Moreover, much of the Commission's impact

analysis for cumulated subject imports was in fact different, because the Commission addressed

various arguments by non-Israeli Joint Respondents that were not raised by Israeli respondents, and the Commission's non-attribution analysis was different.  Views at 99-102.

Plaintiff also argues that subject imports from other sources undersold the domestic like product by greater margins of underselling and were larger in volume than subject imports from Israel, and were therefore a greater cause of injury than subject imports from Israel, and that the Commission failed to isolate the injury caused by subject imports from Israel from injury caused by other imports.  PlBr. at 40-41.  To the contrary, however, the Commission recognized each of the factors argued by Plaintiff and found that they did not negate other evidence indicating that subject imports from Israel caused injury that was distinguishable from any injury caused by other imports.  Furthermore, Plaintiff's argument completely misapprehends the statute.  There is no requirement that subject imports be the sole or principal cause of injury to the domestic industry for the Commission to reach an affirmative determination, as the "by reason of" standard is satisfied so long as subject imports are more than an incidental, tangential, or trivial cause of injury.  *Nippon Steel Co. v. U.S. Int'l Trade Comm'n*, 345 F.3d 1379, 1381 (Fed. Cir. 2003).  Moreover, the Commission need not isolate the injury caused by other factors from the injury caused by subject imports, nor need it weigh the injury caused by subject imports against other factors which may be contributing to overall injury to an industry.  SAA at 851-52; S. Rep. 96-249, 96th Cong. 1st Sess. at 74-75 (1979); H.R. Rep. 96-317 at 46-47.  Rather, the Commission must examine other factors to ensure that it is not attributing injury from other sources to subject imports.  *Taiwan Semiconductor Indus. Ass'n v. Int'l Trade Comm'n*, 266 F.3d 1339, 1345 (Fed. Cir. 2001).  The Court should therefore reject Plaintiff's attempt to weigh the effects of subject imports from Israel against those of other imports.

Contrary to Plaintiff's arguments, the Commission analyzed domestic industry supply constraints and imports from sources other than Israel, as well as other factors, and reasonably explained that these factors could not account for the injury to the industry that the Commission had attributed to subject imports from Israel.  Views at 75-82.  In doing so, the Commission complied with its obligations under the statute.  The Court should therefore reject Plaintiff's invitation to reweigh the evidence and should sustain the Commission's non-attribution analysis.

## IV.    CONCLUSION

For the foregoing reasons, the Court should affirm the Commission determinations under review and dismiss Plaintiff's complaint.

Respectfully submitted,

Margaret D. MacDonald
General Counsel

Karl S. von Schriltz
Assistant General Counsel for Litigation

*/s/  John D. Henderson*
John D. Henderson
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone:  (202) 205-2130
Facsimile: (202) 205-3111
john.henderson@usitc.gov

*Counsel for Defendant*
*U.S. International Trade Commission*

Dated:  August 15, 2025

## CERTIFICATE OF COMPLIANCE

Pursuant to Chambers Procedures 2(B)(1) and (2), I hereby certify that the attached

**DEFENDANT U.S. INTERNATIONAL TRADE COMMISSION'S PUBLIC**

**MEMORANDUM IN OPPOSITION TO PLAINTIFF'S MOTION FOR JUDGMENT ON**

**THE AGENCY RECORD** contains 13,968 words, according to the word-count function of the

word processing system used to prepare this brief (Microsoft Word 2010).

*/s/ John D. Henderson*
John D. Henderson
Attorney-Advisor
Office of the General Counsel
U.S. International Trade Commission
500 E Street, SW
Washington, DC 20436
Telephone: (202) 205-2130
Facsimile: (202) 205-3111
john.henderson@usitc.gov

Dated: August 15, 2025