UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE LISA W. WANG, JUDGE

| | | |
|---|---|---|
| **GOVERNMENT OF ISRAEL, MINISTRY OF ECONOMY AND INDUSTRY,** | ) | Court No. 24-00197 |
| **Plaintiff,** | ) | |
| **v.** | ) | **PUBLIC VERSION** |
| | ) | |
| **UNITED STATES,** | ) | |
| | ) | |
| **Defendant,** | ) | |
| **And** | ) | |
| | ) | Confidential Information |
| **AMERICAN BRASS ROD FAIR TRADE** | ) | Removed from Brackets on |
| **COALITION, et al.,** | ) | Pages 11, 13-14, 17, 19-20, 23-26, |
| **Defendant-Intervenors.** | ) | and 28-29 |
| | ) | |

---

**RESPONSE BRIEF
ON BEHALF OF
THE AMERICAN BRASS ROD FAIR TRADE COALITION,
MUELLER BRASS CO. AND WIELAND CHASE LLC**

---

Jack A. Levy, Esq.
Noah A. Meyer, Esq.
Daniel J. Calhoun, Esq.
Paul K. Keith, Esq.
**ROCK CREEK TRADE LLP**
900 19th Street, NW
Suite 600
Washington, DC 20006
(202) 230-6630

August 29, 2025

# TABLE OF CONTENTS

Page

I.    STATEMENT PURSUANT TO RULE 56.2(C)(1) ........................................ 1

      A.    Administrative Determinations Under Review .................................... 1

      B.    Issues Presented for Review .............................................................. 1

II.   STATEMENT OF FACTS ............................................................................. 2

III.  SUMMARY OF ARGUMENT ...................................................................... 3

      A.    Hamas' October 7 Attack ................................................................... 3

      B.    Significant Subject Import Volumes ................................................... 4

      C.    Significant Adverse Price Effects ...................................................... 4

      D.    Significant Adverse Impact ................................................................ 6

IV.   STANDARD OF REVIEW ............................................................................ 7

V.    ARGUMENT ................................................................................................. 8

      A.    The Commission Was Not Required to Give Further Consideration to the
            October 2023 Hamas Attack in Its Material Injury Determinations ...................... 8

      B.    The Commission's Finding that the Volume of Subject Imports from Israel
            Was "Significant" Was Based Substantial Evidence and Otherwise in
            Accordance with Law ........................................................................ 10

      C.    The Commission's Determination that Subject Imports from Israel
            Resulted in Significant Adverse Price Effects Was Supported by
            Substantial Evidence and Otherwise in Accordance with Law ........................... 12

            1.    The Commission's Price-Based Adjustment Methodology Was
                  Reasonable ............................................................................. 16

            2.    The Commission Reasonably Relied on the Domestic Industry's
                  Increasing COGS to Net Sales Ratio in Support of Its Price
                  Suppression Finding ............................................................... 19

            3.    The Commission Reasonably Found that Underselling Drove the
                  Market Share Shift from the Domestic Industry to Subject Imports
                  from Israel .............................................................................. 22

Page(s)

D.    The Commission's Finding that Israeli Subject Imports had a Significant Adverse Impact on the Domestic Industry Was Supported by Substantial Evidence and Otherwise in Accordance with Law ............................................... 25

    1.    The Commission Properly Rejected the GOI's Impact Arguments ......... 26

    2.    The Commission's Impact Analysis Did Not Erroneously Attribute to Israeli Imports Harm from Other Import Sources ............................... 29

VI.    CONCLUSION ............................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

Page(s)

**<u>Statutes</u>**

19 U.S.C. § 1516a(b)(1)(B)(i)............................................................................7

19 U.S.C. § 3512(d) .......................................................................................8

19 U.S.C. § 1677(7)(F) ...................................................................................9

19 U.S.C. § 1677(7)(C)(iii)(I)-(V)...................................................................9

19 U.S.C. § 1677(7)(F)(i)(II)...........................................................................9

19 U.S.C. § 1675a(a)(2)(A) ...........................................................................10

19 U.S.C. § 1677(7)(C)(i)..............................................................................10

19 U.S.C. § 1677(7)(C)(ii).............................................................................13

19 U.S.C. § 1677(7)(J)...................................................................................27

**<u>Court Decisions</u>**

*Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978 (Fed. Cir. 1994) .........7

*Consolidated Edison Co. v. NLRB*, 305 U.S. 197 (1938) ...............................................7

*Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927 (Fed. Cir. 1984)..................7, 12

*United States Steel Group v. United States*, 96 F.3d 1352 (Fed. Cir. 1996)............................7, 10

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ..............................................7

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ......................................................7

*AWP Indus., Inc. v. United States,* 783 F. Supp. 2d 1266, 1282 (Ct. Int'l Trade 2011) ..........9, 10

*Usinor v. United States*, 26 C.I.T 767 (2002) ........................................................10

*Nippon Steel Corp. v. United States*, 182 F. Supp. 2d 1330 (Ct. Int'l Trade 2001) .....................12

*Coal. of Gulf Shrimp Indus. v. United States*, 71 F. Supp. 3d 1356 (Ct. Int'l Trade 2015)...........16

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006)...........................20

*CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337 (Ct. Int'l Trade 2014)........................20

*Siemens Energy, Inc. v. United States*, 992 F. Supp. 2d 1315 (Ct. Int'l Trade 2014) .................20

*Nucor Fastener Div. v. United States*, 37 C.I.T. 749 (2013) ........................................20

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370 (Fed. Cir. 2013) .............23

*SeAH Steel Vina Corp. v. United States*, 269 F. Supp. 3d 1335 (Ct. Int'l Trade 2017)................23

PUBLIC VERSION

Page(s)

**Administrative Determinations**

*Certain Carbon Steel Butt-Weld Pipe Fittings from France, India, Israel, Malaysia,*
*the Republic of Korea, Thailand, the United Kingdom, and Venezuela*, Inv. Nos.
701-TA-360 and 361 and 731-TA-688-695 (Final), USITC Pub. 2870 (Apr. 1995) .......... 4, 11-12

**Legislative Materials**

Statement of Administrative Action to the Uruguay Round Agreements Act,
H.R. Rep. No. 103-316, Vol. I (1994) ........................................................................................8, 10

H.R. Rep. 96-317, 96th Cong., 1st Sess., at 381, 474 (1979) ........................................................12

## I.        STATEMENT PURSUANT TO RULE 56.2(C)(1)

Pursuant to USCIT Rule 56.2 and the Court's scheduling order (ECF No. 26), Defendant-Intervenors American Brass Rod Fair Trade Coalition and its constituent members, Mueller Brass Co. ("Mueller") and Wieland Chase LLC ("Weiland') (collectively, "the Coalition"), submit the following response in opposition to the motion for judgment on the agency record filed by the Ministry of Economy and Industry of the Government of Israel ("Plaintiff" or "GOI") in the above-captioned action.

