Slip Op. 26-57

## UNITED STATES COURT OF INTERNATIONAL TRADE

|  |  |
|---|---|
| GOVERNMENT OF ISRAEL, MINISTRY OF ECONOMY AND INDUSTRY,<br><br>    Plaintiff,<br><br>v.<br><br>UNITED STATES,<br><br>    Defendant,<br><br>and<br><br>AMERICAN BRASS ROD FAIR TRADE COALITION, et al.,<br><br>    Defendant-Intervenors. | Before: Lisa W. Wang, Judge<br><br>Court No. 24-00197<br><br>**PUBLIC VERSION** |

## <u>OPINION AND ORDER</u>

[Sustaining in part and remanding in part the United States International Trade Commission's final affirmative determinations.]

Dated: June 8, 2026

<u>Bernd G. Janzen</u> & <u>Julia K. Eppard</u>, Akin Gump Strauss Hauer & Feld LLP, of Washington, D.C., argued for Plaintiff Government of Israel, Ministry of Economy and Industry. With them on the brief were <u>Devin S. Sikes</u>, <u>Daniel M. Witkowski</u>, <u>Sydney L. Stringer</u>, and <u>Paul S. Bettencourt</u>.

<u>John D. Henderson</u>, Attorney-Advisor, Office of the General Counsel, U.S. International Trade Commission, of Washington, D.C., argued for Defendant United States. With him on the brief were <u>Margaret D. Macdonald</u>, General Counsel, and <u>Karl S. von Schriltz</u>, Assistant General Counsel.

<u>Noah A. Meyer</u> & <u>Paul K. Keith</u>, Rock Creek Trade LLP, of Washington, D.C., argued on behalf of Defendant-Intervenors American Brass Rod Fair Trade Coalition and its members, Mueller Brass Co. and Wieland Chase LLC. With them on the brief were <u>Jack A. Levy</u> and <u>Daniel J. Calhoun</u>.

Court No. 24-00197                                                                     Page 2
**PUBLIC VERSION**

Wang, Judge: This action stems from final affirmative material injury determinations made by the United States International Trade Commission ("Commission") in the antidumping duty and countervailing duty investigations of brass rod from Israel. Brass Rod from Israel, 89 Fed. Reg. 78,330 (USITC Sep. 25, 2024), PR 216; Brass Rod from Israel, Inv. Nos. 701-TA-687 and 731-TA-1614 (Final), USITC Pub. 5545 (Sep. 2024), PR 212. The Government of Israel, Ministry of Economy and Industry ("Plaintiff"), moves for judgment on the agency record pursuant to CIT Rule 56.2. Plaintiff challenges as unsupported by substantial evidence or otherwise not in accordance with law: (1) the Commission's treatment of information from outside of the period of investigation ("POI") in its present material injury analysis; (2) the Commission's volume analysis; (3) the Commission's pricing analysis; (4) the Commission's finding of negative impact on the domestic industry; and (5) the Commission's non-attribution analysis.

For the following reasons, Plaintiff's motion for judgment on the agency record is granted in part and denied in part.

## BACKGROUND

Plaintiff Government of Israel, Ministry of Economy and Industry, is a "foreign government of a country in which subject merchandise is manufactured and from which subject merchandise is exported." Public Compl. ("Compl.") ¶ 3, ECF No. 9.

The underlying investigations that form the basis of this action were initiated after "the American Brass Rod Fair Trade Coalition … ; Mueller Brass Co. … ; and Wieland Chase LLC … filed petitions with the Commission and [the United States Department of] Commerce, alleging that an industry in the United States is materially injured or

threatened with material injury by reason of subsidized imports of brass rod from India,

Israel, and South Korea and [less than fair value] imports of brass rod from Brazil, India,

Israel, Mexico, South Africa, and South Korea" on April 27, 2023. Brass Rod from Brazil,

India, Israel, Mexico, South Africa, and South Korea, 88 Fed. Reg. 39,477 (USITC June

16, 2023), PR 83. The American Brass Rod Fair Trade Coalition and its members

Mueller Brass Co. ("Mueller") and Wieland Chase LLC ("Wieland") (collectively

"Defendant-Intervenors") are respectively "an association, a majority of whose members

is composed of U.S. producers of a domestic like product to [b]rass [r]od from Israel"

and "U.S. producers of a domestic like product to [b]rass [r]od from Israel." Def.-Ints.'

Consent Mot. to Intervene as a Matter of Right ("Def.-Ints.' Consent Mot. to Intervene")

at 2, ECF No. 12.

Once the petitions were filed, "effective April 27, 2023, the Commission instituted

countervailing duty investigation Nos. 701-TA-686-688 and antidumping duty

investigation Nos. 731-TA-1612-1617 (Preliminary)." Brass Rod from Brazil, India,

Israel, Mexico, South Africa, and South Korea, 88 Fed. Reg. 39,477 (USITC June 16,

2023). The Commission published the results of its preliminary investigation on June 16,

2023. Id. The Commission "determine[d] … that there is a reasonable indication that an

industry in the United States is materially injured by reason of imports of brass rod from

Brazil, India, Israel, Mexico, South Africa, and South Korea … that are alleged to be

sold in the United States at less than fair value ('LTFV') and to be subsidized by the

governments of India, Israel, and South Korea." Id.

After receiving "notification of a preliminary determination by Commerce that

imports from India were subsidized[,]" "[t]he Commission scheduled the final phase of

the investigations …." <u>Brass Rod from Israel</u>, 89 Fed. Reg. 78,330 (USITC Sep. 25,

2024). As part of the final phase, "[t]he Commission conducted [a] hearing on December

12, 2023." <u>Id</u>. At the hearing, among others,

> Representatives of Mueller and Wieland appeared … accompanied by counsel and submitted prehearing and posthearing briefs and final comments … Representatives for Finkelstein Metals Ltd., a producer/exporter of brass rod in Israel, and Finkelstein Metals USA Inc. ("Finkelstein USA"), a U.S. importer of brass rod from Israel (collectively, "Finkelstein"), appeared at the hearing accompanied by counsel and submitted prehearing and posthearing briefs and final comments. The Government of Israel, Ministry of Economy and Trade Affairs, submitted pre-hearing and post-hearing statements, and a representative of the Government of Israel appeared at the hearing accompanied by counsel.

