***Public Version***

## Views of the Commission

By decision and order dated June 8, 2026, the U.S. Court of International Trade ("CIT") remanded the Commission's final affirmative injury determinations in *Brass Rod from Israel,* Inv. Nos. 701-TA-687 and 731-TA-1614 (Final), USITC Pub. 5545 (Sept. 2024).[1] Upon consideration of the remand order and based on the evidence in the record of these investigations, the Commission determines again that an industry in the United States is materially injured by reason of imports of brass rod from Israel that the U.S. Department of Commerce ("Commerce") determined are sold in the United States at less than fair value and subsidized by the government of Israel.[2]

## I. Background

The American Brass Rod Fair Trade Coalition and its individual members, Mueller Brass Co. ("Mueller") and Wieland Chase LLC ("Wieland") (collectively, "Petitioners") filed petitions on imports of brass rod from Brazil, India, Israel, Mexico, South Africa, and South Korea on April 27, 2023. The Commission's final phase investigation schedules became staggered when Commerce postponed almost all of its final determinations with respect to the six subject countries, but did not postpone its final countervailing duty determination with respect to India, as to which Commerce made an affirmative determination in December 2023. Moreover, Commerce tolled the deadlines for its final antidumping and countervailing duty determinations with respect to Israel for an additional 90 days. The statutory cumulation provision for

[1] *Government of Israel, Ministry of Economy and Industry v. United States*, Court No. 24-00197, 2026 WL 1972194, Slip Op. 26-57 (Ct. Int'l Trade June 8, 2026) ("Slip Op.").

[2] Commissioners Bart Thanhauser and David Foley Jr. did not participate in these remand proceedings.

staggered investigations provides that the Commission must make its determinations for each investigation based on the record compiled in the leading investigation, and that the record for each such investigation shall be the same, except that prior to the Commission's determinations in the trailing investigations, it shall include in the record Commerce's later final antidumping and countervailing duty determinations and the parties' final comments concerning Commerce's later determinations.[3]

Accordingly, the Commission issued three sets of determinations in these investigations. In the leading investigation, *Brass Rod from India* ("leading investigation"),[4] the Commission made an affirmative final determination with respect to subject imports from India based on a cumulated analysis of subject imports from Israel and all other subject countries. Following additional final determinations by Commerce in April 2024, the Commission issued additional affirmative final determinations in the first trailing investigations in *Brass Rod from Brazil, India, Mexico, South Africa, and South Korea*,[5] adopting its reasoning from *Brass Rod from India*.

Following Commerce's final affirmative final antidumping and countervailing duty determinations with respect to Israel in July 2024, the Commisison issued affirmative final determinations with respect to Israel in the second trailing investigations on September 19, 2024, in *Brass Rod from Israel,*[6] adopting its reasoning from *Brass Rod from India*. In accordance with the statute for trailing investigations, the Commission specifically adopted its findings and analysis from the determination and views in the leading investigation "with

---

[3] 19 U.S.C. § 1677(7)(G)(iii).

[4] *Brass Rod from India,* Inv. No. 701-TA-686 (Final), USITC Pub. 5485 (Feb. 2024).

[5] *Brass Rod from Brazil, India, Mexico, South Africa, and South Korea*, Inv. Nos. 701-TA-688 and 731-TA-1612-1613 and 1615-1617 (Final), USITC Pub. 5513 (June 2024),

[6] *Brass Rod from Israel,* Inv. Nos. 701-TA-687, 731-TA-1314 (Final), USITC Pub. 5545 (Sept. 2024).

respect to the issues of domestic like product, domestic industry, cumulation (including material injury by reason of subject imports from Israel), conditions of competition, and material injury by reason of cumulated subject imports."[7] In all three proceedings, Commissioners Karpel, Kearns, and Schmidtlein reached affirmative determinations, while Commissioner Johanson dissented and made negative determinations.

Before cumulating subject imports in the leading investigation with respect to India, the Commission had to determine in that investigation whether subject imports from Israel were eligible for cumulation with subject imports from the other five subject countries. The Commission applied the statutory cumulation provision with respect to Israel, which provides that the Commission may only cumulate subject imports from Israel with subject imports from other countries for purposes of its material injury determination if it first determines that subject imports from Israel, considered alone, materially injured or threatened with material injury the domestic industry.[8] The Commission determined that the domestic industry was materially injured by reason of subject imports from Israel taken alone.[9] The Commission then cumulated subject imports from Israel with imports from the other five subject countries (Brazil, India, Mexico, South Africa, and South Korea), and determined that the domestic industry was materially injured by reason of cumulated subject imports.

---

[7] *Brass Rod from Israel,* Inv. Nos. 701-TA-687, 731-TA-1314 (Final), USITC Pub. 5545 at 6 (Sept. 2024).

[8] 19 U.S.C. § 1677(7)(G)(ii)(IV).

[9] The public version of the leading investigation is *Brass Rod from India,* Inv. No. 701-TA-686 (Final), USITC Pub. 5485 (Feb. 2024) ("Original Public Views"), with relevant portions relating to the Commission's determination with respect to Israel at pages 13-61. Relevant portions of the Commission's Original Confidential Views in the leading investigation (EDIS Document No. 813414) ("Original Confidential Views") are at pages 16-82.