### A.  Administrative Determinations Under Review

The administrative determinations under review are the final determinations of the U.S. International Trade Commission (the "Commission" or "ITC") in the investigations of *Brass Rod from Israel*, 89 Fed. Reg. 78,330 (Sept. 25, 2024), and the accompanying views of the Commission contained in *Brass Rod from Israel*, Inv. Nos. 701-TA-687 and 731-TA-1614 (Final), USITC Pub. 5545 (Sept. 2024), P.R. 215 ("*Brass Rod II*"), which incorporate by reference the findings and analyses from the determination and views contained in *Brass Rod from India*, Inv. No. 701-TA-686 (Final), USITC Pub. 5485 (Feb. 2024), P.R. 163 ("*Brass Rod I*").

### B.  Issues Presented for Review

1. Whether the Commission was required to give further consideration to Hamas' October 7, 2023 attack in its material injury determinations.

2. Whether the Commission's finding that subject import volumes from Israel were significant was supported by substantial evidence and otherwise in accordance with law.

3. Whether the Commission's finding that subject imports from Israel had significant adverse price effects was supported substantial evidence and otherwise in accordance with law.

4.  Whether the Commission's finding that subject imports from Israel had a significant adverse impact on the domestic industry was supported by substantial evidence and otherwise in accordance with law.

## II.    STATEMENT OF FACTS

In the interest of judicial efficiency, the Coalition incorporates by reference the Statement of Facts contained in the Commission's Response Brief (ECF No. 35), including its observation that the GOI "participated" in the underlying investigations.  *See* ITC Br. at 5-12.

The Coalition notes, however, that the GOI's "participation" was actually quite limited. Importantly, the GOI failed to submit an application for access to confidential business proprietary information under the Commission's administrative protective order ("APO") until *after* it filed its summons for this appeal.  *See* GOI Protective Order Request, P.R. 217.  As a result, the GOI's understanding of the confidential administrative record was non-existent throughout the underlying proceedings and up through the time when it commenced this appeal.

By contrast, Finkelstein Metals ("Finkelstein") — Israel's sole producer of brass rod — submitted confidential briefs totaling nearly 800 pages in the final phase investigations.  *See generally* Finkelstein Prehr'g Br., C.R. 193; Finkelstein Posthr'g Br., C.R. 210; Finkelstein Final Comments, C.R. 228.  Yet, upon review of the Commission's final determinations, and taking into account its first-hand knowledge of the confidential record evidence, Finkelstein declined to challenge any aspect of the Commission's determinations in an appeal to this Court.

There is no dispute that the GOI now has access to the full administrative record, including confidential data, and that it has standing to present arguments to this Court.  But the fact remains that the GOI commenced this appeal before it ever had a full understanding of the factual underpinnings of the Commission's determinations, suggesting that its appeal stems from a gut reaction to the *outcome* of the case.

III.     **SUMMARY OF ARGUMENT**

The GOI advances several arguments on appeal, namely:  (1) that the Commission was required to give further consideration to Hamas' October 7 attack in its material injury determinations; (2) that the volume of subject imports from Israel was too small to support the Commission's finding that the volumes were "significant"; (3) that the Commission erred in its findings that subject imports from Israel resulted in significant adverse price effects, including price underselling and price suppression; and (4) that the Commission's impact analysis was flawed, both in its assessment of material injury as well as its purported inability to distinguish between the contributions of subject imports from Israel as compared with other country sources. As discussed below, these arguments are misplaced.

### A.  Hamas' October 7 Attack

The Commission's standard practice in investigations is to collect information needed to conduct *both* a material injury analysis *and* a threat of material injury analysis.  The Commission therefore collected information concerning Hamas' October 7 attack — which occurred after the period of investigation ("POI") but before vote day — and described the significance of the event in the "Conditions of Competition" section of its determinations.

In the underlying investigations, Finkelstein argued about the relevance of this event in the context of any threat of material injury analysis, as this analysis is necessarily prospective in nature.  But on appeal, the GOI argues that the Commission was required to ascribe greater evidentiary weight to this post-POI development in its material injury analysis.  The GOI is simply wrong, as there is no statutory requirement that the Commission consider such post-POI information in rendering material injury determinations.

**B.  Significant Subject Import Volumes**

Consistent with the statutory framework, the Commission made findings that subject imports from Israel were "significant" in terms of:  (1) their absolute volume; (2) the increase in their absolute volume; and (3) their share relative to U.S. consumption.  The GOI does not dispute the accuracy of the volume data or market share calculations but instead asks the Court to re-weigh the evidence to find that the Israeli subject import volumes were "minor."

At the heart of the GOI's argument is a refusal to accept that every case is *sui generis* and that there is no minimum threshold when assessing the significance of subject import volumes. The GOI asserts that the Commission's 1995 determination in *Certain Carbon Steel Butt-Weld Pipe Fittings from France, India, Israel, Malaysia, the Republic of Korea, Thailand, the United Kingdom, and Venezuela*, Inv. Nos. 701-TA-360 and 361 and 731-TA-688-695 (Final), USITC Pub. 2870 (Apr. 1995) ("*Pipe Fittings*") is somehow controlling here, but that case had vastly different facts.  As the Commission determined on this evidentiary record, Finkelstein's low prices had an outsized impact on the broader market due to the "ripple effects" they had on U.S. producers' industry-wide price lists.

The Commission properly focused on the record evidence involving the U.S. *brass rod* market — including both quantitative data as well as qualitative information pertaining to the conditions of competition — in finding that the subject import volumes from Israel were, in fact, "significant."

**C.  Significant Adverse Price Effects**

The GOI challenges the Commission's findings that Israeli imports resulted in significant adverse price effects in three respects, all of which fail.  *First*, while most of the pricing products undisputably provided "apples-to-apples" price comparisons for the underselling analysis, the

GOI maintains that the Commission needed to apply a "cost-based" adjustment — rather than a "price-based" adjustment — when analyzing any pricing products involving "scrap buyback programs" to end users.  But the Commission acted reasonably in its chosen methodological approach, citing multiple grounds for rejecting the flawed cost-based methodology.  Indeed, even the dissenting opinion declined to assign probative value to the GOI's preferred "cost-based" adjustment methodology.

*Second*, the GOI takes issue with the Commission's standard approach to analyzing price suppression, which found that an increasing cost-of goods-sold ("COGS") to net sales ratio was indicative of a cost-price squeeze.  According to the GOI, the Commission should have ascribed greater weight to absolute changes in the units COGS when assessing price suppression, but the Commission declined to do so, noting that the rate of increase in net-unit sales values did not increase to the same extent of COGS — *i.e.*, the domestic industry's gross margin as a percent of sales was getting squeezed, and this was indicative of price suppression.

*Finally*, the GOI now claims — for the first time — that the timing of Israeli import underselling did not align with the market share shifts observed by the Commission, and it curiously styles this argument as an issue of "price effects" rather than "causation."  As an initial matter, this argument can be dismissed on exhaustion grounds.  But on the substance, the GOI is also flat wrong, as the record evidence summarized in the Commission's determinations demonstrates that:  (1) low-priced subject imports from Israel took market share from domestic producers from 2020 to 2021; (2) low-priced subject imports from Israel prevented domestic producers from recovering that market share loss in 2022; and (3) in interim 2023, the domestic industry's partial market share recovery came at the expense of *non-Israeli* sources, which were not priced as aggressively as low-priced subject imports from Israel.