<u>Brass Rod from India</u>, Inv. No. 701-TA-686 (Final), USITC Pub. 5485 (Feb. 2024)

("Public Views") at 4, PR 172.

> Over the course of the investigations by both the United States Department of

Commerce ("Commerce") and the Commission,

> The investigation schedules became staggered when Commerce postponed its final antidumping duty determinations regarding brass rod from Brazil, India, Israel, Mexico, and South Korea and its final countervailing duty determinations regarding brass rod from Israel and South Korea ("the trailing investigations"), but did not postpone its final countervailing duty determination regarding brass rod from India. Commerce published its final determination with respect to brass rod from India on December 18, 2023. This necessitated that the Commission issue an earlier final determination in the countervailing duty investigation of brass rod from India than in the trailing investigations.

<u>Id</u>. at 3; Public Views at I-1–I-2. Additionally, "[t]he investigation schedules became

further staggered when Commerce aligned its countervailing duty investigation

regarding Israel with its antidumping duty investigation regarding Israel and tolled all

deadlines for its antidumping duty investigation regarding Israel by 90 days." <u>Brass Rod</u>

**PUBLIC VERSION**

from Israel, Inv. Nos. 701-TA-687 and 731-TA-1614 (Final) at 2, USITC Pub. 5545 (Sep. 2024).

Notably, "[p]ursuant to the statutory provision on staggered investigations, the record for the trailing investigations [was] the same as the record in the countervailing duty investigation of brass rod from India except that, prior to the Commission's final antidumping duty determinations on brass rod from Brazil, India, Israel, Mexico, South Africa, and South Korea, and its final countervailing duty determinations on brass rod from Israel and South Korea, the Commission include[d] in the record Commerce's final dumping and countervailing duty determinations and the parties' final comments concerning those determinations." Public Views at 3–4. As such, the Views of the Commission in Brass Rod from India, Inv. No. 701-TA-686 (Final), USITC Pub. 5485 (Feb. 2024), include detailed findings regarding subject imports from Israel.

Ultimately, "Commerce issued its final affirmative determinations in its antidumping and countervailing duty investigations concerning imports of brass rod from Israel on August 5, 2024." Brass Rod from Israel, Inv. Nos. 701-TA-687 and 731-TA-1614 (Final) at 4, USITC Pub. 5545 (Sep. 2024). After "notification of final determinations by Commerce that imports of brass rod from Israel were being sold at LTFV within the meaning of section 735(a) of the Act (19 U.S.C. 1673d(a)) and were being subsidized by the government of Israel within the meaning of section 705(a) of the Act (19 U.S.C. 1671d(a))," the Commission provided "notice of the supplemental scheduling of the final phase of [its] antidumping duty and countervailing duty investigations regarding brass rod from Israel …." Brass Rod from Israel, 89 Fed. Reg. 78,330 (USITC Sep. 25, 2024).

**PUBLIC VERSION**

On September 19, 2024, the Commission "completed and filed its determinations in" the trailing antidumping and countervailing duty investigations of subject merchandise from Israel. Id. The Commission defined the POI as January 2020 to September 2023. Public Views at 11. The Commission determined "that an industry in the United States is materially injured by reason of imports of brass rod from Israel … that have been found by the U.S. Department of Commerce … to be sold in the United States at less than fair value … and subsidized by the government of Israel." Brass Rod from Israel, Inv. Nos. 701-TA-687 and 731-TA-1614 (Final) at 1, USITC Pub. 5545 (Sep. 2024).[1]

The Commission found "that the volume of such imports from Israel is significant in absolute terms and relative to consumption in the United States, and that the increase in that volume is significant in absolute terms." Public Views at 35. The Commission also "conclude[d] that subject imports from Israel caused significant price effects." Id. at 50. Further, the Commission "considered other factors to ensure that [it was] not attributing injury from other factors to the subject imports from Israel" and determined "that subject imports from Israel had a significant impact on the domestic industry." Id. at 59, 61.

---

[1] Notably, "Section 771(G)(ii)(IV) of the Tarriff Act provides an exception to cumulation with respect to subject imports from Israel [given the existence of the United States-Israel Free Trade Agreement] … Thus, where, as here, antidumping or countervailing duty investigations involve both Israel and other countries, the Commission must first determine whether a domestic industry is [materially] injured or threatened with material injury by reason of imports from Israel. If this inquiry is answered in the affirmative, the imports from Israel are then eligible for cumulation with imports from the other subject [countries]. If this inquiry is answered in the negative, the Commission cannot cumulate the imports from Israel." Public Views at 14.

**PUBLIC VERSION**

On November 22, 2024, pursuant to 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i), Plaintiff filed a complaint seeking judicial review in this court of final affirmative injury determinations made by the Commission. Compl. ¶ 2. Defendant-Intervenors filed a motion to intervene on December 2, 2024. Def.-Ints.' Consent Mot. to Intervene. The motion was granted on the same day. Order Granting Def.-Ints.' Consent Mot. to Intervene as a Matter of Right, ECF No. 16.

Plaintiff filed its CIT Rule 56.2 motion for judgment on the agency record on May 9, 2025. Pl.'s Public Mot. for J. on Agency R. ("Pl.'s Mot."), ECF No. 30. Defendant United States filed its opposition on August 15, 2025. Def.'s Public Mem. in Opp. to Pl.'s Mot. for J. on Agency R. ("Def.'s Mem."), ECF No. 34. Defendant-Intervenors filed their opposition on August 29, 2025. Def.-Ints.' Public Mem. in Opp. to Pl.'s Mot. for J. on Agency R., ECF No. 38. Plaintiff filed its reply on September 19, 2025. Pl.'s Public Reply in Supp. of its Mot. for J. on Agency R. ("Pl.'s Reply"), ECF No. 40. Oral arguments were held on February 4, 2026. ECF No. 51.

## JURISDICTION & STANDARD OF REVIEW

The court has jurisdiction over this action. 28 U.S.C. § 1581(c) ("The Court of International Trade shall have exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930."). This action is commenced under 19 U.S.C. §§ 1516a(a)(2)(A)(i)(II) and (a)(2)(B)(i).

The court will uphold the Commission's final injury determinations unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); Sweet Harvest Foods v. United States, 155 F.4th 1355, 1362 (Fed. Cir. 2025).