On November 22, 2024, Plaintiff Government of Israel, Ministry of Economy and Industry ("Plaintiff"), filed a complaint after commencing an action to contest the Commission's final injury determinations with respect to Israel. Plaintiff challenged the Commission's determinations as unsupported by substantial evidence and otherwise not in accordance with law.[10] While Plaintiff has challenged the Commission's affirmative determinations with respect to Israel in the second trailing investigations, the relevant findings and analysis that Plaintiff has challenged are contained in the Commission's Views in the leading investigation.

On June 8, 2026, the U.S. Court of International Trade, per Judge Lisa W. Wang, issued an opinion granting in part and denying in part Plaintiff's Rule 56.2 motion for judgment on the agency record. The Court affirmed the Commission's determination on all issues except the Commission's volume analysis. It upheld the Commission's treatment of information from outside the Commission's January 2020 to September 2023 period of investigation ("POI") in its present material injury analysis.[11] The Court found that the Commission's pricing analysis was supported by substantial evidence, finding that the price-based adjustment that the Commission used in its analysis of underselling by subject imports from Israel was supported by substantial evidence.[12] Similarly, it found that the Commission's finding that subject imports from Israel caused negative price effects was supported by substantial evidence.[13] In addition, the Court found that the Commission's finding that subject imports from Israel had a negative impact on the domestic industry was supported by substantial evidence.[14] Finally, it found that

[10] Complaint, ECF No. 9.
[11] Slip Op. at 9-14.
[12] Slip Op. at 18-21.
[13] Slip Op. at 21-24.
[14] Slip Op. at 25-28.

the Commission's non-attribution analysis, and the Commission's finding that the domestic industry was materially injured by reason of subject imports from Israel, were supported by substantial evidence.[15]

The Court remanded the Commission's determinations, however, because it found that the Commission's volume analysis was not supported by substantial evidence.[16] Specifically, the Court found that the Commission "failed to draw a rational connection between the record evidence and why subject imports were 'significant'" and "fail{ed} to link its conclusion regarding the significance of the volume of subject imports to the conditions of competition of the affected industry."[17]

On July 17, 2026, the Commission published notice of its remand proceeding in the Federal Register. In the notice, the Commission stated that it was not reopening the record, but invited interested parties to submit comments concerning how the Commission could best comply with the Court's remand instructions.[18] On August 3, 2026, remand comments were filed by Petitioners/Defendant-Intervenors the American Brass Rod Fair Trade Coalition and its individual members Mueller and Wieland (collectively, "Petitioners") and by the Plaintiff/Respondent Government of Israel, Ministry of Economy and Industry ("Respondent").[19]

---

[15] Slip Op. at 28-31.

[16] Slip Op.at 14-18.

[17] Slip Op. at 16.

[18] *Brass Rod from Israel*, 91 Fed. Reg. 44872 (July 17, 2026).

[19] Confidential Remand Comments on Behalf of Petitioners, EDIS Doc. 890219 (Aug. 3, 2026) ("Petitioners' Remand Comments"); Government of Israel's Confidential Comments on the Commission's Forthcoming Remand Redetermination, EDIS Doc. 890275 (Aug. 3, 2026) ("Respondent's Remand Comments").

*Public Version*

## II. Adoption of Findings from the Commission's Original Determinations

We have considered the record as a whole and adopt the Commission's original findings, analysis, and conclusions in their entirety with respect to those issues not subject to appeal, or affirmed by the Court, including domestic like product, domestic industry, negligibility, legal standards, conditions of competition, price effects of subject imports from Israel, and impact of subject imports from Israel. We also adopt the Commission's original findings, analysis, and conclusions with respect to the volume of subject imports from Israel, as supplemented by the analysis in these remand views. Those Commissioners who did not participate in the original investigations have reviewed *de novo* the record from the original investigations. For purposes of these remand proceedings, in addition to joining in full these Remand Views, they have adopted all findings from the original determinations that have not been modified herein.[20]

In accordance with the Court's remand instructions, we provide further explanation of our finding that the volume of subject imports from Israel is significant.

## III. The Volume of Subject Imports from Israel

### A. The Court's Instructions

The Court found that the Commission's volume analysis with respect to subject imports from Israel was unsupported by substantial evidence. In the original determinations, the Commission found that the volume of subject imports was significant in absolute terms and relative to consumption in the United States, and that the increase in that volume was

[20] Chairman Doyle and Commissioner Pappas did not participate in the original determinations because they were not members of the Commission at that time.

significant in absolute terms.[21] In finding the Commission's volume analysis not supported by substantial evidence, the Court stated that the Commission "failed to draw a rational connection between the record evidence and why subject import volumes were 'significant'" and offered only a "conclusory statement" that the volume of subject imports from Israel was significant in the three respects.[22]

Quoting the *Nippon Steel* case cited by the Commission in its original views, the Court explained as follows:

> In order 'for the Commission's findings under Section 1677(7)(C)(i) {*i.e.,* the volume provision} to be supported by substantial evidence, the Commission must analyze the volume and market share data in the context of conditions of competition. This is especially crucial where, as here, subject imports represent a small percentage of market share relative to that held by the domestic industry.'[23]

The Court found that the Commission "fail{ed} to link its conclusion regarding the significance of the volume of subject imports to the conditions of competition of the affected industry."[24]

The Court criticized the Commission's volume discussion for reciting the relevant volume "metrics" and then stating its conclusion without further explanation. The Court stated that "{t}he recitation of metrics does not provide a sufficient basis for evaluating whether the volume of subject imports was 'significant,' particularly when such imports represent a small percentage of market share relative to that held by the domestic industry."[25] The Court

---

[21] Original Confidential Views at 46; Original Public Views at 35.