### D. Significant Adverse Impact

In its determinations, the Commission considered and weighed all the relevant evidence, but the GOI inappropriately asks the Court to re-weigh evidence concerning the condition of the domestic industry and ascribe greater weight to certain metrics.  However, the GOI fails to explain how those metrics sever the causal nexus between (1) Israeli price underselling and lost sales, and (2) the declines in the domestic industry's market share.  And the GOI similarly fails to explain how other metrics sever the causal nexus between (1) the price suppressing effects of subject imports from Israel, and (2) the increase in the domestic industry's COGS to net sales ratio, as well as the domestic industry's declining operating income rates.  The Commission's impact analysis — which included *a thorough year-by-year description* of the fluctuations of each of the domestic industry's trade, employment, and financial metrics, as well as evidence concerning "supply constraints" — was well-reasoned and supported by substantial evidence.

Finally, the GOI erroneously argues that the Commission mistakenly attributed injury from subject imports, generally, to subject imports from Israel.  The Commission was discerning in its analysis and only attributed a portion of the domestic industry's injury to subject imports from Israel.  To be sure, the subject imports from non-Israeli sources were also injurious, but the Commission did not conflate this point with the significant injurious impact of underselling, price suppression, and market share shifts specific to subject imports from Israel.

As discussed in detail below, the GOI's various arguments are unavailing, and the Court should reject its request to re-weigh evidence that was already carefully considered by the Commission in making its affirmation determinations.

## IV.     STANDARD OF REVIEW

The standard of review requires that the Court uphold an agency determination as lawful unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law."  19 U.S.C. § 1516a(b)(1)(B)(i).  Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Suramerica de Aleaciones Laminadas, C.A. v. United States*, 44 F.3d 978, 985 (Fed. Cir. 1994) (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

In addition, a plaintiff may not ask the Court to re-weigh the evidence and decide the case for the Commission.  *See Matsushita Elec. Indus. Co., Ltd. v. United States*, 750 F.2d 927, 933 (Fed. Cir. 1984).  The role of the Court is not to question the agency's decisions about the weight or quality of the evidence.  *See United States Steel Group v. United States*, 96 F.3d 1352, 1356-57 (Fed. Cir. 1996) (it is the agency's task to evaluate and assign weight to the evidence); *see also Matsushita*, 750 F.2d at 933 (it is not the weight of the evidence, but whether it reasonably supports a rational decision, that is evaluated by a reviewing court).  The Court may not substitute its judgment or its interpretation of the evidence for that of the agency.  *See Matsushita*, 750 F.2d at 936.

In contrast to questions of fact, questions of statutory interpretation are "emphatically the role of the courts."  *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412 (2024) ("*Loper Bright*") (internal citation omitted).  At the same time, agency expertise concerning a particular and often technical subject matter "has always been one of the factors which may give an Executive Branch interpretation particular 'power to persuade, if lacking power to control.'"  *Loper Bright* 603 U.S. at 402 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

Lastly, the Statement of Administrative Action to the Uruguay Round Agreements Act ("SAA") represents "an authoritative expression by the Administration concerning its views regarding the interpretation and application of the Uruguay Round agreements." H.R. Rep. No. 103-316, Vol. I at 656 (1994); *see also* 19 U.S.C. § 3512(d) ("The statement of administrative action approved by the Congress ... shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act in any judicial proceeding in which a question arises concerning such interpretation or application.").

## V.    ARGUMENT

### A. The Commission Was Not Required to Give Further Consideration to the October 2023 Hamas Attack in Its Material Injury Determinations

The GOI contends that the Commission erred in ignoring the October 7, 2023 Hamas attack in rendering its affirmative material injury determinations. *See* GOI Br. at 13-17. As an initial matter, the Commission did not "ignore" the attack — indeed, it discussed it in the "Conditions of Competition" section of its decision, *see Brass Rod I* at 26, P.R. 165, and thoughtfully explored the potential relevance of the attack during its hearing. *See e.g.*, Hr'g Tr. at 34 (Christie) (noting that the volume of subject imports from Israel actually increased since October 7, 2023); *id.* at 149 (Kendler) (discussing that the attack led to workforce reductions); *id.* at 237-38 (Apeloig) (noting that Finkelstein had not yet hired additional workers to replace its displaced Palestinian workers), P.R. 135.

The Commission's standard practice in investigations is to collect information needed to conduct *both* its material injury analysis *and* its threat of material injury analysis. Consideration of material injury involves an analysis of whether the domestic industry was materially injured during the POI; by contrast, consideration of a *threat* of material injury involves a prospective

analysis of whether the domestic industry is likely to suffer material injury in the imminent future.  *Compare* 19 U.S.C § 1677(7)(C) *with* 19 U.S.C. § 1677(7)(F).  Thus, while the statute makes no mention of considering subject producers' production capacity or excess capacity in making material injury determinations, *see* 19 U.S.C. § 1677(7)(C)(iii)(I)-(V), such information is explicitly referenced in the statute for any threat of material injury analysis, *see* 19 U.S.C. § 1677(7)(F)(i)(II).

In these investigations, the Commission rendered affirmative determinations based on material injury — not threat of material injury.  *See Brass Rod I* at 1, P.R. 165; *see also Brass Rod II* at 1, P.R. 215.  And as the Commission correctly notes, there is simply no statutory requirement that the Commission consider post-POI information in rendering material injury determinations.  *See* ITC Br. at 16 (*citing AWP Indus., Inc. v. United States,* 783 F. Supp. 2d 1266, 1282 (Ct. Int'l Trade 2011)).

In the underlying proceedings, Finkelstein took the coherent position that the Hamas attack was relevant to the Commission's threat analysis.  *See* Hr'g Tr. at 149 (Kendler) ("Petitioners' allegation that shipments increased after October 7… fails to establish the 'imminent, substantial increase in production capacity' in Israel 'indicating the likelihood of substantially increased imports required by the statute ***for a proper threat analysis***.'") (emphasis added), P.R. 135.  Finkelstein similarly referenced the threat standard in its briefing, arguing that the Hamas attack "obviate{s} the possibility that there will be an 'imminent, substantial increase in production capacity' in Israel 'indicating the likelihood of substantially increased imports' as required by the statute."  Finkelstein PostHr'g Br., Exh. 1 at 27, C.R. 210.  But on appeal, the GOI seems to misunderstand that the Hamas attack was *irrelevant* to the Commission's material injury determinations.