The United States Supreme Court has specified that "substantial evidence is more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Universal Camera Corp. v. NLRB, 340 U.S. 474, 477 (1951) (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). When determining whether an agency action is supported by substantial evidence, the court "asks whether a reasonable fact finder could have arrived at the agency's decision …." In re Gartside, 203 F.3d 1305, 1312 (Fed. Cir. 2000).

In reviewing the Commission's injury determination, the court "may not reweigh the evidence or substitute its own judgment for that of the agency." Usinor v. United States, 342 F. Supp. 2d 1267, 1272 (CIT 2004); see also Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 936 (Fed. Cir. 1984); Hynix Semiconductor, Inc. v. United States, 431 F. Supp. 2d 1302, 1306 (CIT 2006). The Commission "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." Timken United States Corp. v. United States, 421 F.3d 1350, 1355 (Fed. Cir. 2005) (quoting Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)). Thus, "even if it is possible to draw two inconsistent conclusions from evidence in the record, such a possibility does not prevent [the Commission's] determination from being supported by substantial evidence." Nippon Steel Corp. v. United States, 458 F.3d 1345, 1352 (Fed. Cir. 2006) (quoting Am. Silicon Techs. v. United States, 261 F.3d 1371, 1376 (Fed. Cir. 2001)).

The court "must consider the record as a whole, including that which fairly detracts from its weight." Id. at 1351. However, "when the totality of the evidence does

not illuminate a black-and-white answer to a disputed issue, it is the role of the expert

factfinder — here the majority of the Presidentially-appointed, Senate-approved

Commissioners — to decide which side's evidence to believe." Id. at 1359. Ultimately,

the court will "affirm a Commission determination if it is reasonable and supported by

the record as a whole, even if some evidence detracts from the Commission's

conclusion." Altx, Inc. v. United States, 370 F.3d 1108, 1121 (Fed. Cir. 2004) (quoting

Atlantic Sugar, Ltd. v. United States, 744 F.2d 1556, 1562–64 (Fed. Cir. 1984)).

## DISCUSSION

Plaintiff challenges five elements of the Commission's determinations as

unsupported by substantial evidence or otherwise not in accordance with law: (1) the

Commission's treatment of information from outside of the POI in its present material

injury analysis; (2) the Commission's volume analysis; (3) the Commission's pricing

analysis; (4) the Commission's finding of negative impact on the domestic industry; and

(5) the Commission's non-attribution analysis. The United States ("Defendant") and

Defendant-Intervenors argue that all challenged elements of the determinations are

supported by substantial evidence or otherwise in accordance with law. Each challenge

is addressed in turn.

I.     **The Commission's Treatment of Information from Outside of the POI
       Was Lawful**

Plaintiff argues that the Commission was required to consider information from

outside of the POI, specifically the October 7, 2023, Hamas attack on Israel, in its

present material injury analysis. Plaintiff argues that the Commission was required to do

so, given: (1) the language of 19 U.S.C. § 1671d(b)(1)(A); and (2) such information was

placed on the record and "seriously undermine[s] … [the] reasoning and conclusion" of

**PUBLIC VERSION**

the Commission. Pl.'s Mot. at 13–17 (quoting <u>Wind Tower Trade Coal. v. United States</u>, 569. F. Supp. 3d 1221, 1248 (CIT 2022)).

### A.    Statutory Requirements

The first issue before the court is whether 19 U.S.C. § 1671d(b)(1)(A) requires the Commission to consider post-POI data as part of its present material injury determination.

Plaintiff argues that "[t]he statute requires (in the present tense) the Commission to determine whether the domestic [industry] '<u>is</u> materially injured' or '<u>is</u> threatened with material injury.'" Pl.'s Mot. at 15 (emphasis in original). In Plaintiff's view, this means that "the Commission is not permitted to end its analysis at the end of the POI. Rather, the statute requires the Commission to make a determination of present material injury, warranting greater emphasis on events at the end of or after the POI." <u>Id</u>. at 15–16.[2]

In Defendant's view, "[h]aving reasonably selected the January 2020-September 2023 POI and collected data with respect to that POI, the Commission appropriately relied on [this] data for its determination of present material injury, and not on post-POI data." Def.'s Mem. at 16.[3]

In determining the requirements of 19 U.S.C. § 1671d(b)(1)(A), the court is required "to exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority …." <u>Loper Bright Enters. v. Raimondo</u>, 603 U.S. 369

---

[2] At oral argument, Plaintiff appears to have changed course, declaring "the statute itself does not require expressly the Commission to look at post-POI developments, absolutely." Oral Arg. (Feb. 4, 2026) at 21:25–21:32.

[3] For this and other issues, Defendant-Intervenor largely echoes Defendant's arguments. <u>See</u> Def.-Ints.' Public Mem. in Opp. to Pl.'s Mot. for J. on Agency R.

**PUBLIC VERSION**

(2024). The court must use the "relevant interpretive tools" to reach "the best reading of

the statute and resolve … ambiguity." Id. at 373. Those interpretive tools include the

canons of statutory construction. Timex V.I. v. United States, 157 F.3d 879, 882 (Fed.

Cir. 1998) ("Beyond the statute's text, those 'tools' [of statutory construction] include the

statute's structure, canons of statutory construction, and legislative history."); Metro.

Area EMS Auth. v. Sec'y of Veterans Affs., 122 F.4th 1339, 1345 (Fed. Cir. 2024).

The disposition of this issue turns on the proper interpretation of the phrase "is

injured." Whether "is" has a continuous or contemporaneous meaning in a sentence is

determined by the words that follow it.[4] Determining the meaning of "is" in the statute

therefore requires turning to the meaning of "injured." The Oxford English Dictionary

defines "injured" as "wronged" or "hurt, damaged, impaired." Injured, Oxford English

Dictionary, https://www.oed.com/dictionary/injured_adj (last visited May 21, 2026).

Other dictionaries adopt similar definitions.[5] The statutory pairing of "is" with "injured"

(conjugated in the past tense) means that something or someone can be injured in the

present, even if the event that caused the injury occurred at a discrete moment in the

past.

Given that the phrase "is injured" indicates a continuous state of being, not an

assessment of injury at a singular moment in time, the statute's use of the phrase "is

---

[4] See Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 140 (2012) ("[w]ords are to be given the meaning that proper grammar and usage would assign them.").