[22] Slip Op. at 16.

[23] Slip Op. at 16 (quoting *Nippon Steel Corp. v. United States*, 182 F. Sup. 2d 1330, 1335 (Ct. Int'l Trade 2001)); *see* Original Confidential Views at 46-47 n.189; Original Public Views at 35 n.189.

[24] Slip Op. at 16.

[25] Slip Op. at 17.

instructed that "{o}n remand, the Commission must provide an adequate explanation of whether the volume of subject imports, or any increase in that volume, either in absolute terms or relative to apparent consumption is significant."[26] It further instructed that "{a}s part of its explanation, the Commission must examine the volume of subject imports in the context of the conditions of competition, particularly as subject imports represent a [ [redacted] ] share of the market than the domestic industry."[27]

**B. Party Arguments**

**1. Petitioners' Comments**

Petitioners argue that the relevant conditions of competition support the Commission's conclusion that the volume of subject imports from Israel was significant, including the moderate-to-high degree of substitutability between subject imports from Israel and the domestic like product, the importance of price in purchasing decisions, the high degree of price transparency in the brass rod market, and the domestic industry's use of frequently revised price lists, which support the conclusion that even seemingly small volumes of subject imports had a significant impact on the domestic industry's prices and performance.[28] Petitioners contend that the Commission did discuss all these conditions in its Original Views, and that to comply with the Court's remand instructions, the Commission need only supplement its volume analysis with discussions of these conditions of competition found elsewhere in the Original Views.[29] Petitioners contend that the Commission's statement in the Original Views that the

[26] Slip Op. at 18.
[27] Slip Op. at 18.
[28] Petitioners' Remand Comments at 2.
[29] Petitioners' Remand Comments at 2-3, 6-7.

conditions of competition section "inform{s} our analysis of whether there is material injury by reason of subject imports," signalled that the conditions of competition were already considered, accounted for, and embedded in the Commission's remaining analyses and overall assessment of the impact of subject imports on the domestic industry.[30]

Petitioners urge the Commission to again find that the volume of subject imports is significant and make affirmative material injury determinations concerning subject imports from Israel, asserting that there is no factual dispute concerning the Commission's numerical calculations underlying the Commission's volume analysis, the administrative record has not changed, and the Court has already affirmed the Commission's conclusions that subject imports from Israel had significant price effects and a significant adverse impact on the domestic industry.[31]

Petitioners argue that the Commission's volume analysis complied with the statute, contending that case law, the text and structure of the statute, and legislative history all militate against an interpretation of the statute (19 U.S.C. § 1677(7)(C)) to require the Commission to discuss conditions of competition in its volume analysis.[32]

Petitioners argue that in the Remand Redetermination, the Commission may want to reiterate its "uncontested" analysis of the volume of subject imports in absolute and relative terms, before explaining how the conditions of competition allow seemingly small volumes of subject imports to have significant price effects and a significant adverse impact on the

---

[30] Petitioners' Remand Comments at 5-6 (quoting Original Public Views at 22; Original Confidential Views at 28).

[31] Petitioners' Remand Comments at 3.

[32] Petitioners' Remand Comments at 4-5.

domestic industry.[33] They argue that there is nothing left for the Commission to do but "connect the dots" between the volume analysis already conducted and the discussion of conditions of competition already contained in the Views.[34]

**2. Respondent's Comments**

Respondent contends that there were "exceedingly low import volumes and market share of subject imports from Israel,"[35] asserting that "overwhelming record evidence demonstrat{es} that subject imports from Israel were not significant," which "permeates" the rest of the Commission's analysis, and compels a negative injury determination.[36] Respondent discusses certain prior Commission investigations where the Commission found the subject import volume to be insignificant and made negative determinations, arguing that the Commission should follow these "precedents" and do likewise here.[37]

Respondent states that "significant" is an express statutory term that must be given meaning, and provides several dictionary definitions of "significant," with its first proposed definition being "having or likely to have influence or effect."[38] Respondent contends that under any of its proposed definitions, subject imports from Israel are not significant in the context of the conditions of competition with respect to demand and supply.[39]

---

[33] Petitioners' Remand Comments at 7.

[34] Petitioners' Remand Comments at 8.

[35] Respondent's Remand Comments at 1.

[36] Respondent's Remand Comments at 1-2.

[37] Respondent's Remand Comments at 2-3, 5-6; *see, e.g., Ball Bearings from China*, Inv. No. 701-TA-989 (Final); USITC Pub. 3593 at 17 (Apr. 2003); *Pure Magnesium from China and Israel*, Inv. Nos. 701-TA-403 and 731-TA-895-896 (Final), USITC Pub. 3467 at 22-23 (Nov. 2001).

[38] Respondent's Remand Comments at 3.

[39] Respondent's Remand Comments at 3-4.