In arguing that the Commission was "not permitted to end its analysis at the end of the POI" and was instead required to consider this "event that occurred after the POI and before the vote," GOI Br. at 15-17, the GOI cites to a case involving a Commission five-year review determination ("sunset review").  *See* GOI Br. at 15-16 (*citing Usinor v. United States*, 26 C.I.T 767, 779 (2002); 19 U.S.C. § 1675a(a)(2)(A)) (requiring the Commission to consider "any likely increase in production capacity or existing unused production capacity in the exporting country" in the context of a five-year review).  But in sunset reviews, the Commission applies a standard similar to threat of material injury determinations — *i.e.*, the Commission conducts a *prospective analysis* of whether revocation of an order would be likely to lead to continuation or recurrence of material injury within a reasonably foreseeable time.  *See, e.g.*, *Usinor*, 26 C.I.T. at 790 (*citing* 19 U .S.C. § 1675a(a)(1) and SAA at 884)).  That is not the relevant inquiry in material injury determinations.

In short, the GOI's legal argument is grounded in confusion between the analytical framework used in material injury determinations as compared with threat of material injury determinations.  The approach taken by the Commission in its material injury determinations was lawful, as it relied upon POI evidence as the centerpiece of its analysis.  *See AWP Indus., Inc.*, 783 F. Supp. 2d at 1282; *see also United States Steel Group*, 96 F.3d at 1356-57.

## B.  The Commission's Finding that the Volume of Subject Imports from Israel Was "Significant" Was Based Substantial Evidence and Otherwise in Accordance with Law

The statute instructs the Commission to consider "whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant."  19 U.S.C. § 1677(7)(C)(i).  The GOI asserts that "the majority incorrectly applied the statute and contradicted its past practice," GOI Br. at

12, but as explained in the Commission's Response Brief, its volume analysis was entirely

consistent with the statute and supported by substantial record evidence.  *See* ITC Br. at 18-21.

The GOI does not dispute the accuracy of the volume data or market share calculations.

Rather, it asks the Court to re-weigh the evidence in finding that the Israeli subject import

volumes were "minor."  GOI Br. at 17-18.  To be clear, this argument was already considered

and rejected by the Commission in *Brass Rod I* at 35 n.189, P.R. 165:

> Finkelstein argues that the market share of subject imports from Israel is
> insignificant because it "remained tiny throughout," and that the volume of subject
> imports from Israel and increase thereof and channel-specific volumes were
> similarly insignificant…. As the Commission has previously noted, the legislative
> history and court decisions have made clear that there is no minimum threshold for
> the market share or increase to be "significant" under the statute….

The Commission then went on to find that the subject imports from Israel were "significant" in

terms of:  (1) their absolute volume; (2) the increase in their absolute volume; and (3) their share

relative to U.S. consumption.  *See Brass Rod I* at 35, P.R. 165.

The GOI would have the Court believe that this case is similar to the *Pipe Fittings* case

from 1995, ignoring the reality that each Commission investigation is *sui generis* and that the

brass rod record is wholly distinct.  For example, in response to Commission questions at the

hearing, the Coalition explained that *Pipe Fittings* was a totally distinct case*, where the market

share of Israeli imports [                    ] and the domestic industry in that case actually gained

nearly 20 percentage points of market share.  *See* Coalition's PostHr'g Br. at III-13-14, C.R. 209;

*see also Pipe Fittings*, USITC Pub. 2870 at I-20.

Moreover, there was no significant underselling in *Pipe Fittings*, as compared with

pervasive underselling in the brass rod investigations.  *Compare Brass Rod I* at 44, P.R. 165 *with

Pipe Fittings*, USITC Pub. 2870 at I-21.  And perhaps most importantly, as demonstrated on this

record, Finkelstein's low prices had an outsized impact on the broader market due to the "ripple

effects" they had on U.S. producers' *industry-wide price lists*.  Clearly, the propensity of Israeli

subject import volumes to have industry-wide adverse price effects — without regard to any

arbitrary minimum-volume threshold — speaks to the "significance" of such volumes on the

record of this particular case.  *See Nippon Steel v. United States*, 182 F. Supp. 2d 1330, 1335 (Ct.

Int'l Trade 2001) (quoting H.R. Rep. 96-317, 96th Cong., 1st Sess., at 381, 474 (1979)

("Congress has specified that 'for one industry, an apparently small volume of imports may have

a significant impact on the market, for another the same volume may not be significant.'")).  For

precisely this reason, the Commission's determinations were grounded in an understanding that,

"because of the domestic industry's use of price lists, a domestic producer adjusting its pricing

due to low-priced import competition would affect its prices for all customers that use that price

list." *Brass Rod I* at 40, P.R. 165.

　　　　In short, it is clear that the Commission was well aware of the vast differences between

*Pipe Fittings* and the record of the current investigations during the course of its deliberative

process.  The Commission properly focused on the record evidence involving the U.S. *brass rod*

market — including both quantitative data as well as qualitative information pertaining to the

conditions of competition — in finding that the subject import volumes from Israel were, in fact,

"significant."  The GOI is wrong to ask the Court to substitute its judgment for the

Commission's well-reasoned interpretation of the record evidence.  *See Matsushita*, 750 F.2d at

936.

**C.  The Commission's Determination that Subject Imports from Israel Resulted in Significant Adverse Price Effects Was Supported by Substantial Evidence and Otherwise in Accordance with Law**

　　　　In analyzing significant price effects, the statute at 19 U.S.C. § 1677(7)(C)(ii) directs the

Commission to consider whether:

(I) there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States, and

(II) the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree.

In its preliminary determinations, the Commission observed "universal underselling" by Israeli subject imports in available quarterly comparisons. *See Brass Rod from Brazil, India, Israel, Mexico, South Africa, South Korea*, Inv. Nos. 701-TA-686-688 and 731-TA-1612-1617 (Preliminary), USITC Pub. 5436 at 31 (June 2023), P.R. 87. Finkelstein had alleged that this underselling was a function of distortions related to the domestic industry's use of scrap buyback programs.[1] *See id.* at 31 n.148; P.R. 87. To address these concerns in the final phase investigations, Finkelstein requested that the Commission modify its pricing products to "enable apples-to-apples" price comparisons. *See* Finklestein Comments on Draft Questionnaires at 4 & 9, P.R. 96.

Finkelstein got what it requested. In the final phase investigations, the Commission adopted Finkelstein's pricing product definitions consisting of brass rod <u>sold to end users through scrap buyback programs</u> (products 1, 4 and 7), <u>sold to end users not through scrap buyback programs</u> (products 2, 5 and 8), and <u>sold to distributors</u> (products 3, 6, and 9). *See Brass Rod I* at 36 n.192, P.R. 165. But contrary to Finkelstein's expectations, its preferred pricing products yielded price comparisons in which [      ] and [      ] percent of the reported volume of Israeli subject imports undersold the domestic like product in sales to distributors and non-scrap buyback end users, respectively — comparisons that remain unchallenged and which

---

[1] For a description of scrap buyback programs, *see* ITC Br. at 7-8.

were unaffected by end-user buyback pricing.  *See Brass Rod I* at 49, C.R. 232.[2]  The

Commission then proceeded to consider further adjustments to address Finkelstein's argument

that price premiums commanded though scrap buyback programs should result in predominant

overselling to end users (*i.e.*, products 1, 4, and 7).[3]  *See Brass Rod I* at 41-44, C.R. 165.  In

doing so, the Commission reasonably explained why it elected to use a "price-based" approach

and why it declined to utilize Finkelstein's preferred "cost-based" adjustment methodology.  *See

Brass Rod I* at 55-57, C.R. 232.