[5] See, e.g., Injured, Cambridge Dictionary, https://dictionary.cambridge.org/us/dictionary/english/injured (last visited May 21, 2026) (similarly defining "injured" as "hurt or physically harmed").

injured" does not impose a requirement on the Commission to consider information at a specific point in time. Thus, Plaintiff's argument that the statute requires a "greater emphasis on events at the end of or after the POI" is incorrect. See Pl.'s Mot. at 15-16.

Here, the Commission chose to rely primarily on data collected during the POI (i.e., January 2020 to September 2023). Public Views at 11. The United States Court of Appeals for the Federal Circuit has explained that "the Commission has broad discretion with respect to the period of investigation that it selects for purposes of making a material injury determination." Nucor Corp. v. United States, 414 F.3d 1331, 1337 (Fed. Cir. 2005). The court has further noted that "[w]hile [the Commission] has the discretion to use post-POI data to bolster POI data or to further support its decision, there is no requirement to include such post-POI data, as the POI is the centerpiece of the investigation's time frame." AWP Indus. v. United States, 783 F. Supp. 2d 1266, 1282 (CIT 2011). In sum, the Commission's reliance on POI data does not run counter to the statute and is reasonable.

### B.    Conditions of Competition and Information on the Record

The next issue is whether the Commission was required to consider information from outside of the POI because such information impacted the "conditions of competition" and "seriously undermine[s] [the Commission's] reasoning and conclusion." See Pl.'s Mot. at 14–15 (quoting Wind Tower Trade Coal., 569 F. Supp. 3d at 1248).

Plaintiff argues that "[i]n its determinations, the Commission failed to consider economic factors in the conditions of competition as required by statute." Pl.'s Mot. at 15. Per Plaintiff, "[t]he war impacted the conditions of competition by affecting the operations of the only Israeli producer of subject merchandise and the condition of the

domestic [industry] at the time of the Commission's determinations." Pl.'s Reply at 2 (emphasis in original). Plaintiff argues that "[b]y failing to address the significant factual information on the record, the Commission ignored 'significant arguments and evidence which seriously undermine[s] its reasoning and conclusion[,]'" rendering the Commission's determination unsupported by substantial evidence. Pl.'s Mot. at 15.

Defendant counters that "in its discussion of supply constraints affecting various market participants, the Commission specifically noted Finkelstein's report that the Hamas attack and subsequent Gaza war caused shortages and constraints affecting its production in the post-POI period." Def.'s Mem. at 15. Further, Defendant argues that the Commission was only required to address post-POI events as part of its threat of material injury analysis. Id. at 17–18. Defendant contends that because "[t]he Commission made a final determination that subject imports from Israel caused present material injury to the domestic industry … [it] did not have occasion to address in its Views whether subject imports from Israel threatened material injury to the industry." Def.'s Mem. at 15.

The court has explained that "[a]bsent some showing to the contrary, [the Commission] is presumed to have considered all evidence in the record in making its determination." Ranchers-Cattlemen Action Legal Found v. United States, 74 F. Supp. 2d 1353, 1373 (CIT 1999). Further, there is a difference between ignoring record evidence, as Plaintiff argues, and disagreeing with the Commission's determination of the probative value and relevance of that evidence. See SeAH Steel VINA Corp. v. United States, 950 F.3d 833, 842–43 (Fed. Cir. 2020). This situation falls into the latter category.

In its Views, the Commission discussed the Hamas attack on Israel as one of the "conditions of competition [that] inform our analysis of whether there is material injury by reason of subject imports." Public Views at 22, 26. Specifically, the Commission explained that "Finkelstein states that it did not experience any supply constraints during the POI. After the end of the POI, Finkelstein reported that the war in Gaza following Hamas's October 7, 2023, attack on Israel caused labor shortages and logistical constraints that forced it to reduce production of brass rod." Id. at 26. The Commission then addressed the supply constraints facing the domestic industry, as well as other "supply considerations" as part of its discussion of the conditions of competition and the business cycle. Id. at 22–34.

In making its material injury determination, the Commission expressly noted the "labor shortages and logistical constraints" caused by the Hamas attack as well as other supply constraints and conditions of competition related to the Israeli producer of subject merchandise. Id. at 26. Given these statements, Plaintiff's argument that the Commission ignored such evidence falls flat. Plaintiff may be dissatisfied as to the weight assigned to certain evidence, but such a responsibility "falls exclusively within the authority of the Commission." Nippon Steel, 458 F.3d at 1358. The court will not disturb such calls. See United States Steel Group – a Unit of USX Corp. v. United States, 96 F.3d 1352, 1362 (Fed. Cir. 1996).

II.      **The Commission's Volume Analysis Is Not Supported by Substantial Evidence**

The next issue is whether the Commission's determination that the volume of subject imports was significant is supported by substantial evidence.

**PUBLIC VERSION**

Plaintiff argues that "[t]he Commission improperly determined that the small volume of subject imports from Israel was significant," given that "the increase in subject import volumes was minor, in absolute terms and relative to apparent U.S. consumption and domestic production." Pl.'s Mot. at 17. According to Plaintiff, "in finding that import volumes from Israel were significant, the majority impermissibly read the word 'significant' out of the statute." Pl.'s Mot. at 20.[6]

Defendant argues that "it is … well settled that there is no minimum threshold for import volumes to be found significant, and that the significance of the volume of imports may be affected by the conditions of competition for the industry at issue." Def.'s Mem. at 20.

---

[6] Plaintiff also argues that the Commission was required to address the significance of a previous Commission investigation on certain pipe fittings from Israel, which was "raised … multiple times in briefing during the final phase of the investigations." Pl.'s Mot. at 19; see Certain Carbon Steel Butt-Weld Pipe Fittings from France, India, Israel, Malaysia, The Republic of Korea, Thailand, The United Kingdom, and Venezuela, Inv. Nos. 701-TA-360-361 (Final) and 731-TA-688-695 (Final), USITC Pub. 2870 (Apr. 1995) ("Pipe Fittings"). The court has explained that "the ITC need not address every argument and piece of evidence, [but] it must address significant arguments and evidence which seriously undermines its reasoning and conclusions." Altx, Inc. v. United States, 167 F. Supp. 2d 1353, 1374 (CIT 2001), aff'd, 370 F.3d 1108 (Fed. Cir. 2004) (internal citations omitted). Pipe Fittings predates the underlying investigation in this case by approximately 30 years and involves a different industry and subject merchandise. Given these differences, and the sui generis nature of Commission investigations, Plaintiff has not established the significance of Pipe Fittings would seriously undermine the Commission's reasoning in this case. Nucor, 414 F.3d at 1340; see also Cleo Inc. v. United States, 501 F.3d 1291, 1299 (Fed. Cir. 2007) ("For that reason, prior determinations by the Commission with regard to one industry typically provide little guidance for later determinations with regard to different industries. Each of the prior Commission determinations on which the appellants rely on involved significantly different facts.").