***Public Version***

With respect to demand, Respondent argues that market share data indicate that subject imports from Israel accounted for a small share of apparent U.S. consumption, and that the increase in market share over the POI for subject imports from Israel was likewise very small, demonstrating that subject imports from Israel were "an inconsequential subset of a large industry during the POI."[40] Respondent presents data showing fluctuations in apparent U.S. consumption during the POI, and contends that these fluctuations are substantially greater than the volume of subject imports from Israel during the period, further indicating their lack of significance.[41]

[40] Respondent's Remand Comments at 4-5. Respondent makes a series of factual misstatements in its remand comments in presenting data represented to be the volume of subject imports from Israel, when the data in fact concerned U.S. shipments of subject imports from Israel, which are lower than the volume of subject imports. Respondent's Remand Comments at 4-5, 7-8. Specifically, the table on page 4 of Respondent's remand comments purports to present data for the "Volume of Subject Imports from Israel (pounds)," but the data presented by Respondent are the (lower) volume of U.S. shipments of subject imports from Israel, not the (higher) volume of actual subject imports from Israel, as found by the Commission. *See* Original Confidential Views at 45 and n.184; Original Public Views at 34 and n.184. Similarly, on the next page of its comments Respondent claims that the volume of subject imports from Israel "peaked" at [ [redacted] ] pounds and increased by [ [redacted] ] pounds over the three full years of the POI, again citing U.S. shipments of subject imports rather than subject import data. Respondent's Remand Comments at 5. In fact, as the Commission found, the volume of subject imports from Israel "peaked" at [ [redacted] ] pounds in 2021, and the volume increased by [ [redacted] ] pounds from 2020 to 2022. *See* Original Confidential Views at 45; Original Public Views at 34. In the original determinations, the Commission presented the data for U.S. shipments of subject imports from Israel as well as the data for actual subject imports from Israel. Original Confidential Views at 45 and n.184; Original Public Views at 34 and n.184. As the Commission explained in the original determinations, consideration of the data for U.S. shipments of subject imports from Israel, in addition to data on subject imports from Israel, does not change our findings that the volume of subject imports from Israel is significant absolutely and relative to U.S. consumption, and that the increase in that volume is significant in absolute terms. Original Confidential Views at 45 n.184; Original Public Views at 34 n.184. Consistent with the Commission's usual approach, we rely on data regarding U.S. shipments of subject imports from Israel, rather than data on subject imports from Israel, in our calculations of apparent U.S. consumption and subject import market share, as the more accurate measure of consumption of such imports in the U.S. market. *See* Confidential Report, INV-VV-114 (Dec. 28, 2023) ("CR") at Tables IV-11, C-1; Public Report, *Brass Rod from India,* Inv. No. 701-TA-686 (Final), USITC Pub. 5485 (Feb. 2024) ("PR") at Tables IV-11, C-1.

[41] Respondent's Remand Comments at 5.

With respect to supply, Respondent asserts that the domestic industry supplied the vast majority of U.S. demand, and suppliers from subject sources other than Israel accounted for almost all of the rest of U.S. demand, arguing that by comparison the volume of subject imports from Israel is insignificant.[42] Respondent compares the volume of U.S. shipments of subject imports from Israel to U.S. producers' U.S. shipment volume, export shipments by U.S. producers, the ending inventory quantity reported by U.S. producers, and the U.S. shipment volume of other subject imports, and argues that the volume of subject imports from Israel is "inconsequential" with respect to each comparison.[43] Respondent further contends that the Commission should consider whether the decline in volume from other subject sources accounted for the small increase in volume of subject imports from Israel in interim 2023.[44] Respondent argues that the Commission should consider in its volume analysis domestic industry supply constraints during the POI, contending that the increases in U.S. shipments of subject imports from Israel from 2020 to 2021 and in interim 2023 compared with interim 2022 were attributable to subject imports from Israel filling demand that the domestic industry was unable to meet because of these supply constraints.[45]

Respondent argues that if the Commission now concludes that the volume of subject imports from Israel is insignificant, it could not attribute any significant negative impact on the domestic industry to subject imports from Israel, and other factors (*e.g.,* supply constraints and subject imports from other sources) must have caused that negative impact.[46] Thus,

[42] Respondent's Remand Comments at 6.
[43] Respondent's Remand Comments at 7.
[44] Respondent's Remand Comments at 7-8.
[45] Respondent's Remand Comments at 8-9.
[46] Respondent's Remand Comments at 9.

Respondent argues that the Commission should revise its impact analysis to account for its finding that the volume of subject imports from Israel was insignificant, and determine that subject imports from Israel neither cause nor threaten material injury to the domestic industry.[47]

**C. Analysis**

As discussed above, the Court remanded for the Commission to examine the volume of subject imports from Israel in the context of the conditions of competition and provide an adequate explanation of whether the volume of subject imports from Israel is significant.[48] At the outset, we observe that the statute does not require the Commission to consider the significance of subject import volume in the context of conditions of competition, as that requirement applies only to the Commission's consideration of impact.[49] Nevertheless, we understand that under the facts of this case, "particularly when such imports represent a small percentage of market share relative to that held by the domestic industry," the Court requires a further explanation for the Commission's finding that the volume of subject imports from Israel was significant, taking into account the relevant conditions of competition.[50]

---

[47] Respondent's Remand Comments at 9-10.

[48] Slip Op. at 18.