The Commission also reviewed purchaser reports confirming lost sales to the domestic

industry due to the low prices of Israeli subject imports, as detailed in ITC Br. at 22-23.  *See also

Brass Rod I* at 50, C.R. 232.  The Commission noted that the domestic industry's market share to

distributors declined by [       ] percent while Israeli subject imports' market share increased by

[       ] percent from 2020 to 2022; similarly, the domestic industry's market share for sales to

end users not through a scrap buyback program declined by [     ] percent during this period

while Israeli subject imports' market share increased by [        ] percent.  *See Brass

Rod I* at 49 nn.197 & 198, C.R. 232.  The Commission discussed that the domestic like product

and subject imports from Israel competed head-to-head for sales to both distributors and end

users (*i.e.*, segments unaffected by end-user scrap buyback programs), as reflected by quarterly

---

[2] The dissenting opinion found that these "apples-to-apples comparisons" were sufficient to support a finding that Israeli subject imports "almost universally undersold the domestic like product" and declined to make any price adjustments to compare domestic industry and subject import sales to all end users, as any such adjustments would be only estimates.  *See* Confidential Separate and Dissenting Views of Chairman David S. Johanson at 22-23 ("*Dissenting Views*"), C.R. 233.

[3] For a discussion of the price adjustments, *see* ITC Br. at 24.

14

price comparison data and market share shifts from the domestic industry to Israeli imports. *See Brass Rod I* at 39, P.R. 165.

The Commission went on to explain that Israeli subject import sales to non-buyback end users also affected the domestic industry's sales to end users using scrap buyback programs, as purchasers compare the price of brass rod sold though scrap buyback programs along with the premium-over-market they could expect for returning their scrap though such programs. *See* ITC Br. at 22-23; *see also Brass Rod I* at 52-53, C.R. 232. The Commission also highlighted sworn testimony that Mueller had been undercut by subject import pricing at two scrap buyback purchaser accounts. *See Brass Rod I* at 40, P.R. 165. Moreover, it observed that due to the domestic industry's use of price lists, a domestic producer adjusting its pricing to prevent lost sales to Israeli subject imports would result in the adjusted pricing being sent to all purchasers receiving the price list (*e.g.*, all purchasers that purchase from the domestic industry though scrap buyback programs). *See id.* at 39-40, P.R. 165.

Given the record evidence that Israeli subject imports undersold the domestic like product, resulting in a market share shift, lost sales, and the suppression of domestic prices, the Commission reasonably found that subject imports from Israel caused significant adverse price effects. *See id.* at 50, P.R. 165.

The GOI contests three aspects of the Commission's significant adverse price effects findings: (1) the Commission's price-based adjustment methodology for comparing relative prices to all end users, including those that participate in scrap buyback programs (*see* GOI Br. at 22-27); (2) the weight the Commission gave to the domestic industry's COGS to net sales ratio in assessing price suppression (*see* GOI Br. at 28-29); and (3) the timing of underselling relative

to the domestic industry's loss of market share (*see* GOI Br. at 29-30). As discussed below, each of these arguments is unavailing.

### 1. *The Commission's Price-Based Adjustment Methodology Was Reasonable*

The GOI argues that the methodology the Commission utilized to lend additional support to its underselling analysis was arbitrary and unsupported by substantial evidence. *See* GOI Br. at 22-27. At bottom, the GOI's argument is simply a request for the Court to re-weigh evidence already considered by the Commission.

The Commission considered various methodologies to allow comparison of domestic industry sales to all end users with Israeli subject import sales to end users, as discussed in ITC Br. at 23-25. The Commission explained how and why it chose to utilize the price-based methodology, the resulting price comparisons of which showed that Israeli subject imports predominantly undersold the domestic like product in sales to all end users. *See* ITC Br. at 24-25; *Brass Rod I* at 56-58, C.R. 232.

The GOI argues that the Commission's use of a price-based adjustment to conduct price comparisons between domestic and import sales to end users — thereby eliminating any price premium associated with scrap buyback programs — is unsupported by substantial evidence because it does not account for volume discounts to large purchasers. *See* GOI Br. at 25. The Commission directly addressed — and correctly dismissed — this argument in its views.[4]

The Commission explained that, although it agreed that record evidence showed certain price lists provided for large volume discounts, it disagreed with the premise that scrap buyback sales were only to large purchasers while distributor or non-buyback end-user sales were to

---

[4] The Coalition agrees with and highlights the Commission's reliance on *Coal. of Gulf Shrimp Indus. v. United States*, 71 F. Supp 3d 1356, 1357 (Ct. Int'l Trade 2015). *See* ITC Br. at 25.

smaller purchasers.  *See* ITC Br. at 27-29; *see also Brass Rod I* at 57 n.226, C.R. 232.  Indeed, the record belies such a contention as, of the top three domestic purchasers of brass rod who provided final phase questionnaire responses, one did not purchase through a scrap buyback program, one did, and one [

].  *See* [                                              ] U.S. Purchaser Questionnaires at Questions II-1 and II-30, C.R. 101, 114, and 215.

Based on a selective reading of the Commission's opinion — which ignores the entirety of the Commission's primary analysis on this issue — the GOI claims that the Commission did not make volume discount adjustments because doing so "'would not reverse the majority underselling for Israeli subject imports from Israel shipped to end users,'" thereby departing from its practice of considering margins of underselling.  *See* GOI Br. at 25-26 (*quoting Brass Rod I* at 43 n.226, P.R. 165).  But to be clear, while the Commission conducted an analysis of the effects of such an adjustment on the underselling data, ***it was done in the alternative*** and was not the reason the Commission declined to further adjust scrap buyback prices to reflect volume discounts.[5]

The GOI further argues that the Commission unreasonably rejected its proposed cost-based adjustment based on speculation that the adjustment did not account for the additional costs U.S. producers may incur to test, clean, sort, and process scrap purchased on the open

---

[5] While a careful reading of the Commission's opinion is enough to dispose of this argument, the Commission nevertheless calculated the margins of underselling associated with the quarterly comparisons resulting from its price-based methodology.  Israeli subject imports undersold the domestic like product in sales to end users at margins ranging from [    ] to [    ] percent. *See Staff Report* at F-8, Table F-2, C.R. 218.

market.  *See* GOI Br. at 26-27.  Again, this argument mistakenly relies on a myopic reading of the Commission's determinations.