19 U.S.C. § 1677(7)(C)(i) establishes that "[i]n evaluating the volume of imports of merchandise, the Commission shall consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." In order "for the Commission's findings under section 1677(7)(C)(i) to be supported by substantial evidence, the Commission must analyze the volume and market share data in the context of conditions of competition. This is especially crucial where, as here, subject imports represent a small percentage of market share relative to that held by the domestic industry." Nippon Steel Corp. v. United States, 182 F. Supp. 2d 1330, 1335 (CIT 2001). Further, the Commission "must defend its actions based on the reasons it gave when it acted." Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 591 U.S. 1, 24 (2020).

The Commission's volume analysis is not supported by substantial evidence. Specifically, the Commission failed to draw a rational connection between the record evidence and why subject import volumes were "significant." See Timken United States Corp., 421 F.3d at 1355. The Commission offers only a conclusory statement "that the volume of subject imports from Israel is significant in absolute terms and relative to consumption in the United States, and that the increase in that volume is significant in absolute terms." Public Views at 35.

The Commission fails to link its conclusion regarding the significance of the volume of subject imports to the conditions of competition of the affected industry. See Confidential Views of the Commission, ECF No. 21-1 ("Conf. Views") at 45–46, CR 232; Public Views at 34–35. The relevant section of the Views summarizes metrics regarding

the volume of subject imports, absolute and relative to consumption, without sufficient

analysis. Id. The recitation of metrics does not provide a sufficient basis for evaluating

whether the volume of subject imports was "significant," particularly when such imports

represent a small percentage of market share relative to that held by the domestic

industry.

Here, the volume of subject imports ranged from [[          ]] pounds in 2020

to [[          ]] pounds in 2021 and [[          ]] pounds in 2022. Conf. Views at 45;

Public Views at 34. In contrast, the domestic industry's production volume ranged from

[[          ]] pounds in 2020 to [[          ]] pounds in 2021 and [[

]] pounds in 2022. Conf. Views at 68; Public Views at 51. In other words, the

volume of subject imports accounted for less than [[    ]] percent of the comparable

volume of domestic production during this period.

The Commission also found that the market share of subject imports from Israel

ranged from [[    ]] percent at the beginning of the POI in 2020 to [[    ]] percent in

2022. Conf. Views at 46; Public Views at 34. In contrast, the domestic industry's market

share ranged from [[    ]] percent in 2020 to [[    ]] percent in 2022. Conf. Views at

29–30; Public Views at 23-24. When Finkelstein noted the contrast between the market

share of subject imports and that of the domestic industry, the Commission summarily

dismissed these arguments by asserting that "there is no minimum threshold for the

market share or increase to be 'significant' under the statute." Conf. Views at 46, n.189;

Public Views at 35, n.189.

Defendant is correct that the statute does not define the term "significant," nor

does it impose a minimum threshold for a finding that subject imports are significant.

**Confidential Information Omitted**

**PUBLIC VERSION**

See 19 U.S.C. § 1677(7)(C)(i). However, the Commission cannot use this statutory silence as a justification for failing to provide a reasoned analysis of its conclusions. Defendant's proffered explanation as to the sufficiency of the Commission's volume analysis is a post-hoc rationalization. Defendant contends that "the conditions of competition in the U.S. brass rod market found by the Commission support its conclusion that the volume of subject imports from Israel was significant[,]" citing the Commission's findings regarding product substitutability, price as a factor in purchasing decisions, price transparency, and price sensitivity. Def.'s Mem. at 21. Such an explanation is missing from the Views.

On remand, the Commission must provide an adequate explanation of whether the volume of subject imports, or any increase in that volume, either in absolute terms or relative to apparent consumption, is significant. As part of its explanation, the Commission must examine the volume of subject imports in the context of the conditions of competition, particularly as subject imports represent a [[

]] share of the market than the domestic industry.

III.    **The Commission's Pricing Analysis Is Supported by Substantial Evidence**

Plaintiff argues that the Commission's pricing analysis is unsupported by substantial evidence and otherwise not in accordance with law because: (1) "the [Commission] attempted to adjust the pricing data to account for price differences distinct to the channels of distribution, but in so doing, the majority failed to quantify the true net price to the Petitioners, undermining the comparison of domestic prices to subject import prices"; and (2) "the [Commission] improperly found that subject imports caused negative price effects." Pl.'s Mot. at 22–23, 27.

**Confidential Information Omitted**

**PUBLIC VERSION**

### A. Pricing Data Adjustment

The court next turns to whether the Commission's decision to use a price-based adjustment is supported by substantial evidence.

Plaintiff argues that the Commission's choice of a price-based adjustment is unsupported by substantial evidence because the Commission "unreasonably rejected" the use of a "cost-based adjustment" and "substantial evidence supports using a cost-based adjustment." Pl.'s Mot. at 26–27.

Defendant argues that "[t]he Commission reasonably found that, notwithstanding some limitations, including limitations in the available data, the price-based adjustment … was the most reliable approach." Def.'s Mem. at 24.

Under 19 U.S.C § 1677(7)(C)(ii)(I), when "evaluating the effect of imports of … merchandise on prices," the Commission must consider whether "there has been significant price underselling by the imported merchandise as compared with the price of domestic like products of the United States." To conduct an underselling analysis, the Commission may have to adjust price data. This may require the Commission to choose among adjustment methodologies. See, e.g., Nucor Corp. v. United States, 318 F. Supp. 2d 1207, 1256–1257 (CIT 2004).