[49] *See* 19 U.S.C. § 1677(7)(C)(i); *Seafood Exporters Association of India v. United States,* Court No. 25-00031, Slip Op. 26-106 at 17-19 (Ct. Int'l Trade Sept 4, 2026); *Tenaris Bay City, Inc. v. United States,* 789 F. Supp. 3d 1352, 1373 (Ct. Int'l Trade 2025), *appeal pending.* The volume provision of the statute, 19 U.S.C. § 1677(7)(C)(i), instructs the Commission to "consider whether the volume of imports of the merchandise, or any increase in that volume, either in absolute terms or relative to production or consumption in the United States, is significant." This provision makes no mention of conditions of competition. By contrast, the impact provision of the statute, 19 U.S.C. § 1677(7)(C)(iii), lists the "relevant economic factors" the Commission must consider when examining the impact of subject imports on the domestic industry and requires the Commission to "evaluate all relevant economic factors described in this clause," meaning section 1677(7)(C)(iii), "within the context of the business cycle and conditions of competition."

[50] Slip. Op. at 17; *see also id.* at 16, 18.

Having reconsidered these issues pursuant to the Court's instructions, we again find that the volume of subject imports from Israel is significant in absolute terms and relative to consumption in the United States, and that the increase in that volume is significant in absolute terms.

**1. Data Concerning the Volume of Subject Imports from Israel**

In the original investigations, the Commission considered the significance of the volume of subject imports from Israel based on data concerning the volume of such imports in absolute terms and relative to apparent U.S. consumption.[51] The volume of subject imports from Israel increased by [ [redacted] ] percent from 2020 to 2022, and was [ [redacted] ] percent higher in interim 2023 than interim 2022.[52] The volume of subject imports from Israel increased from [ [redacted] ] pounds in 2020 to [ [redacted] ] pounds in 2021 before declining to [ [redacted] ] pounds in 2022; it was [ [redacted] ] pounds in interim 2023, as compared with [ [redacted] ] pounds in interim 2022.[53]

As a share of apparent U.S. consumption, subject imports from Israel increased by [ [redacted] ] percentage points between 2020 and 2022, and were [ [redacted] ] percentage points higher in interim 2023 compared with interim 2022.[54] The share of apparent U.S. consumption accounted for by subject imports from Israel increased from [ [redacted] ] percent in 2020 to [ [redacted] ] percent in 2021

---

[51] *See* Original Confidential Views at 45-46; Original Public Views at 34-35.

[52] CR/PR at IV-8.

[53] CR/PR at Tables IV-2, IV-3. U.S. shipments of subject imports from Israel increased by [ [redacted] ] percent between 2020 and 2022, increasing from [ [redacted] ] pounds in 2020 to [ [redacted] ] pounds in 2021, and then decreasing to [ [redacted] ] pounds in 2022. U.S. shipments of subject imports from Israel were [ [redacted] ] percent higher, at [ [redacted] ] pounds in interim 2023, compared with [ [redacted] ] pounds in interim 2022. CR/PR at Tables IV-11, C-1.

[54] CR/PR at Table C-1. As the domestic industry lost [ [redacted] ] percentage points of market share between 2020 and 2022, subject imports from Israel gained [ [redacted] ] percentage points of market share. *Id.*

before declining to [ [redacted] ] percent in 2022; it was [ [redacted] ] percent in interim 2023, compared with [ [redacted] ] percent in interim 2022.[55] The market share of subject imports from Israel in 2022 ([ [redacted] ] percent) and at the end of the POI ([ [redacted] ] percent) was higher than their market share at the beginning of the POI ([ [redacted] ] percent in 2020).[56]

On remand, we explain why these volumes of subject imports from Israel, present in the U.S. market in every month of the POI,[57] were significant in the context of the relevant conditions of competition, particularly those discussed in the following section.

### 2. Relevant Conditions of Competition in the U.S. Brass Rod Market

As previously stated, we adopt the Commission's original findings, analysis, and conclusions in their entirety with respect to the conditions of competition.[58] In this section we address and supplement these findings with respect to certain conditions of competition of particular relevance to the Commission's volume analysis.

We adopt the Commission's original findings concerning substitutability and the importance of price to purchasing decisions. In the original investigations, the Commission

---

[55] CR/PR at Table IV-9. The ratio of subject imports from Israel to production in the United States increased from [ [redacted] ] percent in 2020 to [ [redacted] ] percent in 2021, and then declined to [ [redacted] ] percent in 2022; it was higher, at [ [redacted] ] percent, in interim 2023, compared with [ [redacted] ] percent in interim 2022. CR/PR at Table IV-2.

[56] CR/PR at Table C-1. The market share of subject imports from Israel in sales to distributors increased from [ [redacted] ] percent in 2020 to [ [redacted] ] percent in 2021, and then declined to [ [redacted] ] percent in 2022; it was higher, at [ [redacted] ] percent, in interim 2023, compared with [ [redacted] ] percent in interim 2022. CR/PR at Table IV-15. The market share of subject imports from Israel in sales to end users without scrap buyback increased from [ [redacted] ] percent in 2020 to [ [redacted] ] percent in 2021 and [ [redacted] ] percent in 2022; it was higher, at [ [redacted] ] percent, in interim 2023, compared with [ [redacted] ] percent in interim 2022. CR/PR at Table IV-15. For sales to all end users, the market share of subject imports from Israel increased from [ [redacted] ] percent in 2020 to [ [redacted] ] percent in 2021 and [ [redacted] ] percent in 2022; it was up to [ [redacted] ] percent in interim 2023, compared with [ [redacted] ] percent in interim 2022. Derived from CR/PR at Tables V-13 to V-14.