First, the Commission did not speculate on this point and cited to record evidence clearly establishing that U.S. producers *do* incur additional costs when purchasing scrap on the open market compared to purchasing scrap of their own chemistry through scrap buyback programs. *See Brass Rod I* at 42 n.222, P.R. 165.  Indeed, the GOI's assertion that "the Commission cited no record evidence" to support this proposition, GOI Br. at 26, is patently false, as noted in ITC Br. at 26-27.  It remains undisputed that the first steps of brass rod production are raw material receipt and analysis and that any undesired chemistry variance identified in this analysis must be remedied during the melt and chemistry control process by "adding pure copper, zinc, and/or lead, or other trace elements to the melt."  *Brass Rod I* at 42 n.222, P.R. 165 (*citing* Staff Report at I-12, C.R. 218).  To imply that these processes can be conducted without incurring additional costs strains credulity.[6]

Moreover, the GOI's argument relies on a selective reading of the Commission's determination and overlooks that the Commission provided multiple grounds for rejecting its preferred cost-based methodology, including the methodology's flawed assumption of a uniform scrap generation rate among customers (each of whom have distinct end uses for brass rod).  *See* ITC Br. at 25-26.  The Commission's finding that scrap yield rates can vary substantially remains uncontested by the GOI and is supported by substantial evidence.  *See Brass Rod I* at 56

---

[6] While the GOI attempts to seize on the Commission's use of the word "may," this did not reduce its analysis to mere speculation.  As discussed above, and at ITC Br. 26-27, and the Commission extensively supported its finding that U.S. producers incur additional costs when purchasing scrap on the open market with substantial evidence.

n.223, C.R. 232 (*citing* Hr'g Tr. at 53 (Mitchell), 68, 73-74 (Christie), P.R. 135; *see also*
Coalition's PostHr'g Br. at Exh. 10, C.R. 209).

Thus, the Commission provided multiple grounds for rejecting the cost-based
methodology, all of which were reasonable and supported by substantial evidence.  Indeed, even
the dissenting opinion, cited with approval throughout the GOI's brief, declined to assign
probative value to the GOI's preferred cost-based methodology.  *See Dissenting Views* at 22 &
n.67, C.R. 233.

> 2.  *The Commission Reasonably Relied on the Domestic Industry's Increasing COGS
>     to Net Sales Ratio in Support of Its Price Suppression Finding*

The GOI claims that, to support a finding of significant adverse price effects, "there must
be more than underselling; underselling must affect the prices for or volume of the domestic like
product."  GOI Br. at 27.  The Coalition agrees.  As discussed below, subject imports from Israel
suppressed the domestic industry's prices to a significant degree while taking sales and market
share from the domestic industry.

In this vein, the GOI contends that the Commission erred in finding that low-priced
Israeli subject imports suppressed domestic prices to a significant degree because the domestic
industry's unit gross profit increased during the POI.  *See* GOI Br. at 29.  During the
investigations, Finkelstein argued that the Commission should focus on the domestic industry's
unit COGS and unit sales value in absolute terms to assess price suppression.  *See Brass Rod I* at
61 n.239, C.R. 232.  The Coalition argued in response that, in the context of weak market
conditions in 2020, overall increasing demand from 2020 to 2022, "{a} [                    ]
increase in unit gross margin during this period … is further evidence … {of} the price
suppressing effects of subject imports."  Coalition's PostHr'g Br. at III-23, C.R. 209.

The Commission, consistent with its usual practice, considered the domestic industry's unit COGS to net sales ratio in its assessment of whether subject imports from Israel suppressed domestic prices, resulting in a "cost-price squeeze." *Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1354 (Fed. Cir. 2006) (upholding "{t}he Commission's finding that the subject imports caused the suppression of domestic prices, which was based on the Commission's underlying finding that the domestic industry was suffering from a cost-price squeeze…{The Commission noted} that the domestic industry's overall cost of goods sold … had increased in relation to net sales…."); *see also CP Kelco US, Inc. v. United States*, 24 F. Supp. 3d 1337, 1341 (Ct. Int'l Trade 2014), *aff'd*, 623 F. App'x 1012 (Fed. Cir. 2015) ("The Commission's normal methodology for determining whether price suppression has occurred is to compare ratios of the cost of goods sold … to the value of net sales … over time."); *Siemens Energy, Inc. v. United States*, 992 F. Supp. 2d 1315, 1335 (Ct. Int'l Trade 2014) (sustaining Commission's decision to use a COGS to net sales ratio to measure price suppression against substantial-evidence attack, and citing further precedent in support of this position); *Nucor Fastener Div. v. United States*, 37 C.I.T. 749, 751 (2013) (referring to the COGS to net sales ratio as "the ratio the {Commission} commonly uses to analyze price suppression"). The Commission found that the domestic industry's non-toll COGS to net sales ratio increased from [          ] percent from 2020 to 2022, evincing the price suppressing effects of Israeli subject imports. *See* ITC Br. at 30-31; *see also Brass Rod I* at 60-62, C.R. 232.

Indeed, the GOI ***does not contest*** that the domestic industry's non-toll COGS to net sales ratio increased from 2020 to 2022. *See Staff Report* at Table C-1, C.R. 218; *Brass Rod I* at 60-62, C.R. 232. It also explicitly acknowledges that the Commission's usual practice is to compare that ratio of COGS to net sales — not to compare an absolute increase in COGS to an absolute

increase in the net sales. *See* GOI Br. at 28-29 ("As a practice, the Commission measures price

suppression by *changes in the ratio* of the domestic industry's cost of goods sold … to net sales

on an annual basis. Under the practice, an *increase in the ratio* over the POI indicates that the

domestic industry could not raise prices to cover rising costs.") (internal citations omitted). In its

determinations, the Commission not only adhered to its established practice for assessing price

suppression, but it also explained why focusing on the absolute increase in unit COGS was

distortive. *See Brass Rod I* at 61 n.239, C.R. 232 ("On their face, {analyses of absolute

increases} appear to indicate that the domestic industry's costs were met on a dollar-for-dollar

basis. However … analyzing the rate of increase in net unit sales values and costs … reveals that

non-toll unit sales values … did not increase to the same extent of COGS."); *see also* ITC Br. at

30-31.

The Commission's focus on the ratio between the domestic industry's COGS and its net

sales value is well justified. Consider Table 1 below, which uses illustrative, non-confidential

data to depict the same trends in effect from the 2020 to 2022 period:

| Table 1<br>Hypothetical Illustration of COGS, Price, and Gross Margin | | | |
|---|---|---|---|
| *Metric* | *Period 1* | *Period 2* | *Trend* |
| Unit COGS | 20 | 30 | Increasing |
| Unit Price | 40 | 52 | Increasing more than unit COGS |
| Unit Gross Margin (GM) | 20 | 22 | Increasing by small $ amount |
| GM % | 50% | 42% | Decreasing |

As this table illustrates, despite an industry's ability to increase its unit price by a greater

absolute amount than its unit COGS, the domestic industry's gross margin as a percentage of

sales declined. This makes intuitive sense as COGS increased relative to total sales,

demonstrating a cost-price squeeze which portends a pattern of increasingly compressed margins

over time.  Indeed, as shown in Table 2 below, if this trend were to continue over time, the unit gross margin would increase incrementally, but the gross margin percent would get smaller and smaller — decreasing from 50 percent in Year 1 to less than 25 percent by Year 15.

| Table 2 Long Term Effects of Increasing COGS Relative to Net Sales | | | | |
|---|---|---|---|---|
| *Year* | *Unit COGS* | *Unit Price* | *Unit GM* | *GM%* |
| **1** | 20 | 40 | 20 | 50% |
| **5** | 60 | 88 | 28 | 32% |
| **10** | 110 | 148 | 38 | 26% |
| **15** | 160 | 208 | 48 | 23% |

It is beyond question that gross margin squeeze is not a sign of a healthy industry on a sustainable trajectory.  This is precisely the flaw in Finkelstein's argument that the Commission highlighted when it explained that focusing on absolute increases in unit COGS and values can conceal the pernicious effects of an increasing COGS to net sales ratio which — on this record — resulted in declines in the domestic industry's non-toll gross profits to net sales ratio and its ratio of non-toll operating income to net sales.  *See Brass Rod I* at 61 n.239, C.R. 232.  As the GOI's argument represents an unwarranted request that the Commission depart from its well-reasoned practice, it should be rejected.