Under the substantial evidence standard, "[w]hen evaluating challenges to the [Commission's] methodology, the court will affirm the chosen methodology as long as it is reasonable." Coal. of Gulf Shrimp. Indus. v. United States, 71 F. Supp. 3d 1356, 1365 (CIT 2015); see, e.g., United States Steel Group, 96 F.3d at 1362.

In this case, the Commission explained that an adjustment to the pricing data was necessary to account for the fact that brass rod is sold through multiple channels of

distribution. Public Views at 17–18, 42–44. The Commission decided to use a price-based adjustment to calculate the cost of domestic goods for its underselling analysis. Id. at 42–44.

The Commission provided an explanation of why it chose to use a price-based adjustment and why this choice was reasonable, noting:

> the most reliable approach to adjusting domestic prices on sales to end users using scrap buyback programs for purposes of comparing them to subject import prices on sales to end users not through such programs is the price-based adjustment presented in Table F-2 of the Commission report, which reflects the price "premium" paid to U.S. brass rod producers by customers participating in the scrap buyback program relative to the prices paid to distributors and end users not using scrap buyback.

Id. at 42–43. The Commission "acknowledge[d] that this approach has certain limitations" but addressed why the concerns Finkelstein raised with the price-based adjustment methodology were unfounded and why the approach was more reliable than Finkelstein's preferred methodology. Conf. Views at 57–58, n. 226, Public Views at 43–44, n. 226.

The Commission also provided an explanation of why it opted not to adopt a cost-based adjustment methodology, including arguments regarding the approach advocated by Finkelstein in the underlying proceeding, and by Plaintiff here. Public Views at 42–44. Specifically, the Commission explained that Finkelstein's preferred

> cost-based approach does not take into account all the cost savings to U.S. producers in purchasing scrap with their company's own "chemistry" and known quality directly from their customers participating in the scrap buyback program, as opposed to purchasing scrap from middlemen in the open market … [T]he approach advocated by Finkelstein assumes a uniform scrap yield, regardless of source or product to be manufactured, when in fact scrap yields can considerably vary from product to product and from end user to end user.

Id. at 42.

**PUBLIC VERSION**

It is not the court's role to second-guess agency decision-making so long as the agency provides a reasoned analysis for its choices after considering the full gambit of record evidence, including those facts that detract from its findings. See Motor Vehicle Mfrs. Ass'n, 463 U.S. at 43; Wheatland Tube Co. v. United States, 161 F.3d 1365, 1369–1370 (Fed. Cir. 1998); Mittal Steel Galati S.A. v. United States, 502 F. Supp. 2d 1295, 1313 (CIT 2007). Here, the Commission provided an explanation for its choice of a price-based adjustment methodology, which included addressing arguments and information that detracted from its conclusion. As such, the Commission's choice of methodology is reasonable and supported by substantial evidence and otherwise in accordance with law.

### B. Price Effects

The next issue is whether the Commission's finding that subject imports caused negative price effects is supported by substantial evidence.

Plaintiff argues that "the record contradicts the Commission's finding that the small volume of subject imports from Israel that undersold domestic product caused adverse price effects." Pl.'s Mot. at 28.[7] Specifically, Plaintiff contends that "[t]he record does not support a finding of significant price suppression ...." Id.

---

[7] Plaintiff also argues that "[t]he Commission did not explain its departure from past practice that there must be more than underselling; underselling must affect the prices for or volume of the domestic like product." Pl.'s Mot. at 27 (emphasis added). However, in the next paragraph of its motion, Plaintiff quotes the Commission's determination that "subject imports from Israel undersold the domestic like product to a significant degree, leading to a market share shift from the domestic industry to subject imports from Israel from 2020 to 2022, and prevented price increases, which otherwise would have occurred, to a significant degree." Id. at 28 (emphasis added). Given that Plaintiff concedes their own argument by quoting to the Commission's explanation of a link

**PUBLIC VERSION**

Defendant contends that the Commission's finding "that the significant underselling it found by subject imports from Israel prevented price increases, which otherwise would have occurred, to a significant degree" is supported by substantial evidence. Def.'s Mem. at 29.

19 U.S.C. § 1677(7)(C)(ii)(II) requires the Commission to consider if "the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree."[8] The statute does not direct the Commission on what factors to consider in determining whether price depression or suppression have occurred, nor does it define the term significant. 19 U.S.C. § 1677(7)(C)(ii)(II).

While "a reviewing court must take into account contradictory evidence or any evidence in the record that undermines the agency's finding, the substantial evidence test does not require that there be an absence of evidence detracting from the agency's conclusion, nor is there an absence of substantial evidence simply because the reviewing court would have reached a different conclusion based on the same record." Cleo, 501 F.3d at 1296; Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1385 (Fed. Cir. 2014) ("An agency finding may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence.")

---

between its finding of underselling and underselling's effect on prices, the court deems the issue no longer in dispute.

[8] Given that the Commission did not make a price depression finding, Plaintiff only challenges the Commission's finding of price suppression. Pl.'s Mot. at 28.

Court No. 24-00197                                                                     Page 23
**PUBLIC VERSION**

Here, the Commission provided an explanation for its finding of price suppression, which included a rational connection between the facts and its conclusion. Relying on purchaser questionnaire responses to support its findings, the Commission explained that "[[          ]] U.S. purchaser [[                    ]] reported that U.S. producers had reduced prices in order to compete with lower-priced subject imports from Israel, for an estimated price reduction of [[      ]] percent due to competition with low-priced imports from Israel." Conf. Views at 62; Public Views at 47. The Commission went on to highlight that "the third largest responding purchaser of domestic product, reported buying [[                    ]] pounds of subject imports from Israel instead of domestic product primarily due to the lower prices of the imports …." Conf. Views at 62–63; Public Views at 47. Based on this explanation, a reasonable mind could have reached the conclusion that underselling of subject imports led to significant price suppression. See Universal Camera Corp., 340 U.S. at 477.

The Commission also addressed significant evidence and arguments that could have undermined its conclusions. Specifically, the Commission addressed two arguments raised by Finkelstein, and that largely continue to be raised by Plaintiff here: (1) "that the volume of any lost sales as a result of underselling by subject imports from Israel is too small to have caused any cost-price squeeze experienced by the domestic industry"; and (2) "that the increase in the domestic industry's COGS [cost of goods sold] to net sales ratio over the POI was not significant … and that the increase between 2020 and 2021 was due to an abnormally low COGS to net sales ratio in 2020, as the COVID-19 pandemic initially caused raw material costs to drop significantly while brass rod prices increased." Public Views at 48–49.