[57] *See* Original Confidential Views at 23; Original Public Views at 18-19; CR/PR at Table IV-10.

[58] *See* Original Confidential Views at 28-45; Original Public Views at 22-34.

found that there is at least a moderate-to-high degree of substitutability between domestically produced brass rod and brass rod imported from Israel.[59] The Commission also found that price is an important factor in purchasing decisions for brass rod, along with other important factors such as quality and availability.[60]

We also adopt the Commission's original findings that domestic producers Mueller and Wieland sell brass rod based on published price lists, which are frequently revised in light of market developments, including changes in raw material costs and lost sales to lower-priced competitors.[61] The record indicates that, on average, Mueller and Wieland issued revised price lists [ [redacted] ] during the POI.[62] Representatives of both Mueller and Wieland testified that when domestic producers revise their price lists, prices are updated for all customers receiving the price list.[63]

By offering the same prices to all customers receiving their frequently updated price lists, domestic producers competing with low-priced subject imports from Israel for sales to certain customers automatically extend any price concessions made to those customers, whether price reductions or the forgoing of price increases that would otherwise have occurred, to all customers using the price lists. As Mr. Mitchell of Mueller testified:

> Perhaps more than any other industry you have examined, this is an industry where a low-volume sale on a given day can have a

[59] *See* Original Confidential Views at 35-37; Original Public Views at 27-29; CR/PR at II-19, Tables II-14 to II-20.

[60] *See* Original Confidential Views at 38; Original Public Views at 29; CR/PR at Tables II-9 to II-10.

[61] *See* Original Confidential Views at 42-43; Original Public Views at 32-33; *see also* Hearing Tr. at 25, 63-64, 112-113 (Mitchell), 31 (Christie).

[62] During the POI, Mueller issued [ [redacted] ] brass rod price lists, while Wieland Chase issued [ [redacted] ] brass rod price lists. Petitioners' Posthearing Brief at III-26 to III-27; *see* Hearing Tr. at 31 (Christie), 63 (Mitchell). In response to Commission requests, Mueller and Wieland also submitted copies of their brass rod price lists. Petitioners' Posthearing Brief at II-2, III-26 to III-27 and Exhs. 6, 7A- 7E.

[63] Hearing Tr. at 25, 64 (Mitchell), 31 (Christie).

***Public Version***

> ripple effect across the entire U.S. market and affect prices across a wide range of customers. At Mueller, we send our customers an updated price list whenever market conditions or metal pricing warrant a change … Our policy is to ensure that our customers are all receiving and using the same price list on any given day. As the saying goes, today's deal is tomorrow's price.[64]

Mr. Christie of Wieland testified that "{l}ike Mueller, we issue price lists to our customers on a frequent basis in response to changing market conditions, including base metal costs, conversion costs, and competitive price intelligence…. {T}he updated price list would now apply to all customers using the new price list."[65]

Both Mr. Mitchell and Mr. Christie explained the importance of their firms providing the revised price lists to all customers using the price list to maintain "an even playing field" for those customers. As Mr. Mitchell of Mueller testified:

> So it's very important for us to issue a price list to provide an even playing field to our customers that are competing with each other. So, when we do that and we have to try and win back that business, the only way we can do it is to lower the price to the entire market.[66] … So when we make a price change it's on the list … {w}hich goes to all of the customers that use that price list. We don't go and individually discount to that customer to regain the sale. We make a change to the list. And so when we have to make a price change, it changes what we are receiving from every customer that's using that list. … So in an environment where our customers are competing with each other, in order to provide any type of price stability to the market and allow the market to function properly, we have to be very consistent. And so that's the way we deal at Mueller. We publish a change in the price and it affects everybody. If we stop doing that -- there can be some very, very rapid ramifications to the market.[67]

---

[64] Hearing Tr. at 25 (Mitchell).
[65] Hearing Tr. at 31 (Christie).
[66] Hearing Tr. at 51 (Mitchell).
[67] Hearing Tr. at 64 (Mitchell).

Mr. Christie of Wieland likewise explained that:

> {F}rom our perspective the reason we have to make those adjustments, as I referenced the canary in the coal mine, when we see one data point where we see a customer that all of a sudden has that lower price, they're not the only one getting that lower import price. That means that it's pervasive and widespread. So if you rifle shoot, as opposed to a shotgun approach, then you're just giving that one particular distributor or end user a competitive advantage over the market, whereas we know that's going on, we know they're not just hitting one account. So then we adjust to the competitive situation so all of our customers are on a {level} playing field. That's the way we do it, otherwise you would just be rewarding the customers that are shopping you the most often.[68]

The foregoing conditions of competition, which Respondent has not contested, inform our finding that the volume of subject imports was significant.

### 3. The Volume of Subject Imports from Israel Was Significant in the Context of the Conditions of Competition

We find that the volume of subject imports from Israel is significant in absolute terms and relative to consumption in the United States, and that the increase in that volume is significant in absolute terms, in light of the conditions of competition in the U.S. brass rod market, particularly those highlighted in the preceding section. As the Commission explained in the price and impact sections of the Original Views, which we adopt in their entirety here, those conditions of competition enabled the volume of low-priced subject imports from Israel to have adverse price effects and a significant adverse impact on the domestic industry.