    3.   *The Commission Reasonably Found that Underselling Drove the Market Share Shift from the Domestic Industry to Subject Imports from Israel*

The GOI now claims — for the first time — that the timing of Israeli import underselling did not align with the market share shifts observed by the Commission, as "the domestic industry lost market share only from 2020 to 2021 … {and f}rom 2021 to 2022 and in interim 2023, the

domestic industry gained market share while purported underselling continued."[7]  GOI Br. at 30.
Notably, despite arguments to the Commission that there was no correlation between market
share shifts and underselling for subject imports, generally, such analysis showed that
underselling trends for Israeli subject imports *did* align with its market share gains.  *See* Joint
Respondents' Final Comments at 6, Table 2 (C.R. 227).  In fact, no party raised the argument
now being advanced by the GOI on appeal.

This Court's governing statute mandates that plaintiffs exhaust administrative remedies
where appropriate.  *See* 28 U.S.C. § 2637(d).  The court "generally takes a 'strict view' of th{is}
requirement."  *Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed.
Cir. 2013).[8]  On this basis alone, the Court should reject the GOI's claim.

But even if the GOI had exhausted its administrative remedies before the Commission,
this argument suffers from two major flaws.  *First*, it overlooks that the underselling data
coverage — while robust — necessarily represents a representative *sampling* of overall sales in
the U.S. market.  Specifically, the pricing product data "accounted for approximately [        ]
percent of U.S. producers' U.S. shipments of brass rod … {and} [        ] percent of U.S.
shipments of subject imports from Israel."  *Brass Rod I* at 48, C.R. 232.

And notably, for the U.S. shipments encompassed by the quarterly price comparison data
for pricing products 2, 3, 5, 6, 8, and 9 — for which the record showed [                    ]

---

[7] Although the GOI raises the issue of market share trends in the context of its pricing arguments,
market share trends ostensibly relate to the adverse *impact* that subject imports from Israel had
on the domestic industry's performance.  Nevertheless, for the sake of clarity, the Coalition
addresses this argument in the context of pricing arguments.

[8] None of the limited exceptions to the exhaustion requirement apply here.  *See, e.g., SeAH Steel
Vina Corp. v. United States*, 269 F. Supp. 3d 1335, 1351 n.7 (Ct. Int'l Trade 2017) (summarizing
exceptions).

by subject imports from Israel — the domestic industry's share of total shipments [

       ] from [       ] percent in 2020, to [       ] percent in 2021, to [       ] percent in 2022,

as shown in Table 3 below:

| Table 3 U.S. Shipment Volumes and Market Share Trends in Pricing Products 2, 3, 5, 6, 8, and 9 | | | | | | | |
|---|---|---|---|---|---|---|---|
| | **VOLUME** | | | | **MARKET SHARE** | | |
| | *Domestic* | *Israel* | *Other* | *Total* | *Domestic* | *Israel* | *Other* |
| **2020** | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |
| **2021** | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |
| **2022** | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |
| **Interim 2023** | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] | [     ] |
| *Source:* Calculated from Staff Report at Tables V-5-6, V-8-9, & V-11-12, C.R. 218 | | | | | | | |

These data clearly show that, for the portion of U.S. shipments covered by pricing

products sold to non-buyback end users and to distributors, the domestic industry [

                                                              ]. While

subject imports from non-Israeli sources [

                                    ] in 2022, this does not negate that the domestic industry

was [                                                        ] in 2021.

*Second*, while the domestic industry's market share [                    ] in interim

2023, this came [                                            ], highlighting

another flaw in the GOI's argument — *i.e.*, the assumption that the market share trends

necessarily reflect competition between only Israeli imports and U.S.-produced brass rod.  In

reality, there was competition between and among various import sources and the domestic like

product.  As shown in Table 3 above, the domestic industry's market share gain in interim 2023 came [                                                      ], while significant underselling by [                                                      ].  The Commission's Staff Report at Table C-1 reflects this same dynamic, showing that the domestic industry's slightly increasing market share in interim 2023 was [          ] from [                                                      ] while the market share of subject imports from Israel [          ] from [      ] percent in 2022 to [      ] percent in interim 2023.  *See* C.R. 218.  These data not only corroborate that underselling drove the increases in the market share held by subject imports from Israel, but also explain that the increase in the domestic industry's market share in interim 2023 was at the expense of [                                                      ] which, collectively, [                                                      ].

*See Staff Report* at V-50, Table IV-17, C.R. 218.

For the foregoing reasons, the GOI's arguments in this area should be rejected.

**D.  The Commission's Finding that Israeli Subject Imports had a Significant Adverse Impact on the Domestic Industry Was Supported by Substantial Evidence and Otherwise in Accordance with Law**

In its impact analysis, the Commission found that, while the domestic industry increased its production and U.S. shipments between 2020 and 2022, those increases were not commensurate with the increase in apparent U.S. consumption during this period and most of the domestic industry's financial indicators declined.  *See Brass Rod I* at 51, P.R. 165.  For a discussion of the factual aspects of the Commission's impact analysis, *see* ITC Br. at 11-12 and 33-35.

While the Commission considered all statutory factors that have a bearing on the condition of the domestic industry — whether they improved or deteriorated — it found a causal

nexus between low-priced subject imports from Israel and the domestic industry's deteriorating condition.  Specifically, it found that significant underselling by Israeli subject imports took sales and market share from the domestic industry, preventing it from capitalizing on the increase in apparent consumption from 2020 to 2022.  *See Brass Rod I* at 55, P.R. 165.  It also found that, due to the significant price-suppressing effects of Israeli subject imports and the resulting [      ] percentage point increase in the domestic industry's non-toll COGS to net sales ratio from 2020 to 2022, the domestic industry's ratio of operating income to net sales declined by [      ] percentage points during this period.  *See Brass Rod I* at 74-75, C.R. 232.  Accordingly, the Commission reasonably found that Israeli subject imports had a significant adverse impact on the domestic industry.  These findings are supported by substantial evidence.