**Confidential Information Omitted**

Court No. 24-00197                                                                 Page 24
**PUBLIC VERSION**

In response to each of Finkelstein's arguments, the Commission cited record evidence to underscore why these arguments were unpersuasive. Conf. Views at 63–66; Public Views at 48–50. In response to Finkelstein's first argument, the Commission found that:

> The record indicates that the U.S. brass market has substantial price transparency, with both Mueller and Wieland selling brass rod off published price lists that they revise frequently to take into account developments in the market. Given the price sensitivity of the U.S. market for brass rod, domestic producers report that lost sales to subject imports from Israel prompt a downward revision to their price lists, or a forgoing of price increases necessary to cover increases in their costs, to avoid further lost sales to their competitors. In either case, the domestic producer's price reductions, or forgone price increases, affect their sales prices to all of their customers using the price lists, and accordingly affect their revenues from sales to those customers.

Public Views at 48.

The Commission also responded to Finkelstein's argument regarding the COGS to net sales ratio, noting that:

> Contrary to this argument, the record shows that the domestic industry's brass rod prices declined from the first quarter to the second quarter of 2020, and prices of copper, zinc, and yellow brass scrap also declined. Both the domestic industry's prices and raw material prices increased during the third and fourth quarters of 2020, but raw material prices increased by a greater percentage than the domestic industry's prices between the first and fourth quarters of 2020. Thus … the [[     ]] percentage point increase in the domestic industry's non-toll COGS to net sales ratio from 2020 to 2021 cannot be explained by anomalously low cost and high price conditions in 2020.

Conf. Views at 65–66; Public Views at 49–50.

Given that the Commission drew a rational connection between record evidence and its conclusions, and addressed counterarguments, its finding that subject imports caused significant negative price effects is supported by substantial evidence and otherwise in accordance with law. See Universal Camera Corp., 340 U.S. at 477.

**Confidential Information Omitted**

IV.    **The Commission's Finding of a Negative Impact on the Domestic Industry Is Supported by Substantial Evidence**

The court turns next to whether the Commission's finding that "subject imports from Israel had a significant negative impact on the domestic industry" is supported by substantial evidence. Pl.'s Mot. at 30.

Plaintiff argues that "[t]he majority relied on isolated data points to support its determinations[,]" did not "engage with … clear indicators of the domestic industry's success during the POI," and thus "fail[ed] to take into account record evidence that fairly detracts from its conclusions," rendering the "impact analysis … not supported by substantial evidence." Pl.'s Mot. at 31–32.

Defendant argues that the Commission's finding of significant impact is supported by substantial evidence. Defendant supports this contention by noting that "[t]he Commission discussed all relevant indicators of the domestic industry's performance during the POI, including those that improved or were unchanged." Def.'s Mem. at 34.

Under 19 U.S.C. § 1677(7)(B)(i)(III), the Commission must consider "the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States[.]" The statute specifies several factors that the Commission is required to evaluate in its impact analysis. 19 U.S.C. § 1677(7)(C)(iii).[9]

---

[9] 19 U.S.C. § 1677(7)(C)(iii) states that the Commission must "evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to— (I) actual and potential decline in output, sales, market share, gross profits, operating profits, net profits, ability to service debt, productivity,

**PUBLIC VERSION**

The Commission retains discretion in how it chooses to weigh these statutory factors. Am. Bearing Mfrs. Ass'n v. United States, 350 F. Supp. 2d 1100, 1123 (CIT 2004) (Plaintiff's "arguments go to the weight the [Commission] assigned to the observed declines in several of the statutory factors[.] … This assignment of weight, however, is within the [Commission's] discretion."); see United States Steel Group, 96 F.3d at 1357 ("It is the Commission's task to evaluate the evidence it collects during its investigation. Certain decisions, such as the weight to be assigned a particular piece of evidence, lie at the core of that evaluative process."); see generally Nucor Corp v. United States, 594 F. Supp. 2d 1320 (CIT 2008).

Here, the Commission considered the statutorily required factors. Conf. Views at 67–82; Public Views at 50–61. Among other evidence, the Commission found, and supported with record evidence, the fact that:

> (1) "The domestic industry's capacity was flat from 2020 to 2022[,] while the industry's production quantity and capacity utilization increased irregularly, but all were lower in interim 2023 than in interim 2022";
>
> (2) "The domestic industry's overall employment remained generally stable between 2020 and 2022, while its hours worked and wages paid increased, but its productivity declined";
>
> (3) "The domestic industry's U.S. shipments increased irregularly from 2020 to 2022[,] but were lower in interim 2023 than in interim 2022";

---

return on investments, return on assets, and utilization of capacity, (II) factors affecting domestic prices, (III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment, (IV) actual and potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and (V) in a proceeding under part II of this subtitle, the magnitude of the margin of dumping."

(4) "The domestic industry's net sales value and gross profit increased irregularly from 2020 to 2022, but were lower in interim 2023 than in interim 2022";

(5) "The industry's operating income and net income both declined irregularly from 2020 to 2022, but were higher in interim 2023 than in interim 2022";

(6) "The domestic industry's operating income and net income as shares of net sales both decreased each year between 2020 and 2022, but were higher in interim 2023 than in interim 2022"; and

(7) "The domestic industry's capital expenditures increased irregularly from 2020 to 2022 …."

Conf. Views at 67–72; Public Views at 51–54. The Commission further established that "[t]he domestic industry's financial data on a non-toll basis showed similar declines between 2020 and [2022] in non-toll net income, non-toll operating income, and the ratios of non-toll net income and operating income to net sales." Conf. Views at 72; Public Views at 54.

The Commission subsequently exercised its discretion in choosing the factors most relevant to its finding of significant impact and explained what those factors indicated about the state of the industry. The Commission found that "[t]he domestic industry recorded increases in production and U.S. shipments between 2020 and 2022, but those increases lagged behind the [[    ]] percent increase in apparent U.S. consumption, and the industry's market share and most financial indicators declined." Conf. Views at 67; Public Views at 51.