In the original determinations, the Commission explained that the volume of low-priced subject imports from Israel was sufficient to have adverse price effects on the domestic

[68] Hearing Tr. at 65 (Christie).

industry in light of the price transparency and price sensitivity of the U.S. brass rod market and the use of frequently revised price lists by U.S. brass rod producers Mueller and Wieland.[69] In its price effects analysis, the Commission found that, in light of the at least moderate to high degree of substitutability of subject imports from Israel with the domestic like product, the importance of price in purchasing decisions for brass rod, the pricing data showing pervasive subject import underselling, and the substantial volume of confirmed lost sales, the underselling by subject imports from Israel was significant.[70] The Commission further found that significant underselling by subject imports from Israel over the POI led to a market share shift from the domestic industry to subject imports from Israel, and prevented the domestic industry from raising its prices to cover its increasing costs, and therefore prevented price increases that otherwise would have occurred to a significant degree.[71] As part of this analysis, the Commission considered and rejected the argument by Israeli producer Finkelstein Metals Ltd. ("Finkelstein") that the volume of any lost sales as a result of underselling by subject imports from Israel was too small to have caused any cost-price squeeze experienced by the domestic industry.[72]

In rejecting Finkelstein's argument in the original determinations, the Commission found that the record indicated that the U.S. brass market has substantial price transparency, with both Mueller and Wieland selling brass rod off published price lists that they revise frequently

[69] Original Confidential Views at 63-65; Original Public Views at 48-49. As previously stated, we adopt the Commission's original findings, analysis, and conclusions in their entirety with respect to the price effects of subject imports from Israel.

[70] Original Confidential Views at 58-59; Original Public Views at 44.

[71] Original Confidential Views at 66; Original Public Views at 50.

[72] Original Confidential Views at 63-65; Original Public Views at 48-49.

to take into account developments in the market.[73] The Commission found that, given the price sensitivity of the U.S. market for brass rod, domestic producers reported that lost sales to subject imports from Israel prompted a downward revision to their price lists, or a forgoing of price increases necessary to cover increases in their costs, to avoid further lost sales to such imports. The Commission found that in either case, the domestic producer's price reductions, or forgone price increases, affected their sales prices to all of their customers using the price lists, and accordingly affected their revenues from sales to those customers.[74] The Commission found that because of this price transparency and sensitivity, when a domestic producer loses a sale to a purchaser as a result of underselling by subject imports from Israel, prompting either a downward revision in the producer's price list, or the forgoing of upward revisions necessary to cover increased costs, it affected prices for all purchasers buying from that price list.[75]

In its impact analysis, the Commission further explained that the volume of subject imports from Israel was sufficient to have a significant adverse impact on the domestic industry.[76] The Commission found that the domestic industry "failed to fully benefit from the increase in apparent U.S. consumption and its overall financial performance deteriorated by some measures as it lost market share and sales to low-priced subject imports from Israel which also had significant price-suppressing effects."[77]

[73] Original Confidential Views at 63-64; Original Public Views at 48; *see* Hearing Tr. at 31 (Christie), 63 (Mitchell).

[74] Original Confidential Views at 64; Original Public Views at 48; *see* Hearing Tr. at 25, 63-64, 112-113 (Mitchell), 31 (Christie).

[75] Original Confidential Views at 64; Original Public Views at 48-49; *see* Petitioners' Posthearing Brief at III-27 to III-28.

[76] As previously stated, we adopt the Commission's original findings, analysis, and conclusions in their entirety with respect to the impact of subject imports from Israel.

[77] Original Confidential Views at 75; Original Public Views at 56.

On remand, Respondent continues to argue that the volume of subject imports from Israel was too small to have any effect on the domestic industry or the U.S. brass rod market.[78] Using its first proposed dictionary definition of "significant," Respondent argues that "the volume of subject imports from Israel was not significant because such low volumes were not 'having or likely to have influence or effect.'"[79] Contrary to this argument, the Commission found that subject imports from Israel had significant adverse price effects and a significant impact on the domestic industry, rejecting Finkelstein's argument that the volume of lost sales to subject imports from Israel was too small to cause a cost-price squeeze for the domestic industry, and the Court sustained those findings.[80] Moreover, Respondent has not contested

[78] We are unpersuaded by Respondent's argument that the facts of this case are somehow similar to those in past cases in which the Commission found that the volume of subject imports was not significant and issued negative determinations, and that the Commission should "act consistently with these precedents." Respondent's Remand Comments at 5-6. We observe first that Commission determinations are not "precedents," contrary to Respondent's contention. As courts have recognized, the Commission is in no way bound by its past determinations because each investigation is *sui generis* and based on its own unique set of facts. *Nucor Corp. v. United States*, 414 F.3d 1331, 1340 (Fed. Cir 2005). Indeed, this Court's decision in this case acknowledged the "*sui generis* nature of Commission investigations." Slip Op. at 15 n.6. Moreover, unlike the Commission's determinations here, in none of the prior Commission investigations cited by Respondent did the Commission find that subject imports had adverse price effects and an adverse impact on the domestic industry. *See Ball Bearings from China*, Inv. No. 701-TA-989 (Final); USITC Pub. 3593 at 19, 22 (Apr. 2003); *Silica Bricks and Shapes from China*, Inv. No. 731-TA-1205 (Final), USITC Pub. 4443 at 19, 22 (Jan. 2014); *Glass Containers from China,* Inv. No. 701-TA-630 (Final), USITC Pub. 5068 at 31, 38 (June 2020); *Pure Magnesium from China and Israel*, Inv. Nos. 701-TA-403 and 731-TA-895-896 (Final), USITC Pub. 3467 at 24-25 (Nov. 2001).