     1.   *The Commission Properly Rejected the GOI's Impact Arguments*

In its appeal, the GOI complains that the Commission considered "aberrational metrics" (*i.e.*, operating income) while certain other metrics showed improvement and the domestic industry remained profitable.[9]  *See* GOI Br. at 33.  But as noted above, the Commission properly considered and weighed all the relevant evidence, and the GOI fails to explain how certain cherry-picked metrics sever the causal nexus between (1) Israeli underselling and lost sales, and (2) the declines in the domestic industry's market share.  The GOI similarly fails to explain how other metrics sever the causal nexus between (1) the price suppressing effects of subject imports from Israel, and (2) the increase in the domestic industry's COGS to net sales ratio, as well as the

---

[9] While the GOI characterizes the record as "showing improvements in the domestic industry's financial performance," the only financial metric that improved from 2020 to 2022 was its gross profit. *See* GOI Br. at 34; *Brass Rod I* at 70, C.R. 232.  Meanwhile, the domestic industry's ratio of gross profit to net sales, operating income, net income, operating income as a share of net sales, net income as a share of sales, total net assets, and return on assets all declined during this period. *See Brass Rod I* at 71-72, C.R. 232.

domestic industry's declining operating income rates.  Moreover, the GOI cites to no authority for the proposition that a negative determination is required unless most or all domestic industry's performance metrics decline or if the domestic industry is rendered unprofitable.  In fact, the statute explicitly imposes no such requirement:

> The Commission may not determine that there is no material injury … to an industry in the United States merely because that industry is profitable or because the performance of that industry has recently improved.

19 U.S.C. § 1677(7)(J).  Intuitively, it makes perfect sense that the domestic industry's performance improved in certain respects as U.S. demand for brass rod increased overall from 2020 to 2022, resulting in an increase in the domestic industry's output (albeit at a lower rate than the increase in consumption) and an increase in employment.  This, however, does not undermine the Commission's analysis or necessitate a different result.

The GOI also argues that the domestic industry only lost market share from 2020 to 2021 — a period associated with purported domestic industry supply constraints.  *See* GOI Br. at 31-34.  But the fact that the Commission narrated trends over the full years of the POI does not mean it relied on "misleading timelines" or that the domestic industry's supply constraints explain its share losses.  *See* GOI Br. at 33-34.  The Commission accurately described that apparent U.S. consumption increased, overall, during the 2020 to 2022 period and that the domestic industry's U.S. shipments increased to a lesser degree.  Moreover, throughout the Commission's impact analysis, it *provided a year-by-year description* of the fluctuations of each of the domestic industry's trade, employment, and financial metrics.  *See generally*, *Brass Rod I* at 67-75, C.R. 232.

The Commission also directly addressed the argument that "supply constraints" explained the market share shift from the domestic industry to Israeli subject imports.  Specifically, the

Commission highlighted that, after any reported domestic industry supply constraints had been entirely resolved in 2022, the Israeli subject imports' market share ([     ] percent) remained higher than at the start of the POI and the domestic industry's market share remained lower. *See Brass Rod I* at 75-76, C.R. 232. It also explained that the supply constraints in the market in 2021 — which were reported for Israeli subject imports and the domestic like product alike — did not explain the market share shift, as large majorities of purchasers reported the domestic like product was superior or comparable to Israeli subject imports in terms of availability (12 of 13), delivery time (12 of 13), and reliability of supply (12 of 12). *See Brass Rod I* at 57, P.R. 165; *Staff Report* at II-27, Table II-14, C.R. 218. Moreover, purchaser reporting also confirmed that the domestic industry lost sales to subject imports from Israel primarily due to price in every year of the POI, including in 2021 when it had ample excess capacity with which it could supply the U.S. market. *See Brass Rod I* at 57, P.R. 165.

While the GOI accurately indicates that Mueller's [               ] in interim 2023 triggered the need [

],[10] it omits a critical fact noted by the Commission — *i.e.*, Mueller reported

[                                                                    ]. *See Brass Rod I* at 76 n.299, C.R. 232. Thus, Mueller's [     ] in no way explains the increase in Israeli subject imports during interim 2023, as the record demonstrates that [

] and the more than [

---

[10] The GOI also insinuates that [          ] misreported its production capacity as a result of [
], *see* GOI Br. at 38, but it ignores the fact that [
]. *See* Coalition's PostHr'g Br. at III-6, C.R. 209.

]. *See* Mueller U.S. Producer Questionnaire Response at II-8, C.R. 203.

In sum, the Commission properly considered and rejected these various claims in its determinations, and the Court should decline to re-weigh the evidence at the behest of the GOI.

### 2. *The Commission's Impact Analysis Did Not Erroneously Attribute to Israeli Imports Harm from Other Import Sources*

The GOI lastly asserts that the Commission mistakenly attributed injury from subject imports from Israel to that of imports from the other subject import sources. *See* GOI Br. at 39-41. But the Commission was discerning in its analysis, and only attributed [     ] percentage points of the domestic industry's market share decline from 2020 to 2022 to subject imports from Israel, despite the domestic industry's market share declining by [     ] percentage points during this period. *Compare Brass Rod I* at 74, C.R. 232 *with Staff Report* at Table C-1, C.R. 218. And when the Commission observed that subject imports from Israel increased to [     ] percent of the market across the interim periods, while the domestic industry's market share remained lower than the start of the POI, it never suggested that the entirety of the domestic industry's decreased market share was solely due to Israeli imports. *See Brass Rod I* at 75-76, C.R. 232.

Moreover, while the Commission found that price pressure from low-priced subject imports from Israel "contribut{ed}" to the domestic industry's elevated COGS to net sales ratio, it never found that they were solely responsible, and it did not base its finding on evidence relating to the price suppressing effects of imports from other subject countries. *See Brass Rod I* at 55, P.R. 165. To be sure, the Commission recognized that imports from the other subject countries gained more market share from 2020 to 2022, undersold the domestic like product, and placed pressure on the domestic industry's prices. But the Commission did not conflate these

points with the injurious impact of the pervasive underselling, price suppression, and market share shift specific to subject imports from Israel.  *See Brass Rod I* at 59-60, P.R. 165.

## VI.    CONCLUSION

For the foregoing reasons, the Commission's determinations are supported by substantial evidence and otherwise in accordance with law.  Accordingly, the Coalition asks the Court to affirm the Commission's determinations in their entirety.

Sincerely,

Jack A. Levy, Esq.
Noah A. Meyer, Esq.
Daniel J. Calhoun, Esq.
Paul K. Keith, Esq.

**ROCK CREEK TRADE LLP**

**Certificate of Compliance with Chambers Procedures 2(B)(1)**

The undersigned hereby certifies, pursuant to Chambers Procedures 2(B)(1) and (2), the foregoing brief contains 9,040 words, exclusive of the caption block, table of contents, table of authorities, signature block, and certificates of counsel, and therefore complies with the maximum word count limitation set forth in the Standard Chambers Procedures of the U.S. Court of International Trade.

By:    /s/ Jack A. Levy

Jack A. Levy