The Commission also addressed significant arguments and evidence that ran counter to its findings. Conf. Views at 67–82; Public Views at 50–61. Specifically, the Commission responded to Finkelstein's broad contention "that the domestic industry

**Confidential Information Omitted**

was not materially injured because some of its performance indicators increased from 2020 to 2022" by noting that "the record shows that the industry failed to fully benefit from the increase in apparent U.S. consumption and its overall financial performance deteriorated by some measures as it lost market share and sales to low-priced subject imports from Israel which also had significant price-suppressing effects." Public Views at 56.

In reviewing a finding of negative impact by the Commission, "[i]t is not the province of the [c]ourt to reweigh the evidence before the agency. That said, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" Nucor, 594 F. Supp. 2d at 1332 (internal quotations and citations omitted). Having provided satisfactory explanations, a reasonable mind could conclude that the domestic industry was significantly negatively impacted by subject imports. As such, the court will not disturb the Commission's finding. See Universal Camera Corp., 340 U.S. at 477.

## V.    The Commission's Non-attribution Analysis Is Supported by Substantial Evidence

The final issue is whether the Commission's finding that the domestic industry was materially injured by reason of subject imports from Israel is supported by substantial evidence.

Plaintiff contends that the Commission "improperly attributed changes in the domestic industry's performance to subject imports from Israel" by failing to account for "alternative causes of decreased domestic industry market share," including "that supply constraints injured the domestic industry." Pl.'s Mot. at 36–37 (original capitalizations omitted). Plaintiff also argues that the Commission failed to address the impact of

"increased market share by lower-priced imports from countries other than Israel." Id. at 37.

Defendant argues that "the Commission fully explained the causal nexus it found between subject imports from Israel and the injury to the domestic industry …." Def.'s Mem. at 39. Defendant argues that the Commission "addressed … domestic industry supply constraints, imports from sources other than Israel, and demand trends during the POI" and "found that none of these factors explained the injury that the Commission attributed to subject imports from Israel, and that subject imports from Israel had a significant impact on the domestic industry that was distinct from the impact of imports from other sources." Id.

To make an affirmative material injury determination in an antidumping or countervailing duty case, the Commission is required to find that the domestic industry "is materially injured" "by reason of" subject merchandise. 19 U.S.C. § 1673d(b)(1); 19 U.S.C. § 1671d(b)(1). While the Commission is required to find a causal link between the injury and dumping of subject merchandise, the Federal Circuit has specified that "the 'dumping' need not be the sole or principal cause of injury. As long as its effects are not merely incidental, tangential or trivial, the foreign product sold at less than fair value meets the causation requirement." Nippon Steel Corp. v. Int'l Trade Comm'n, 345 F.3d 1379, 1381 (Fed. Cir. 2003); see Gerald Metals, Inc. v. United States, 132 F.3d 716, 721–722 (Fed. Cir. 1997). The same is true of subsidized goods. See Changzhou Trina Solar Energy Co., Ltd. v. United States Int'l Trade Comm'n, 879 F.3d 1377, 1380–1383 (Fed. Cir. 2018).

**PUBLIC VERSION**

Establishing this causal link may require the Commission to address other potential sources of material injury to the domestic industry. However,

> To say that an affirmative determination must be based on evidence that the injury to the domestic industry is "by reason of" subject imports does not require the Commission to address the causation issue in any particular way[.] … The Commission is simply required to give full consideration to the causation issue and to provide a meaningful explanation of its conclusions.

Mittal Steel Point Lisas Ltd. v. United States, 542 F.3d 867, 878 (Fed. Cir. 2008). Therefore, the court's "review of the Commission's causation analysis … is … limited to whether the Commission complied with certain minimum requirements imposed by statutory provisions and principles of administrative law." Id. at 873.

Here, the Commission sufficiently addressed significant arguments about the impact of supply constraints, or lack thereof, on the domestic industry. Conf. Views at 75–77, 81–82; Public Views at 56–57, 60. As part of this discussion, the Commission directly addressed, and dismissed, arguments regarding domestic producers' inability to meet domestic demand increase:

> Although the domestic industry experienced supply constraints in 2021 as a result of the COVID-19 pandemic, so did importers and foreign producers, and purchasers reported that the domestic industry no longer had such supply constraints in 2022. Moreover, large majorities of purchasers reported that the domestic industry was comparable or superior to subject imports from Israel in terms of availability, delivery time, and reliability of supply. … Furthermore, the domestic industry's production quantity declined from 2021 to 2022 and its capacity utilization rate was only [[    ]] percent in 2022, suggesting that the industry had ample unused capacity with which the industry could have increased its production and U.S. shipments.

Conf. Views at 77; Public Views at 57.

The Commission also sufficiently addressed arguments about injury caused by market share gain from lower priced imports from countries other than Israel. The

**Confidential Information Omitted**

Commission acknowledged that "imports from sources other than Israel gained more market share during the 2020-2022 period" than those from Israel and "that cumulated imports from the other five subject countries also undersold the domestic like product, and gained sales and market share at the expense of the domestic industry." Public Views at 59. However, the Commission found that, "[w]hile other subject import sources may also have been sources of pricing pressure for the domestic industry, this does not negate the pricing pressure on the domestic industry … identified from subject imports from Israel." Id. The Commission went on to support this assertion with extensive citation to the record, including purchaser response data. Conf. Views at 79–81; Public Views at 59–60.

Having provided a rational connection between the evidence on the record and its findings, a reasonable mind could conclude that the domestic industry was injured by reason of subject imports from Israel. As such, the court will not disturb the Commission's finding. See Universal Camera Corp., 340 U.S. at 477.

### CONCLUSION

For the foregoing reasons, the Commission's final affirmative material injury determinations are sustained in part and remanded in part for further proceedings not inconsistent with this opinion.

Upon consideration of the papers and proceedings herein, it is hereby:

**ORDERED** that the Commission's final affirmative material injury determinations are remanded in part for reconsideration not inconsistent with this opinion;

**ORDERED** that the Commission shall file a remand redetermination within sixty (60) days following the date of this Opinion and Order; and

Court No. 24-00197                                                                    Page 32
**PUBLIC VERSION**

      **ORDERED** that the deadlines provided in CIT Rule 56.2(h) shall govern

thereafter.

/s/     Lisa W. Wang
Lisa W. Wang, Judge

Dated:    June 8, 2026
       New York, New York