[79] Respondent's Remand Comments at 4.

[80] Slip Op. at 23-24; Original Confidential Views at 63-65; Original Public Views at 48-49. In its remand comments, Respondent urges the Commission to reconsider several issues on which the Commission's analysis in the Original Views was sustained by the Court. Respondent argues that the Commission should consider whether any increase in subject imports from Israel during the POI was caused by domestic industry supply constraints as a result of COVID-19 or a fire at a domestic producer's plant, which allegedly left the domestic industry unable to fully supply the U.S. market. Respondent's Remand Comments at 8-9. However, the Commission fully addressed Finkelstein's arguments about such alleged supply constraints in its impact analysis in the original determinations, Original Confidential Views at 75-77 and n.299; Original Public Views at 56-57 and n.299, and the Court upheld the Commission's findings on this point. As the Court explained, "the Commission sufficiently addressed (Continued...)

any of the Commission's specific findings as to the relevant conditions of competition, including its findings as to the substitutability between subject imports and the domestic like product, the importance of price in purchasing decisions for brass rod, the substantial price sensitivity and transparency of the U.S. brass rod market, and the U.S. producers' reliance on frequently revised public price lists.

We find that that these same conditions of competition rendered the volume of subject imports from Israel significant by enabling that volume to have significant adverse price effects

---

significant arguments about the impact of supply constraints, or lack thereof, on the domestic industry. … As part of this discussion, the Commission directly addressed, and dismissed, arguments regarding domestic producers' inability to meet domestic demand increase." Slip Op. at 30 (citations omitted).

Similarly, Respondent argues that imports from subject sources other than Israel were larger than subject imports from Israel and a greater cause of any injury to the domestic industry, indicating in its view that subject imports from Israel were insignificant. Respondent's Remand Comments at 6-8, 9. However, the Commission fully addressed in its non-attribution analysis the data regarding imports from sources other than Israel, and found that subject imports from Israel had a significant impact on the domestic industry that was distinct from the impact of imports from other sources. Original Confidential Views at 79-81; Original Public Views at 59-60. The Court upheld the Commission's analysis as to imports from other sources, stating that "{t}he Commission also sufficiently addressed arguments about injury caused by market share gain from lower priced imports from countries other than Israel." Slip Op. at 30-31.

In addition, Respondent argues that, in finding that subject imports from Israel caused U.S. producers' market share and certain financial indicators to decline, the Commission "erroneously assume{d} that such imports were significant enough to cause a significant negative impact." Respondent's Remand Comments at 9. Again, these issues were fully addressed by the Commission in its original determinations, and this Court upheld the Commission's findings on them. As previously noted, the Commission addressed in detail in its price effects analysis Finkelstein's argument that the volume of lost sales as a result of subject imports from Israel was too small to have caused a cost-price squeeze for the domestic industry. Original Confidential Views at 63-65; Original Public Views at 48-49. The Court upheld the Commission's findings, stating that the Commission "cited record evidence to underscore why these arguments were unpersuasive," and quoted from the explanation in the Commission's Views. Slip Op. at 24. The Court likewise upheld the Commission's finding in its impact analysis that the domestic industry "failed to fully benefit from the increase in apparent U.S. consumption and its overall financial performance deteriorated by some measures as it lost market share and sales to low-priced subject imports from Israel which also had significant price-suppressing effects." Slip Op. at 28; *see* Original Confidential Views at 75; Original Public Views at 56.

Because the Commission was affirmed by the Court on these issues, we decline to reconsider them.

and a significant adverse impact on the domestic industry, as affirmed by the Court. Specifically, based on these conditions of competition, the Commission found that seemingly small volumes of sales lost to low-priced subject imports from Israel led to a market share shift and suppressed domestic prices to a significant degree by forcing domestic producers to revise their price lists by cutting prices or forgoing needed price increases to all customers using the price lists, thereby reducing the industry's revenues.[81] By suppressing domestic prices to a significant degree and taking sales and market share from the domestic industry, the Commission found, subject imports from Israel prevented the domestic industry from capitalizing on increased apparent U.S. consumption, causing the industry's U.S. shipments to increase at a lower rate than apparent U.S. consumption, and causing its operating income, operating income margin, and market share to decline while its ratio of cost of goods sold to net sales increased.[82] Having adopted the Commission's analysis of price and impact from the Original Views in its entirety, we conclude that the volume of subject imports from Israel was significant in the context of the relevant conditions of competition because those conditions of competition enabled that volume to have adverse price effects and a significant adverse impact on the domestic industry.

In sum, we find that the volume of subject imports from Israel is significant in absolute terms and relative to consumption in the United States, and that the increase in that volume is significant in absolute terms, in the context of the foregoing conditions of competition that

[81] Original Confidential Views at 63-65; Original Public Views at 48-49.
[82] Original Confidential Views at 74-75; Original Public Views at 55-56.

enabled those volumes to have significant price effects and a significant adverse impact on the domestic industry.

## IV. Conclusion

For the foregoing reasons, we determine that an industry in the United States is materially injured by reason of subject imports of brass rod from Israel found by Commerce to be sold in the United States at less than fair value and subsidized by the government of Israel.